**Joanna Gwin Clow CLAYTON and Joanna Gwin Clow, a minor, by Hugh A. Clayton, her next friend, Plaintiffs,**

v.

**JAMES B. CLOW & SONS, a corporation et al., Defendants.**

**Civ. A. No. 55 C 944.**

United States District Court
N. D. Illinois, E. D.

Dec. 10, 1962.

---

10. Altemus v. Talmadge, 61 App.D.C. 148, 152, 58 F.2d 874; Avery v. S. Kann Sons Co., 67 App.D.C. 217, 218, 91 F.2d 248.

484

Lord, Bissell & Brook, Theodore C. Diller, William H. Hillier, Charles H. Weiland, James J. Walsh, Jean Allard, Chicago, Ill. (Wynn, Hafter, Lake & Tindall, Jerome S. Hafter, Charles S. Tindall, Jr., Greenville, Miss., of counsel), for plaintiffs.

Charles M. Price, James T. Otis, Thomas R. Shaver, Chicago, Ill. (MacLeish, Spray, Price & Underwood, Chicago, Ill., of counsel), for defendants James B. Clow & Sons, Inc. and Earle F. Johnson.

James A. Velde, Lloyd W. Bowers, Chicago, Ill. (Gardner, Carton, Douglas, Roemer & Chilgren Chicago, Ill., of counsel), for individual defendants.

ROBSON, District Judge.

Plaintiffs, by Complaint filed June 27, 1955,[1] seek restitution of 91,200 shares of common stock of James B. Clow & Sons, a corporation,[2] as a part of the testamentary trust of the late Charles R. Clow, Sr.[3] These 91,200[4] shares were the result of numerous stock splits,[5] from the 2,850 shares which had been transferred to the Company by Charles, Sr.'s widow, Hattie[6] (trustee under the testamentary trust), in these four transactions:

1,250 shares at $25 on January 15, 1935
500 shares at $30 on December 24, 1935
600 shares at $50 on April 28, 1938
500 shares at $50 on July 1, 1938

These shares were derived from the 437½ shares[7] which had originally constituted the testamentary trust corpus. The 1,250 shares involved in the first transaction were used by the Company to effect a merger; the 1,600 shares involved in the last three transactions were later transferred to William E. Clow, Sr.,[8] brother of Charles, Sr. and an officer and director of the Company.

The very narrow, and principal, issue in this enormously complicated controversy is whether William, Sr., procured the transfers from Mrs. Pryor of the 2,850 shares of common stock in the Company at inadequate prices, in breach of his fiduciary relations, either express or implied.

The physical proportions of this record and the problems involved are clearly demonstrated by an outline of its statistics. There are some 3,023 pages of transcript of the trial testimony; plaintiffs' exhibits number 2,993 (No. 2992 alone has 230 pages); defendants have 241 exhibits. The total number of pages of these exhibits runs about 6,000. There are additionally some 2,663 pages of depositions; 189 pages of excerpts from William, Sr.'s diary, along with a thick volume, unpaged, of summaries therefrom; about ten court envelopes of pleadings, interrogatories, requests for admissions, rulings, and miscellany. The proposed findings of fact and conclusions of law and objections thereto aggregate 334 pages, and the briefs after trial total 856 pages.

The testamentary trust had been created by the will, executed February 17, 1908, of Charles, Sr. who died on May 7, 1910. The will provided, in part, as follows:

(c) " * * * [Mrs. Pryor] is hereby given the right at any time to sell, assign, transfer and dispose of the whole or any part of said capital stock upon consent thereto given in writing by William E. Clow,

---

1. An Amendment and Supplement No. 1 to the complaint was filed April 18, 1956.

2. Hereinafter referred to as the Company. The Court has not distinguished between the Illinois company and the Delaware company, with which it was merged, called James B. Clow & Sons, nor in view of the disposition of the cause on the merits is it necessary to resolve the controversy as to the right of the Delaware company to be substituted for the Illinois company.

3. Charles R. Clow, Sr. is hereinafter referred to as Charles, Sr.

4. Raised to 92,112 shares by virtue of a 1% stock dividend in December, 1960. 22,800 shares were involved at the time of the institution of suit.

5. 200% on August 9, 1910; 300% on February 14, 1934; and eight for one on May 19, 1942.

6. Hereinafter referred to as Mrs. Pryor.

7. 17½% of the 2,500 shares of the Company then outstanding.

8. Hereinafter referred to as William, Sr. The stock involved in the last three transfers to the Company were later transferred by it to William, Sr., thus: The first block of 500 shares was transferred a few days over six months later; the second block of 600 shares was transferred in two transactions a bit over four months later; and the third block was transferred in five transactions from two to five months later.

Harry B. Clow and James C. Clow, or in case of the death of any of them, then upon the like consent in writing of the survivor or survivors of them and the heirs, devisees, executors and administrators of the deceased."

(d) " * * * [The proceeds] shall be invested and reinvested from time to time in such securities or in such loans as my said Trustee shall elect with the consent in writing of said William E. Clow, Harry B. Clow and James C. Clow, or any two of them. * * * "

In addition to seeking recovery of the shares of stock, plaintiffs seek a monetary recovery of $2,755,071.90, which sum constitutes dividends through December 31, 1959, plus five per cent interest thereon, and the amount of a 1936 dividend note, and interest, which Mrs. Pryor sold at discount to William, Sr. They point out that the defendant Delaware corporation has 294,624 treasury shares and 417,120 authorized unissued shares so it has "ample" shares to provide for the return of 92,112 shares "wrongfully acquired" of the trust corpus. If William, Sr.'s successor-defendants restore the stock for which they are allegedly liable, to the trust corpus, liability of the Company would be accordingly reduced. As to defendant John-son, plaintiffs suggest that the exact extent of his liability abide determination of recovery from William, Sr.'s successor-defendants and the Company.

Plaintiffs assert the right to recover on behalf of the trust estate of Charles, Sr. any shares or dividends which belong to the trust estate whether or not such trust property is distributable to them or to other persons as the beneficial owners thereof, because the trustee has failed to sue therefor.[9]

Charles, Sr. left an only child, Charles R. Clow, Jr.,[10] who first married Linda, by whom he had a child, Charles III. Charles, Jr. procured a California divorce, and remarried to Ella, before the expiration of a year from the divorce. The marriage to Ella was annulled and Charles, Jr. later married the present plaintiff, Joanna Gwin Clow [Clayton], by whom he had a daughter, Joanna Gwin Clow, also a plaintiff.[11] Charles, Jr. died in a plane accident in service on March 1, 1943.

Mrs. Pryor, subsequent to Charles, Sr.'s death, married three times: first to Mr. Lawrence Peters, then Mr. Charles O. Pfeil, and later, Mr. Lawrence Pryor, who survived her. Mrs. Pryor was living at the time of the institution of this suit, but she declined to bring it or join in the suit.[12]

9. Restatement, Second, Trusts, § 282(2), comments h and i; and § 294, comments a and b; also 3 Scott on Trusts (2nd ed.), § 282.1–4. Plaintiffs differentiate defendants' citations as concerning suits for legal interests, not equitable, trust interests or suits involving commingling of trust interest.

Plaintiffs plead not only their own interests, but "the cause of justice in a broad sense, far beyond the righting of the wrongs against the trust estate of Charles, Sr. and its beneficiaries." They seek the re-establishment of "the high standard of loyalty and the moral principles required of all those dealing with trust property and of those doing business within a confidential relationship" and declare that "Once again a court of equity has an opportunity to reaffirm these basic standards of conduct which put trustees and others in whom con-fidence is reposed on a level far above the way of the market place."

10. Hereinafter called Charles, Jr.

11. Joanna Gwin Clow later remarried to Hugh A. Clayton, who acts as the guardian of her daughter's estate. He was by court order (Mississippi Court) authorized to pay a contingent fee of one-half of all sums recovered growing out of the sale of the stock by Mrs. Pryor, trustee, and in addition to the fee, to pay her pro rata share of all court costs and other out-of-pocket expenses.

12. Mrs. Pryor's declination to sue is explained by reason of age (about 76 years) and state of health, but defendants point out that neither she nor Charles, Jr. ever complained about any of the stock sales, nor did Charles, Jr. indicate any dissent. These facts plaintiffs lay to a lack of essential knowledge

Defendants are the Company, the executor of the estate of Mrs. Pryor (the testamentary trustee of Charles, Sr.), Earle F. Johnson,[13] and numerous others,[14] as transferees of this Clow common stock and trustees of trusts or executors of estates to which the stock has been traced.

When Charles, Sr.'s will was executed the corporate by-laws restricted stock sales to nonshareholders by requiring that such stock be first offered to existing shareholders under the same terms. The only common stockholders at that time were his three brothers: William, Sr., Harry B. and James C., and James M. Johnson, who owned ten shares.

Charles, Sr. at the time of his death owed the Company $14,930.

The principal business of the Company since 1910 has been the manufacture of cast iron pressure pipes and fittings. It had pipe plants at Birmingham, Alabama, Coshocton, Ohio, and Newcomerstown, Ohio. Its stock has never been listed or traded on any exchange or over the counter. There had been only seven transfers of the stock up to the time of the transactions here involved.[15]

The ancestor, James B. Clow, in his will of January 5, 1904, bequeathed all his property equally to his four sons, William, Sr., Harry B., James C. and Charles, Sr., except the stock in the Clow Company, which he gave equally to the three sons, excepting William, Sr., but he went on to explain the reason he was excluded[16] was because he already possessed a large block of the stock. The four brothers, sons of James B. Clow, by agreement dated January 30, 1908, agreed that the provision in the father's will "shall be disregarded, and all the capital stock (both preferred and common) * * * shall be divided equally between" them, one-fourth to each. Plaintiffs cite, even this 1904 agreement as indicative of William, Sr.'s overwhelming drive to procure control of the Company.

On April 28, 1932, a document executed by Mrs. Pryor, Charles, Jr. and Linda, and witnessed by Mr. Pryor, followed a suggestion by Mr. Sidney Murray, attorney for the Company. It arose out of the financial necessities of Mrs. Pryor. The Company had suspended common stock dividends in that month and she had borrowed $27,500 on a ninety-day note from a bank. Also, Charles, Jr. had left his first wife, Linda, in August, 1931, and she too had gone to William, Sr. about her financial problems in April, 1932. The advances from time to time were made by Clow Company on Company

---

of the true state of facts, concealed by defendants. Mrs. Pryor was served but failed to appear or file an answer.

13. An officer and director of the Company.

14. Kent S. Clow, Jr., Elise Clow Williamson, Frances Clow Bowers, Nadyne McNeill Clow, Beatrice Clow Johnston, Frances Jones Clow, Donald B. Douglas, Jr., Karen Louise Laflin, Mary Laflin Lamberton and Northern Trust Company, Trustee.

15. In 1894 there were five shareholders; at the time of the first transaction there were 15 stockholders; at the time of the second transaction there were 18 stockholders; at the time of the third and fourth transactions there were 20 stockholders. All were members of or related to the Clow family or key employees of the Company.

16. "I wish to state that the reason for giving no part of the capital stock of James B. Clow & Sons, owned by me, to my son William E. Clow, is that he is now the owner of the same amount of the common capital stock * * * that I own and the owner of a larger amount of the preferred capital stock * * * than I own. A portion at least of said capital stock so owned by my son, William E. Clow, I consider as an advancement made by me to him. If I were now the owner of all the capital stock of James B. Clow & Sons I should provide by my will that my son William E. Clow should receive a larger proportion thereof than either of my other three sons, believing that on account of the aid and assistance he has rendered to me during the past years in the conduct of the business * * * he is entitled to more of the capital stock than his brothers, and this I consider he has already received."

checks and were charged to the personal account of William, Sr. They bore interest at 6%; 1,312½ shares of Clow stock had been assigned by Mrs. Pryor, Charles, Jr. and Linda as collateral.

On November 18, 1935, Charles, Jr. transferred to his mother, Mrs. Pryor, his remainder interest under the testamentary trust, whereupon the Company issued new certificates.[17] Later, on July 26, 1940, this November 18, 1935, transaction was rescinded. These two transactions are important to the respective parties' contentions and the conclusion of this case, as affecting the right or power of Mrs. Pryor to make the challenged transfers to the Company in the interval between the two documents, and as barring a cause of action in plaintiffs.

Also of importance in the solution of this cause is a Mississippi court decree, by consent, entered December 14, 1953, construing Charles, Sr.'s will, as resulting in an intestacy of the remainder interest lodged by the will in Charles, Jr. The will made no specific provision for Charles, Jr.'s predeceasing his mother, the eventuality which actually occurred. As a concomitant to the consent decree, there were executed by the plaintiffs covenants not to sue Mrs. Pryor. All these documents are covered in greater detail later herein.

In ruling [18] upon various motions, including that for summary judgment, Judge Julius J. Hoffman of this Court set out with meticulous detail the facts of the controversy and legal contentions of the respective parties. He concluded that it could not be determined at that time as a matter of law that no genuine issue of fact was involved, and therefore denied the motions. He held the Illinois statute of limitations was inapplicable because this was in essence an equitable cause of action to which the doctrine of laches must be applied, but again, concluded a factual issue was involved preventing disposition of the issue.

While the Court has deep respect for the monumental and magnificent research task the plaintiffs have performed, it nevertheless remains completely unconvinced of the soundness of their premise that William, Sr. engineered a "campaign" to purloin the trust stock from Mrs. Pryor or that the Company, or he, paid less than its full value, *as it was then known or knowable*.[19]

Plaintiffs repeatedly stress statistics and statements by William, Sr. and others which they deem overwhelmingly indicative of fraud, concealment, misrepresentation, chicanery, and a campaign to procure the trust shares from Mrs. Pryor so William, Sr. might have complete control of the Company. They assert that if she had been fully apprised by William, Sr. of all the details of the Company's finances and its mode of operation, he could not have swindled the shares from her at such low values.

The Court believes that if such were the true state of facts, and Mrs. Pryor and her husband honestly believed plaintiffs' theories, she as trustee (and as grandmother), had a duty to protect, and in fact would have fulfilled that duty, to her descendant and would have participated fully and wholeheartedly in the suit for recovery. She was the one, other than William, Sr., who knew the real "pulse" of the transactions. Yet she declined to participate in this cause with a

---

**17.** The new certificates, eight for 500 shares each, were in the name of "Hattie B. Pryor, Trustee under the Terms and Provisions of the Last Will and Testament of Charles R. Clow, Deceased Dated February 17, 1908, and subject to certain Document Between Charles R. Clow and Hattie B. Clow, Dated November 18, 1935."

**18.** D.C.Ill., 154 F.Supp. 108. Many times plaintiffs in their briefs have quoted from the opinion of Judge Hoffman as though he made actual findings whereas he was stating the propositions as outlined by the parties with the inferences drawn in their respective favors, with the final determination to be made upon proof, on the trial.

**19.** Difficult as it might be, the facts of this case must be considered in the light of the climate of the times of these depression transactions, not by the rosier light of subsequent happier times.

stupendous sum at stake. That very declination, informed as ostensibly it later was, carries extreme weight with the Court. It is not convinced that either age or state of health deterred her, rather a reluctance to turn against the only source of succor she had in her long interval of financial distress.[20] Plaintiffs state: "At their deposition in this action Mr. and Mrs. Pryor still believed that William, Sr. had not taken advantage of them or done anything improper." The Court accords great weight to that belief as based on the actualities of the case, not on a masterful fabrication of figures infinitely illuminated by hindsight.

Furthermore, in reaching its conclusion that the Company, and thereafter, William, Sr., breached no possible fiduciary relation and treated Mrs. Pryor with absolute integrity, the Court is deeply influenced by the findings [21] of value of this stock by the Federal Government when confronted with the same problem at the time of imposition of estate taxes on two estates, and the State of Illinois when imposing inheritance taxes. These governmental agencies charged with this task are experts in the field of evaluation of the stock of closed corporations. They have the duty of imposing taxes on a basis which is just to the taxpayer and to the governments—an ascertainment made on accounting facts fully presented at a time fairly contemporaneous with the determination. Yet the values of Clow common stock at which the taxes were levied were below those paid by the Company and by William, Sr.

The Court cannot see how it can be claimed that William, Sr. "exaggerated" the personal problems of Charles, Jr., or deprecated his financial wisdom. Charles, Jr. was a thrice married man, deserted a wife and infant child, was unable to hold a position, and was continually borrowing from his mother. It

seems to the Court that William, Sr. exercised extreme patience and resourcefulness in wrestling with Charles, Jr.'s problems. Nor is the Court unaware of the favorable aspects of Charles' life—his service to country and death in service; his charm of personality. But it remained for someone with business acumen or funds to seek a way to support his mother, wives, and children.

Charles, Jr.'s first wife, Linda, went to Greenville, Mississippi, in April, 1936, and had him arrested. Mr. Pryor and Attorney Hafter secured Charles, Jr.'s release. Linda's divorce proceedings against Charles, Jr. were settled on April 27, 1936, by Mr. Pryor and Attorney Hafter who came to Chicago. They also saw William, Sr. and Attorney Murray. Mr. Pryor and Mr. Hafter had a Clow stock certificate for 500 shares with them and a letter signed by Mrs. Pryor and Charles, Jr. asking that the certificate be cancelled and new ones issued: 200 shares to Linda, 200 shares to a trustee for Charles III and 100 shares for Mrs. Pryor. The divorce decree was entered May 4, 1936, and the stock transferred as requested.

Charles, Jr. at the age of twenty-one was employed by the Company, on May 3, 1926, in the shipping and receiving section. A supervisor reported that Charles, Jr. was not only "no good but a detriment." He went back to work for the Company about April 15, 1930, shortly after his marriage to Linda, but he became ill and was hospitalized and returned to work in the Fall. He left the Company June 24, 1931, to work for the Chicago World's Fair. There was some assertion that Charles, Jr. was not as well treated as others of the younger Clow generation, but the evidence showed that he had no predisposition to hard, consistent work, or regular hours. However, he was at one time paid $24 a week

20. Even the substantial funds Mrs. Pryor inherited from a later husband were dissipated.

21. The dates involved in these two estates while not precisely the same as the challenged transactions were determinations made under conditions comparable to and relatively close to the transactions here involved.

when other employees doing comparable work were earning $14 or $15 a week.

William, Sr.'s conscientious handling of the problem of Charles, Jr. is exemplified by this letter of March 17, 1938, to Mrs. Pryor:

"I was under the impression that you had paid all of Charles' debts. The boy has no realization of penalties for breaking the law. * * * I am told you know that he gave a check to his doctor for $190.00 for services rendered when he had nothing in the bank. Now that means that unless it is paid Charles cannot come into the state of Illinois without being arrested. * * * Assuming that you know all about it and intend to pay the bill, if you will authorize us to make the payment, I think in all probability we can have the doctor accept the amount without any interest and give a receipt to Charles for his debt in full. So far as I know, this is the last debt that Charles has in this part of the country. I hope so, for honestly, Hattie, I do not really need Charles' troubles—I have got enough of mine. * * *"

Evidently there was no reply to this letter because on March 29 William, Sr. wrote a strongly worded letter seeking a reply and received a wire authorizing settlement of the bill, and word of appreciation.

A chronology of events here involved is set forth below.[22]

22. 1860 William E. Clow, Sr. born

1878 Partnership of William E. Clow, Sr. and his father, James B. Clow, formed.

October 4, 1894 James B. Clow & Sons incorporated in Illinois with 2,500 shares, $250,000 capital stock.

1894 By-law prevented sale of Clow Company stock to outsider.

1898 Charles Clow sold 250 shares of stock to brother James, but Charles came back in Company in a few years and was given 10% interest.

February 2, 1899 Amendment to Articles of Incorporation increased capital stock to $500,000.

1908–1935 William, Sr. president of Company.

January 7, 1908 James B. Clow (father of William, Sr.) died, and his will gave all the stock in Company to the three brothers of William, Sr. and none to latter.

January 30, 1908 Agreement of four brothers for distribution of stock between the four brothers rather than the three as provided by father's will, increasing William, Sr.'s holdings from 30 to 37½% and reducing brothers' from 20 to 17½%.

February 17, 1908 Charles, Sr.'s will executed.

April 26, 1909 James B. Clow estate closed.

May 7, 1910 Charles R. Clow, Sr. (husband of Mrs. Hattie Pryor and father of Charles, Jr.) died, at age 46, married 8 years; Charles, Jr. was five years old at the time.

June 10, 1910 Charles Clow will admitted to probate, Cook County, Illinois.

August 9, 1910 Capital stock increased 200% to $1,500,000.

August 9, 1910 200% stock dividend.

1910 Harry Clow, Sr. left Clow Company and later became president of Rand McNally Co.

1911 James M. Johnson sold 125 shares common to William, Sr. and 62½ shares each to Harry B. Clow and James C. Clow.

July 8, 1912 Trust began with 437½ shares of Clow Company's 2,500 outstanding shares.

August 5, 1912 Hattie Clow married Lawrence Peters.

October 14, 1912 Hattie wrote for new certificate referring to conditions of will.

December 25, 1914 James C. Clow, Sr. died.

1917 James M. Johnson died.

1918 Lawrence Peters died in military service.

May 1, 1918 Corporation got 500 shares from James M. Johnson's estate in exchange for 500 shares of preferred and $25,000 cash.

1919 By-law authorizing bonuses.

1922 Hattie married Charles O. Pfeil.

July 31, 1924 Mrs. Pearl Libby Clow sold 458 shares common to William, Sr. for 916 shares preferred.

May, 1926 Charles, Jr. went to work for Company.

September 1, 1926 Corporation transferred 250 shares of common for 375 shares of $100 preferred stock to Frances Jones Clow (Mrs. Kent Clow).

*Outline of Plaintiffs' Contentions*

Plaintiffs predicate their cause of action on these four bases:

(1) The existence of breaches of an *express trust* under the "consent" provisions (Article Third, Clauses (c) and (d) quoted above) of Charles, Sr.'s will through (a) self-dealing by William, Sr. and the other advisory trustees, and (b) the lack of written consents of all re-

October 19, 1926 Corporation transferred 250 shares common to William, Jr. and family for $37,500.

1927 Charles O. Pfeil died.

1928 Clow Company purchased assets of National Cast Iron Pipe Company for $3,500,000.

May 31, 1928 Appraisal of the Company made by Coates and Buchard.

February 1, 1929 Trust indenture. Company borrowed $3,000,000 on 5½% first mortgage bonds payable $300,000 each February 1, 1931–February 1, 1938 and $600,000 February 1, 1939.

March 4, 1930 Charles, Jr. and Linda married.

January 17, 1931 Charles R. Clow III born.

June 24, 1931 Charles, Jr. left Clow Company.

March 1, 1932 $1 dividend on common stock.

April, 1932 Clow Company suspended dividend on common stock.

April 28, 1932 Loan agreement between William, Sr. and Hattie, Charles, Jr. and Linda whereby 1312½ shares were pledged; 6% interest.

January, 1933 Louis L. Barth, Hattie's father, died.

August 4, 1933 Harry B. Clow died leaving wife Elizabeth, son Harry and daughters Helen and Marion. U.S. fixed value of common stock shares for estate tax purposes at $18.75; Illinois placed the value at $12.50 for inheritance tax purposes.

February 14, 1934 Amendment increasing common capital stock 300% to 30,000 shares, $3,000,000, and the stated capital to $4,000,000.

February 14, 1934 300% stock dividend.

October 3, 1934 Interlocutory divorce decree of Charles and Linda in California, No. D–120312.

November, 1934 Charles, Jr. married Ella Hall.

December, 1934 Hattie in Chicago.

1935 William, Sr. became chairman of Board of Company; William, Jr. became president.

January 25, 1935 Company acquired 1,250 shares from Hattie at $25.

February 18, 1935 1,250 shares of Mrs. Pryor transferred into name of Company.

March 29, 1935 1919 By-law re bonuses repealed.

April 1, 1935 Linda moved to set aside California interlocutory divorce decree which was effected.

October 1, 1935 $3.50 preferred stock dividend.

November 18, 1935 Agreement—assignment of Charles to Hattie of all his interest in the Clow stock in the testamentary trust.

November 24, 1935 Hattie came to Chicago.

December 2, 1935 $3.50 preferred stock dividend.

December 10, 1935 Letter of Mr. Murray to Mr. Hafter.

December, 1935 Stock acquired (500 shares at $30, $15,000).

December, 1935 Attorney Hafter came to Chicago and conferred with William, Sr., Earle Johnson and Sidney Murray.

January 2, 1936 Second sale of stock by Hattie of 500 shares to Company.

February 19, 1936 Recordation in Mississippi of November 18, 1935, contract of Charles, Jr. and Hattie.

April, 1936 Linda had Charles, Jr. arrested in Greenville, Miss.

April, 1936 Property settlement, Charles, Jr. and his wife, Linda.

April 28, 1936 100 shares of stock transferred on corporate books in Mrs. Pryor's name alone.

May 4, 1936 Final decree of divorce; Charles, Jr. and Linda, Cook County, Illinois, 36 S 6001.

May 12, 1936 Revised by-law re bonuses.

July 10, 1936 Corporation sold 500 trust shares to William, Sr. at $30.

September, 1936 Valuation for Linthicum estate.

July, 1937 William, Sr. bought $18,600 preferred dividend notes of Mrs. Pryor for $15,309, discount of $3,300.

August 21, 1937 Charles married Joanna.

December, 1937 Mrs. Pryor owed about $23,000 on crop loan.

April, 1938 Company acquired 600 shares from Hattie at $50 a share.

July 21, 1938 Company acquired 500 shares from Hattie at $50 a share.

1940 Charles joined Canadian air force.

quired persons to the purported sales by the trustee.

(2) The presumption of fraud arising out of the purchase of property by or for the benefit of William, Sr. as the dominant party in his *confidential relationship* with Mrs. Pryor as trustee, and her son, as the servient parties in that relationship, and the failure of defendants to overcome such presumption of fraud by an affirmative showing that the transactions were fair, including full and frank disclosure of all the material facts and the payment of a fair and adequate price on each of the four acquisitions of trust stock.

(3) The *actual fraud* on the part of William, Sr. and the Company through concealment and misrepresentations of material facts on each of the four acquisitions of trust stock, and through William, Sr.'s calculated, persistent campaign to acquire the trust stock for himself.

(4) The breaches of *fiduciary duty owed by William, Sr. in his capacity as the principal officer, director and controlling stockholder* of the Company to Mrs. Pryor as trustee, in her capacity as a stockholder of the Company, requiring him to make full disclosure to her of all material facts before purchasing stock from her, purportedly for the Company.

More specifically, as to the first contention, plaintiffs maintain that in requiring the brothers' or their heirs' consents to the sale of the Clow stock by Mrs. Pryor as trustee, and the reinvestment of the proceeds, it was Charles, Sr.'s intent expressly to make the consenters trustees for the benefit of his young and inexperienced wife and infant child. They contend that the sales without such consents were beyond the power of Mrs. Pryor as trustee to make, and ineffective because all the required persons[23] did not consent. Plaintiffs predicate the liability of the Company and Mr. John-

July 26, 1940 Rescission of document of November 18, 1935, by Charles, Jr. and Hattie Pryor.

July 29, 1940 Rescission submitted to corporation.

August 9, 1940 Corporation cancelled certificate for remaining 2,000 shares to Mrs. Pryor as trustee.

October 10, 1940 Charles, Jr. will.

January 2, 1942 Plaintiff, Joanna, Jr. born.

May 18, 1942 Letter of William, Jr. to sister Martha and husband.

May 19, 1942 Amendment permitting 8–1 stock split from $100 par to $12.50 par or 240,000 common shares.

September 14, 1942 William, Sr. died at 82.

March 1, 1943 Charles, Jr. died in service.

May 21, 1943 Charles, Jr.'s will admitted to probate in Mississippi.

1952 Kent died.

1953 William, Jr. died.

1953 James Beach Clow died.

July 18, 1953 Hattie's suit in Mississippi against Gwin and mother re will.

December 14, 1953 Mississippi consent decree determined equitable ownership of stock held in trust as part of settlement; plaintiffs executed covenants not to sue re application of 2,850 shares theretofore sold.

June, 1954 Attorney Sidney Murray died.

1955 Pearl Libby (Mrs. James C.) Clow died.

June 27, 1955 Instant complaint filed.

July 1, 1955 Illinois corporation's merger with Delaware corporation named James B. Clow & Sons, Inc.

August, 1955 Mrs. Pryor served.

August 28, 1955 Illinois corporation served.

April 18, 1956 Amendment and supplement to complaint.

July 12, 1957 Opinion of Judge Hoffman: D.C.Ill., 154 F.Supp. 108.

June 1, 1959 Hattie Pryor died.

November 16, 1960 Lawrence B. Pryor, Executor of Will of Mrs. Pryor, was substituted as defendant. He never appeared or answered.

23. William, Sr., James Beach Clow, Pearl Libby Clow, Harry, Jr., Elizabeth McNally Clow, Helen Clow and Marion Clow. Plaintiffs specify Elizabeth McNally Clow, Helen Clow and Marion Clow as having consented to none of the four transactions. They state that consents of some consenters to some transactions were invalidated because of William, Sr.'s alleged failure to disclose vital facts to them; and some consents were allegedly invalid because of "self-dealing." Furthermore, William, Sr.'s confidential relation with Mrs. Pryor and

son on their alleged participation in the asserted breaches of express trust and confidential relationship having full knowledge thereof.[24] Plaintiffs do not predicate their claim upon unjust enrichment, but solely upon tracing trust property. While they have no objection to these defendants' proving the amounts they have paid for income tax on the dividends on the disputed shares, they deem such evidence irrelevant because it could not reduce their liability to plaintiffs, and "if any defendants paid taxes on property or income that does not belong to them, they should apply for tax refunds." [25]

The plaintiffs assert that the consents of Charles, Jr. and Mrs. Pryor to the four transfers of trust stock to the Company were ineffective because they were executed without knowledge of the material facts relating to the transactions, the consents being prepared by some of defendants and given with the inference that they were approved by the Company's counsel, Mr. Sidney Murray.

Plaintiffs maintain that prohibited self-dealing in the trust property, by an advisory trustee expressly named in the will, in itself requires that the acquisitions be set aside, without regard to their fairness or the adequacy of the prices paid. They predicate this position on the rule "unyielding and inflexible" against self-dealing, stated in Bennett v. Weber, 323 Ill. 283, 294, 154 N.E. 105, 109, where it was said:

"A trustee cannot purchase from *himself* or at his own sale. The law does not stop to inquire into the fairness of the sale or the adequacy of the price, but stamps its disapproval upon a transaction which creates a conflict between the self-interest and integrity of the trustee." (Italics supplied.)

Laches, plaintiffs claim, do not bar their suit because they had no knowledge of any of the material facts on which the cause of action is based until shortly before the filing of the complaint and until after discovery herein, or knowledge, even, that William, Sr. had purchased all 1600 shares involved in the last three transactions. They state there was no lack of diligence on their part, nor was there even a duty of diligence, because of the confidential relation. Furthermore, since Charles, Jr. had only an equitable reversionary interest, it did not come into possession until after Mrs. Pryor's death on June 1, 1959, and there has been no prejudice because the suit was not brought earlier.

Plaintiffs also maintain that the covenants not to sue, given Mrs. Pryor in settling the 1953 Mississippi litigation did not release her or any of the defendants as to the subject matter of this action for making the sales, but only as to

Charles, Jr. lays on defendants the burden of proving good faith, full disclosure, fair and adequate price, and no imposition.

24. Plaintiffs trace the trust shares in William, Sr.'s estate, numbering 12,800 descending to his three children equally so each received 4,266.667 shares, which descended through them to others, generally not for value. Plaintiffs trace 11,965.362 of such shares to heirs and transferees of William, Sr.; William, Jr. retransferred 1415.272 to the Company which cancelled them, and plaintiffs seek to hold the Company for them as well as for 580.634 shares which have been traced to the Delaware Company which distributed them to its employees. There are other shares traced and table presented of the amount each holds. They seek to hold defendant Johnson and the Company by minutely pointing out the details constituting their "full knowledge" and participation in the breaches of express trust and confidential relationship by William, Sr.

25. A more timely assertion of plaintiffs' claim would possibly have precluded this item, and might even now be precluded by time bar. Plaintiffs, while pointing out their consistency in asserting impropriety in the transfer on April 28, 1936, of the 400 shares in settlement of Charles, Jr.'s first wife's divorce suit and trust for his first child, Charles III, state they do not now make claim therefor because none of these defendants received any direct benefit therefrom.

the money received by Mrs. Pryor in these transactions. Furthermore, the covenants were executed in Mississippi where the release of one joint obligor does not release others unless there is clear intent so to do.

Secondarily, plaintiffs contend that there was a confidential relationship between William, Sr. and Mrs. Pryor, her husband, and her son, from which a presumption of fraud arises, which presumption was not overcome by evidence adduced by defendants. The confidential relationship was the result of many aspects of the dominant-servient relationship between them. Thus plaintiffs state that "The development of a sense of absolute confidence in him by Mrs. Pryor was the cornerstone of William, Sr.'s success in obtaining Mrs. Pryor's trust stock. He played skillfully and in harmony upon each of his separate relationships with her, weaving them into a single strong tie of unshakable trust and confidence in him. He used to the maximum the family relation, the express trust relation under Charles, Sr.'s will, his relations as an officer and director to her as a stockholder, his professed solicitude for her welfare and his repeated assurances that he always put her interest ahead of his own as a trustee should. Thus he won her absolute trust and confidence. Without it he could never have succeeded in his campaign to obtain her trust stock."

Plaintiffs go on to assert that Mrs. Pryor had no independent advice, other than from her husband and son, neither of whom had more information than she, and there was a duty on the part of defendants to inform them all of the material facts.

The fourth position of plaintiffs is predicated on the premise that William, Sr. and his brother's sons, Harry, Jr. and Beach, held a total of 82.5% stock interest in the Company and William, Sr., as a trustee "violates his duty if he sells trust property to * * * a corporation in which he has a controlling or substantial interest." (Restatement, Second, Trusts, § 170(i); Kinney v. Lindgren, 373 Ill. 415, 422, 26 N.E.2d 471 (1940))

In the margin are set forth briefly some of the many alleged facts plaintiffs deem indicative of William, Sr.'s motive to acquire a controlling interest in the Company.[26]

26. 1. Sale by the Company of treasury stock to members of his family without authorization of other directors or offering it to other stockholders.

2. Tabulation frequently in William, Sr.'s diary of subtotal or unit subtotal of shares owned by William, Sr. and his family.

3. Refusal to permit Earle F. Johnson and his brother-in-law, John A. Byers to buy treasury stock.

4. William, Sr. voted by ownership or proxy from 1928 to 1942 (except when out of the country in 1937) not less than 61% to 90% of the common stock, during which time he and his sons were active members of the board of directors and dominated corporate activity.

5. Salaries and bonuses of officers were always fixed by William, Sr. without consultation with other officers, and bonuses were paid by William, Sr.'s personal checks.

6. By procuring the first transfer of 1,250 shares by Mrs. Pryor to effect merger for income tax benefit to Company, William, Sr. was able to maintain his majority control of 51.94%; by the other plan of each common stockholder transferring pro rata holding, William, Sr.'s control would have been reduced to 49.78%.

7. The other three transfers were by Mrs. Pryor to the Company, and then to William, Sr. at the same price, only in deference to Company counsel's advice that the circuitous route be adopted and a waiting period necessary to avoid appearance of prohibited self-dealing.

8. The last three transactions were without the consents required by the will.

9. Mrs. Pryor had sufficient common stock to warrant her election of a director but she was never invited to do so.

10. A confident letter from William, Jr. of December 8, 1933, to Continental Bank, including a Federal Public Works press release as to business for the last quarter of 1933, being aided by Government expenditures; and another letter of December 12, 1933, requesting loan.

11. Mrs. Pryor was not told of the large and unauthorized salaries and special bonuses paid to William, Sr. and his

They believe those facts, with others, conclusively prove William, Sr.'s overwhelming desire to control the Company at any cost, and that he went to very great lengths to defraud Mrs. Pryor and to delude her and her son and others into parting with their stock when they had no alternative in their financial distress.

*Outline of Defendants' Contentions*

The Court will consolidate for consideration both branches of the defendants, the individuals and the Company. It is the defendants' position that:

1. Plaintiffs have no standing because under the will of Charles, Sr., Mrs. Pryor became entitled to the corpus of the trust if Charles, Jr. predeceased her, as he did.[27]

2. Plaintiffs have no standing because Charles, Jr., through whom they claim, transferred his interest to his mother by agreement of November 18,

sons, or the large advances to them without authorization or ratification.

12. William, Sr. made many offers to buy the stock from Mrs. Pryor; he urged her to spend more money; he had the Company lend her funds so she might be compelled or more willing to sell trust stock to him; charging 6% interest secured by pledge to him personally of the stock, yet no interest was charged to other stockholders or relatives and no security taken from them; he had the Company cut off loans to her and not to the others; threatened to call her loans; refused to grant her loans, particularly in 1938 when loans were freely granted to others; magnified Charles, Jr.'s marital difficulties, warning her he might be put in jail.

13. Advances were made monthly from the Company to Pearl Libby Clow, and thereafter paid from dividends.

14. Mrs. Pryor was not informed that although she had been told William, Sr. and his sons were not paid the last two months of 1932, they were paid in January of 1933 sums covering those nonpayments; that there were "window dressing" operations of the Company which were admitted to the Continental Bank.

15. William, Sr. never had the stock's value appraised before a transaction nor did Mrs. Pryor or her son consult anyone as to its value; nor did he reveal the stock was really being sold to him, nor the excellent earning prospects of the Company for 1936. He concealed from her the prospects of the Company and its satisfactory earnings for 1938. He told her the Company could not make her loans under the law of Illinois.

16. The prepayment in June, 1938, of preferred dividend notes due in December, 1941, amounting to $145,600, which would be the equivalent of $4.85 a share on common stock.

17. The contrasting gloomy statements to Mrs. Pryor and the glowing ones to the Continental Bank with respect to Company finances.

18. The November 18, 1935, document by Charles, Jr. conveying his trust interest to his mother was induced by William, Sr., in derogation of his duties under the trust, and therefore the defendants may not take advantage of that document. Mrs. Pryor never paid the contemplated consideration for that document.

19. The consents of Mrs. Pryor and Charles, Jr. to each of the four transactions were prepared by the Company or its counsel and being sent for their signature carried implied inference they were correct for them to sign. They were not advised of several material facts such as her lack of authority to make the sale, lack of required consents, material facts relating to business prospects of the Company, the self-interest of William, Sr. She had no independent advice. Charles, Jr. was similarly situated.

20. The covenants plaintiffs executed in December, 1953, expressly stated they were not a release of anyone else than Mrs. Pryor, and as to her only for the money she received from the sales, and not as to her liability as trustee; that under the law of Mississippi release of one joint tortfeasor does not release others.

21. Plaintiffs state that neither they nor Mr. Wynn, Charles, Jr.'s executor, had knowledge of the facts of the case until a few weeks before the complaint was filed and therefore they are not barred by laches; they did not learn until the discovery in this cause that William, Sr. had purchased the stock.

22. Charles, Jr.'s heirs did not come into possession of the equitable reversionary interest until Mrs. Pryor's death on June 1, 1959, and laches could not begin to run until that time.

27. Defendants claim that the failure of Charles, Sr.'s will to specify what hap-

1935, and also because he approved each sale.[28]

3. Plaintiffs' claims are barred by the five-year statute of limitations and by laches.[29]

4. The shares plaintiffs seek were received by Mrs. Pryor as dividends and she was entitled to keep them, and had the right to dispose of them.

5. The "consent" clause (c) of Charles, Sr.'s will was made solely for the benefit of the other members of the Clow family, and only they can complain, and failure to object was equivalent to

pened to the trust stock if the son predeceased the life tenant meant it was not to go as intestate property, but to go under the residuary clause to the mother; the lawyer who drew the will made no mention of intestate property in his final report, and, having worked with the Company would not have wanted the Clow stock to have been subject to a court guardianship. And, there is a presumption against intestacy.

28. It would not be reasonable to suppose that Charles, Sr. meant by the restriction in his will to prevent his brothers, by reason of the "self-dealing" principle of the trust law, from buying his stock, inconsistent with the by-laws of the Company which required that they be granted the privilege. They also point out that when Charles, Sr.'s will was drafted the law of Illinois was not certain that the by-law was legal, and the provision was put in the will in case the by-law was held illegal.

The by-law restriction of 1894 provided that the stockholder should not sell to an outsider without first giving ten days' notice of his intention to make the sale; stating the name of the purchaser, price, and terms and conditions of sale; that the stock certificate be deposited with the president for ten days; that any other stockholder had the right to purchase such stock at the same price and conditions. Clow Company contends Harry's widow's and daughter's consents were not necessary because they were not heirs of his Clow stock in that he left it in trust to his son, and since they did not in fact inherit through intestacy [citing Butterfield v. Sawyer, 187 Ill. 598, 602, 58 N.E. 602, 52 L.R.A. 75 (1900); Lawwill v. Lawwill, 29 Ill.App. 643, 647 (1889)] and in any event there was substantial compliance with the consent provision because Harry, Jr. discussed the sale of Mrs. Pryor's stock with his mother and sister.

Defendants cite Sharp & Dohme v. United States, 3 Cir., 144 F.2d 456, 458, as indicating that where the plaintiffs were not the persons meant to be benefited by the consent provision, they have no right to enforce it.

Defendants also point out that the only market which Charles, Sr. could have foreseen was to other members of the family, as indicative of the testator's intent that the "consent" provision was for the benefit of the shareholders of the family enterprise. They bolster this conclusion by the fact that the more limited class of those required for consents to reinvestment, i. e., the testator's brothers, whose judgment was sought after, whereas the earlier provision for consents to sale of the Clow stock included the brothers' heirs. Those heirs, they point out, might have been children, incapable of giving valuable advice.

Defendants also note that Charles, Sr. was cognizant of the by-law provision when in 1898 he sold 250 shares of stock to his brother James C. Clow, and procured their written consent, which was the only sale to that time when the will was drawn in 1908, so it must have been contemplated sales of the stock would be to the family.

29. Laches are predicated on the deaths of important people: William, Sr. died in 1942; Charles, Jr. in 1943; Kent in 1952; William, Jr. in 1953; James Beach Clow in 1953, and Sidney Murray in 1954. Some documents are also gone which leave gaps in the evidence prejudicial to defendants. The life estate of Mrs. Pryor did not excuse the delays because Charles, Jr. had all the sources of knowledge of the sales, to whom made, the purchase price, the number of shares, and could have withheld his consent until satisfied, and as a trust beneficiary could have filed suit immediately after any of the four transactions, the same as plaintiffs.

Laches begins to run not when the beneficiary reasonably learned of the matters he complains of, but when he should with diligence have learned of the claims, and the evidence shows that Charles, Jr. or Mr. Wynn either had knowledge of the facts or should have had knowledge. Plaintiffs can not now complain of lack of consents on the sale when Charles, Jr. and Mrs. Pryor took the proceeds of those sales and failed to complain.

assent.[30] It is a question of fact [31] whether "consentors" are fiduciaries, and even if they are, courts have refused to apply the rule against self-dealing when the evidence indicated the creator of the trust did not intend to prevent him from purchasing trust property.[32]

6. The Mississippi decree construing Charles, Sr.'s will was by consent and pertained only to the shares then in the trust, and it was by the Clow Company's consent that the stock was placed in Mrs. Pryor's name.

7. William, Sr. was not a trustee and Attorney Murray's calling him one did not invest him with that stature. Mrs. Pryor was the only trustee.

8. The July 26, 1940, rescission document did not void *ab initio* the prior executed sales and affected only the 2,000 shares mentioned therein, and did not cover the 3,250 shares theretofore transferred.

9. Defendants deny there was self-dealing, actual fraud, or presumed fraud arising from a confidential relation or nondisclosure.

10. The stock which Mrs. Pryor sold, she had received as dividends and she therefore had an absolute right to use dividends.

11. Defendants deny the inadequacy of valuation by the Company or William, Sr., or the invalidity of advances and loans to others, officers or employees of the Company or their close relatives.

Many are the alleged facts which defendants deem indicative of a lack of fraud on the part of William, Sr.[33]

30. The trust which plaintiffs invoked in 1955 was repudiated with full knowledge of Charles, Jr. as shown by his sale of his interests in 1935 to his mother; by the subsequent sale of Clow stock with his knowledge; by Mrs. Pryor's failure to reinvest the proceeds and use of the funds for her own purpose with his knowledge; by his will without mentioning the stock which had been sold. The repudiation was also known by his attorney and executor, Mr. Wynn. Defendants note the many acts of the Wynn firm—the negotiation of Charles' divorce settlement with Linda, giving her Clow stock, which could only be valid on the basis of the 1938 transfer by Charles, Jr. to his mother being valid. The 1935 document was notarized and filed.

31. Restatement, Second, Trusts, Sec. 185, Comment c (1959) "It is a question of interpretation of the trust instrument in the light of all the circumstances whether the power is conferred upon him for his sole benefit or for the benefit of the beneficiaries of the trust."

32. In re Steele's Estate, 377 Pa. 250, 103 A.2d 409 (1954).

33. a. The passing of dividends was not to embarrass Mrs. Pryor financially but was done because the trust indenture prevented the payment of cash dividends from the Spring of 1932 until the Fall of 1935. Further, it would have been imprudent for the Company to pay any dividends on the common stock between the Spring of 1932 and December, 1936.
 b. Mrs. Pryor's sale of the stock was due to her financial condition only partially brought about by lack of Clow dividends. She had been left a considerable estate by Mr. Pfeil, but the depression reduced it and she was indebted to the Union Planters Bank of Memphis in 1932 for $32,000.
 c. The price of $25 a share for the first sale was determined by the Board and not by William, Sr. The Board fixed the price at $15 to $25. The stock sold on the second transaction became treasury stock and was offered to other family groups but none was interested so it was sold to William, Sr.
 d. Mrs. Pryor used the proceeds from the last three sales for her own purposes free from the trust.
 e. Mrs. Pryor was accompanied by others on her conferences with William, Sr. with great frequency. They lived thousands of miles apart. Mr. Pryor was college trained, a realtor and a plantation owner. He participated in loans from the local banks. Charles, Jr. was in his thirties at the time.
 f. Mrs. Pryor received full advice from the Wynn firm and on that ground alone neither she nor Charles, Jr. was dominated by William, Sr. Mrs. Pryor was not influenced by William, Sr. but generally ignored his advice.
 g. William, Sr. and his family got a controlling interest in the common stock of the Company in 1926 on the purchase of 250 shares from the Company by his son, Kent, and 250 shares by William, Sr. of the 500 shares of stock Mrs. Johnson had sold to the Company; that this

### Mrs. Pryor's Financial Condition

The very fount of this litigation arose from the continued desperate financial condition of Mrs. Pryor during the depths of the depression. Her's was not a unique position. She had requested and received a loan from the Company for $5,000 in November, 1936, to be repaid from anticipated dividends. A dividend of $5 a share in cash and $6 in note, due in 1941 and carrying 3% interest, was declared in December,[34] with Mrs. Pryor receiving cash of $15,500 (not excepting the $5,000 loan) and an $18,600 note. In April, 1937, Mrs. Pryor borrowed $5,000 from William, Sr. against her dividend note, and in July, 1937, she took up the matter of discounting her dividend note with William, Sr. He wrote her back July 8 that the value of her $18,600 note, after deducting the $5,000 was $10,309, and on July 13 she wired him she would sell it for that price. The note was discounted at 4%.[35]

In October, 1937, Mrs. Pryor was hospitalized and went to Florida to recuperate, and Mr. Pryor wrote William, Sr. at that time:

"It is quite true that Hattie has received some handsome dividends but we have used them in helping Charles to equip his place and in making permanent improvements here. I do not feel that a dollar has been spent unwisely but it makes it difficult at this time when we are netting about $30 from a bale of cotton whereas the same bale netted about $90 last year.

"If within the next sixty days there is a possibility of her receiv-

control occurred with the approval of Harry, Sr.; that William, Sr. bought the 500 shares sold by Mrs. Pryor to the Company December 24, 1935, with the approval of Harry, Jr., and Beach Clow, but that his own son, William, Jr., objected to the purchase; that William, Sr. bought the 1100 shares sold to the Company by Mrs. Pryor with the approval of the directors, including Harry, Jr. and Beach, and again William, Jr. objected. William, Sr.'s intent was to prevent acquisition by outsiders of Clow stock through Mrs. Pryor's involvements. If James C., Beach, or Harry, Sr. and Harry, Jr. had detected an improper motive in William, Sr.'s acquiring the stock they would have defeated it.

h. Charles, Jr. consented to each sale when he was between the ages of 29 and 33 at the time of the consents; he had himself worked for the Company. He could have made inquiries or refused to sign the consents; he was not induced to sign by William, Sr. inasmuch as Charles, Jr. was far away from Illinois at the time of signing. Charles, Jr. had conferred with his attorneys in respect to Clow stock on other instances; he had never sought to assail his prior consents. Therefore, the written consents of Charles, Jr. and his later acts of acquiescence completely bar plaintiffs' recovery.

i. On loans made to officers, defendants state that such loans were usually paid off at the end of the year; loans to officers were long customary, and in fact Charles, Sr. owed the Company over $14,000 at his death, which Mrs. Pryor as executor must have known. These loans in no wise affected the payment of dividends.

j. The prices paid Mrs. Pryor were consistent with those of $37.50 paid Mrs. Johnson in May 1918, the price offered Mrs. Pryor at the same time; the $50 paid Pearl Libby Clow in 1924; the $37.50 paid the Company on William, Jr.'s and Kent's purchase of 500 shares in 1926; the $18.75 a share found to be the value of shares held by Harry, Sr. at his death on August 4, 1933, and the value of $54.12 found by the Government to be the value on the death of another shareholder on September 19, 1936.

34. Mr. Pryor wrote on January 26 that "As I told you when I was last in Chicago *it does not seem possible that you all could have been able to accomplish so much but we have always felt that when there was any improvement in conditions James B. Clow and Sons would be the first to take advantage of it.*" This can hardly be considered a criticism of management. (Italics supplied.)

35. A Journal entry for July, 1937, reveals that William, Sr. purchased a dividend note of Mrs. Pryor, face value $18,600, dated December 29, 1936, accrued interest to July 18, 1937, of $69.75, less 4% interest to maturity of $3,317, less $43.75 interest on previous payment on account, making a net purchase price of $15,309.

ing any more dividends it would certainly be a wonderful thing if she could be sent some portion at this time. * * * "

William, Sr. wrote asking the amount he needed and he would try to secure it as a debit against the next dividend. He received a reply from Mrs. Pryor telling of her debts, including one for a new car for Charles, Jr., and asking for $5,000 to pay her's and Charles, Jr.'s debts. The Company advanced the sum and charged it to William, Sr.'s account.[36]

Defendants' Exhibit 91, a memorandum as to Mrs. Pryor (Pfeil), would indicate that she was indebted for $24,500 secured by 1,500 shares of Texas Corporation.[37]

A letter of January 25, 1938, from Attorney Wynn to Mrs. Pryor indicated that she had some $34,000 debts to two local institutions and it was intimated that Mrs. Pryor did not want to go to the Clows again for money, and on February 1 he wrote her "Larry (Mr. Pryor) went to Chicago and I am glad he did not offer to sell any stock." The records of the Southern Credit Company revealed that L. B. Pryor had a balance due them of $23,851.88, secured in part by 1,000 shares of Clow stock, valued at $50 (a valuation requested by them in a letter to Clow Company, although the lender thought the stock possibly had a value of $100 at the time). In a financial statement of L. B. Pryor for a loan of $7,500 made April 11, 1938, there was listed 3,100 shares of common Clow stock at a

value of $310,000. Liabilities at that time totaled $78,800, including $34,650 notes payable, and mortgages totaling $41,400. In an application for a $13,300 loan January 25, 1939, there were listed as assets 2,000 shares of Clow common and 200 shares U. P. Nat. Bank, for a total of $205,600. Liabilities listed totaled $47,600.

One undated letter from Mrs. Pryor to William, Sr. stated her debt to him as $13,565.89 and it was to be paid by deduction of 500 shares from the 4,000 shares the Company held and the proceeds for same should be paid $13,565.89 to William, Sr. and the balance of $1,434.11 to her, the stock being sold for $15,000 or $30 a share.

The Pryors' necessities for the 1938 sales arose out of their crop loss and the need for payment of the crop loan which on April 8, 1938, was approximately $21,409 [38] to Southern Credit Corporation, which plaintiffs say "was vigorously pressing her for payment" and she sought to borrow $20,000 against future dividends which William, Sr. refused [39] offering to buy the stock instead.

Plaintiffs complain that the Company declared, prior to September 12, 1938, only a one dollar dividend in March, 1938, while having earnings in the first quarter of $158,933 and $263,364 for the first month, which would have warranted, they claim, a several dollar dividend, but instead in June, 1938, the Company prepaid $145,600 of dividend notes [40] not due until December, 1941, which would be

36. It is unquestioned that loans made to Mrs. Pryor bore interest. Thus, it is revealed that the April 16, 1937, loan of $5,000 (charged to W. E. Clow) bore 3½% interest. The books of the Company reflect that from May 1, 1932, to November 22, 1935, $923.96 interest was charged against her on principal sums totaling $13,855.38. On the other hand, no interest was charged against William, Sr.'s debt of $15,309.

37. The memorandum goes on to say: "Mr. Melvin Traylor of Chicago is advising her to sell Texas Corporation and she wants us to consent to her selling 600 shares of Texas Corporation and buying Gen-

eral Motors and United Corporation, leaving with us the same margin as at present."

38. A $4.85 dividend could not have been of too much help to a debt of this size.

39. At the end of April, 1938, William, Sr.'s family owed the Company as follows: William, Jr. $98,737; Kent $27,825; Mrs. William, Jr. (Isabelle) $1,200; Mrs. William, Sr. $6,315.

40. $47,004 went to William, Sr. and wife as holders of note dividends (including $18,000 bought from Mrs. Pryor the year before).

equal to $4.85 a share on the common stock. Plaintiffs seem to forget that defendants were denying themselves, as well, of these possible common stock dividends and that the dividend note payment inured to the Company's financial benefit to have this interest-bearing indebtedness off its books.

Nor is there any doubt of Mrs. Pryor's earlier need for money. In a letter of June 3, 1935, she itemized 51 bills totaling $4,024.89, and additional items of taxes and insurance of $1,285.65. In a wire dated June 20, 1935, she stated: "Have not received papers; urgent I have money Saturday morning; people pressing and doubting my promise. * * * " A letter from Greenville Bank & Trust Co. (Greenville, Miss.) to William, Sr., dated December 12, 1935, stated that Mr. Hafter was authorized to settle Mrs. Pryor's and Charles, Jr.'s debt, approximating $13,000, for which were to be returned 4,000 shares of Clow Company common stock and 1,542 shares of U. S. Pipe & Foundry Co. William, Sr., however, was so alarmed over the situation he wrote her he would not turn a share of the stock over to any one but her; that she had no chance of realizing enough money to satisfy a loan she would make, giving the stock as security therefor. Mrs. Pryor then wrote that her chief idea was to protect Charles, Jr. and get the stock out of Illinois.

A very long letter of January 19, 1937, from William, Sr. to Mr. Pryor concerned a $295 debt of Mrs. Pryor for which judgment had been allegedly procured by a creditor who approached the Clows for payment, and William, Sr. was fearful of adverse newspaper publicity and requested authority to pay the debt as against future dividends in case the last dividend had been used up in payment of the Kansas City mortgage. The letter also intimated that Mr. Pryor had been apprised of the Clow Company finances on a visit to Chicago, and William, Sr. further outlined its condition at the time of writing. William, Sr. got a wire back that Mrs. Pryor thought the bill was $125 and that she had paid it the previous December. William, Sr. communicated the wire to the creditor and wrote the results to Mrs. Pryor.[41]

41. "I am very thankful indeed to receive your telegram * * * and immediately telephoned Mrs. Meyers. Now please understand first of all that I don't know Mrs. Meyers, that I have never met her. I only know that Margaret has been buying from her I guess for over thirty years, but I have not said a word to Margaret about our correspondence as I felt that that was a matter that should be entirely up to you and was your private business. I telephoned your telegram to her and she replied that in all the years of her business she had never made a mistake in sending a bill to anyone, that you did not pay her anything at all in December. She said she had a letter from you offering to pay her one half of the judgment if she would accept that amount in full and she had refused it and had heard nothing from you since. I don't want to pay Mrs. Meyers one dollar more than you owe her. * * * She said that she had appreciated your situation and that she had been very considerate in holding off the account; that it was the first account she ever had with anyone in the Clow connection that was not promptly paid, but she did consent to hold off any action until February 1st, although I told her finally that we had authority to pay the account * * * (he recites the items constituting the bill). You will be interested likewise in knowing that of all our common stockholders you stand alone as the only one that did not acknowledge receipt of the dividend and some of the letters I have received I should have framed, and I don't think anyone needed the cash dividend more than you did and there was no one to whom it was sent that I made any suggestions for its use except to you, and that was for the interest I felt in your affairs and not one word of acknowledgment have I received and I don't know whether you have protected your property and I don't know whether you want me to sell the bracelet or not. I hope the improvement in your finances will justify you in having the bracelet returned to you or kept in a safety deposit box until some time when you are in Chicago, but I do want a definite authorization that I can put in the box with the bracelet. I never overlook the fact that I am past 76 years old and have no assurance of staying in this country, and I know very well if I hit the long

It seems to the Court that this letter clearly reveals the characters of the two principal actors in this controversy, to which deduction this Court must attach importance since the plaintiffs or their predecessors did not see fit to bring the suit until after the decease of William, Sr., and Mrs. Pryor herself refused to bring suit or participate therein.

A letter of April 16, 1937, from Kent to Mrs. Pryor reveals the sending of a $5,000 check to her with the understanding she would send the dividend note she had received, as security, with interest of 3½%, stated to be the same as the dividend bore. He added stern admonitions against speculating in commodities.

In June, Mrs. Pryor wired as to the dividend she then expected in order to pay her income tax, to which William, Sr. replied by letter that due to strikes they felt they should buy materials for the future and business had not been as good as expected so it was considered prudent not to declare a dividend at that time.

The patience of the Clow Company is epitomized in this letter from E. F. Johnson, to Mrs. Pryor, dated *December 2, 1933:*

"We are today paying a bill of our customer * * * for $40.04, for work he did for Charlie in September of 1931. * * * This is the only bill of Charlie's that we have paid, but we felt that we just couldn't have an old customer of our company lose because of having given credit to the grandson of Captain Clow. We are, if you have no objections, going to charge this against future dividends payable to you on your Clow stock."

Mrs. Pryor's income in earlier years had been very substantial. According to a May 18, 1932, memorandum re Mrs. Pryor, it was stated that until recently a dividend had been paid of $1,600 a month; another memorandum of May 30, 1932, stated she had received monthly dividends of $1,312.50 and an extra dividend of 10% at the end of the year. A letter to a banker, evidently from Attorney Wynn, dated March 25, 1938, stated that Mrs. Pryor had received $32,000 in dividends for the year 1935, and $20,000 for the year 1936. But her income tax return stated she had received $34,100 for 1936 from the Clow Company. Her income tax return for 1938 took advantage of a $25,000 loss on the capital sale of the 500 shares, taking a 1913 valuation therefor of $50,000. She took a similar $25,000 loss in 1938 for the 500 shares of Clow stock sold to the Company in that year.

On February 29, 1936, the first preferred stock of U. S. Pipe and Foundry Company was retired and Mrs. Pryor received therefor $32,382, on which she paid income taxes on the capital gain. There is no evidence she asked the Clow family as to its mode of reinvestment under the will of Charles, Sr., nor what disposition she made of the proceeds.

*Trustee under express trust*

One facet of defendants' liability is predicated, as above stated, upon William, Sr.'s liability for breaches of an alleged express trust by virtue of his being named in clauses (c) and (d) of Article Third of the will of Charles, Sr. By clause (c) William, Sr.'s, his brothers' and their heirs' consent to sale of the trust's Clow stock was required, and by clause (d) William, Sr.'s and his brothers' consent to the reinvestment of the proceeds of a sale of such stock was required.

Plaintiffs interpret provision (c) not for the benefit of other stockholders, because a Company by-law already so provided.[42]

trail there will be no chance of sending back any word. * * *

"I sincerely trust that you have entirely recovered your health, but will not be foolish enough to leave Miami Beach until you know you are going to have settled weather at the plantation."

42. However, a change in the Company by-law would have rendered such a provision of value to them, and could be in-

The proposed findings of plaintiffs also infer that Charles, Sr.'s will arose out of an awareness from the brothers' agreement, shortly after the father's death, of William, Sr.'s "strong and aggressive" interest in acquiring more stock of the Corporation, and therefore Charles, Sr. could not have intended by the consent provision to confer additional power upon William, Sr. to veto sales of trust stock for his own purposes in derogation of the interest of the trust estate, but rather for the exclusive benefit of his trust estate.[43]

In respect to plaintiffs' contention that the transfers by Mrs. Pryor were invalid because not all of the required consents by members of the Clow family or their heirs were procured approving the transfers, the Court concludes that the fallacy of this contention inheres in the

untenable position that the consent provision was for the benefit of the *cestuis* rather than of the consenters. In line with the conclusion that it was for the benefit of the other stockholders of this closely held stock, it follows that only they for whose benefit the provision was intended have the right to challenge its omission or breach.[44] Plaintiffs' further contention that the consents which were actually procured were ineffective because the consenters lacked necessary information to wise exercise of their right must fail for similar reason.

Plaintiffs have conjured up what seems to the Court a completely tortured construction of the "consent" provision (Article Third (c)). This was a close family corporation with by-laws providing against transfer to others without prior offer to other stockholders—a not unusual

---

terpreted as having been placed in Charles, Sr.'s will to honor the then existing by-law and make his will consonant therewith.

The by-law of the Company adopted at the time of its incorporation in 1894 provided:

"Section XIII. Sale of Stock. No stockholder of this Company shall sell the whole or any part or portion of the capital stock of this Company owned by him to any other person, firm or corporation other than a stockholder in this Company without first having given ten (10) days' notice of his intention to make such sale in writing at some regular or special meeting of the Board of Directors which said notice shall state the person to whom he intends to sell said stock, the price at which said stock is to be sold and the terms and conditions of sale.

"The certificate of stock which is so proposed to be sold shall then be deposited with the President until the date of sale named in the notice and until said ten days have elapsed any stockholder in this Company shall have the right to purchase such stock at the same price and upon the same terms and conditions as it is proposed to sell said stock to the person named in said notice. * * * A reference to or notice of this by-law shall be printed upon each stock certificate issued by this Company."

43. It is just as logical to infer that Charles, Sr. wrote his will shortly after his father's death, and while Charles, Sr.

was a young man, only because of the awareness of death at the time. There is no evidence that the agreement among the brothers, splitting the father's stock equally between them rather than omitting William, Sr. was anything more than a friendly act prompted by true brotherly equality. If Charles, Sr. had no confidence in his brother, William, Sr. he would not have included him in the list of persons to pass upon his widow's reinvestments. The interest of William, Sr., as deduced from the letters he wrote her, seems ample justification for the will including William, Sr.

Plaintiffs argue at length that defendants' assumption that Mr. Wyeth in drawing Charles, Sr.'s will impliedly, knowing of the by-law restriction, inserted clause (c) in the will, is entirely unwarranted. In fact, plaintiffs claim defendants' construction would place an improper restraint on alienation if construed to prevent a sale by his widow to an outsider at a price which the brothers were then unable to meet. (McNulta v. Corn Belt Bank, 164 Ill. 427, 45 N.E. 954 (1897); McNamara v. McNamara, 293 Ill. 54, 127 N.E. 130 (1920)). So, plaintiffs contend, the testator's will should be construed to support its validity. (36 Illinois Law and Practice, Wills, Sec. 208; 3 Restatement, Property, Sec. 243(b)).

44. Sharp & Dohme, Inc. v. United States, 144 F.2d 456 (3rd Cir., 1944); United States v. Smelser, 87 F.2d 799 (5th Cir., 1937).

provision in this kind of situation. The fact that the testamentary trust contained other provisions solely for the benefit of the *cestuis* does not render an interpretation favorable to *other family members*, of the "consent provision" insupportable, inconsistent or illogical.

*The formulators of the by-law and the testator necessarily contemplated "self-dealing" by officers and directors, it being inherent in the purchase of stock in their family corporation.*

The Court is strongly of the opinion that William, Sr. was not a trustee[45] under the provisions of clauses (c) and (d) of the will of Charles, Sr. *He was not so denominated in the instrument while the widow was so called.*

The Court has no doubt in its conclusion that the "consent" provision of clause (c) was *solely* for the benefit of the other members of the Clow family in their common endeavor to keep the Company family-owned. The Company by-law protected the rights of family stockholders so the testator was fully aware that *self-dealing* was *necessarily* contemplated.

It is noteworthy that the scrivener of Charles, Sr.'s will used the word "trustee" in both clauses (c) and (d) when speaking of the widow named to handle the trust estate. Inferentially his failure to so describe the brothers and their heirs in those very same clauses should have significance as indicative of an intent *not* to charge them as trustees.

Plaintiffs claim that since it is a rule of law that wherever possible the Court should harmonize the provisions of a will to avoid conflict (36 Illinois Law and Practice, Wills, Sec. 218, p. 315), the two consent clauses of Charles, Sr.'s will should both be construed as for the beneficiaries' benefit and the brothers trustees under both provisions, otherwise there would be created an irreconcilable con-

flict. This the Court feels is a slurring of ideas—one could well be a trustee under only one provision without conflict arising as to the remaining portions. Be that as it may, however, since the Court has concluded clause (c) requiring consent for sale of the Clow stock was for the benefit of Clow family members and not the testator's heirs, therefore there need be no carry-over of interpretation of trusteeship to all other clauses, but on the contrary there could be a carry-over of the idea of non-trusteeship under the remaining provisions.

The Court believes that one weakness in plaintiffs' case is revealed when they assert (p. 84 of Plaintiffs' Reply to Defendants' Brief after Trial, filed July 17, 1961):

> "As we have already pointed out with respect to the breach of the express trust by William, Sr., since he was an admitted fiduciary with a standard of conduct 'similar to that of a trustee,' *he was bound to act as a trustee in all matters relating to the trust estate. William, Sr.'s fiduciary duties were not limited to his functions under clause (d), i. e., the reinvestment of trust funds. He did not represent himself as a limited trustee.* He told her he was 'trustee of the estate' and that his approval of sales of trust stock was required as 'trustee.' " (Italics supplied.)

If clause (c) be construed as for the benefit of William, Sr. and his brothers, there would be a very substantial basis for the holding of a limited trusteeship, if any, pertaining solely to reinvestments under clause (d).

█ Plaintiffs preclude defendants' interpretation of Charles, Sr.'s will from "surrounding circumstances" because such circumstances may be used only when the language of the will is uncertain or ambiguous, but never to estab-

---

45. The Court is not too impressed by the fact that William, Sr. at one time wrote Mrs. Pryor that he was the "only living trustee"—whether one is a trustee is a conclusion of law which he as a layman would not be able to determine. He was under the impression that he was a trustee because of some such indications from his attorney, Mr. Murray, who the Court believes was so concluding out of an abundance of caution for the protection of his valued client.

lish an intention of the testator not found in the will itself.[46] Since the will does not refer to the by-law, nor does the evidence show the lawyer who drafted the will knew of its existence, it may not be used to show an intent to benefit the consenters personally when the will itself shows the contrary—that they were fiduciaries or advisory trustees. However, it is apparent from a reading of clause (c) alone that it was meant only for the benefit of the other members of the Clow family.

█ Furthermore, plaintiffs claim no gift to or intention to benefit the consenters can be inferred from silence in the will.[47] Nor will the will be construed in favor of the testator's more remote relatives, his brothers, as against his closest relatives, his widow and only child.[48] They say the construction contended for would cut down the value of the trust property held for the testator's widow and child by creating an absolute veto power on the sale of the Clow stock in favor of the testator's brothers and their successors. This would go directly contrary to the fundamental presumption of the law favoring the closest relatives and conforming most nearly to the general law of inheritance. And the presumption is particularly strong here since the trust stock constituted the testator's sole property, so the absolute veto power would be applicable to the entire trust property. Again, the Court feels plaintiffs are citing general rules of will interpretation inapplicable in view of the

exceptional fact situation of a close family corporation.

Plaintiffs point to the alleged subterfuge employed by William, Sr., on the advice of Attorney Murray, that the Company purchase Mrs. Pryor's stock, and after an interval, William, Sr. purchasing the stock himself. There can be no question that the indirect sales were utilized as a protective means deemed appropriate to make sales from Mrs. Pryor legal. Plaintiffs lose sight of the fact that William, Sr. and his attorney were seeking a means to *help* Mrs. Pryor divest herself of stock for which there was no market and to obtain funds of which she was in dire need. The device was employed not to take advantage of her, but to assist her in solving her very pressing and real financial necessities.

The Court is sympathetic to defendants' construction of the will that there was an implied grant by the testator to the defendants of the right to purchase the Clow Company stock. Plaintiffs state this is squarely contrary to the law of Illinois which permits a trustee to buy trust assets only if expressly authorized to do so.[49] They distinguish the Victor v. Hillebrecht, 405 Ill. 264, 90 N.E.2d 751 (1950), case by pointing out that that case did not involve trust property, and the suit was brought by the beneficiary from whom the purchase was made. And in the In re Steele's Estate, 377 Pa. 250, 103 A.2d 409 (1954), case the trustee was put in a conflicting position by the express terms of the trust.

46. 36 Ill.Law & Practice, Wills, § 207, p. 303; Vollmer v. McGowan, 409 Ill. 306, 99 N.E.2d 337 (1951); Dell v. Herman, 365 Ill. 261, 6 N.E.2d 159 (1937).

47. Pontius v. Conrad, 317 Ill. 241, 148 N.E. 17 (1925).

48. Dell v. Herman, 365 Ill. 261, 148 N.E. 17 (1937); Boys v. Boys, 328 Ill. 47, 159 N.E. 217 (1927); Desmarteau v. Fortin, 326 Ill. 608, 158 N.E. 444 (1927).

49. Kinney v. Lindgren, 373 Ill. 415, 26 N.E.2d 471 (1940), where it was said that "A trustee stands in a fiduciary relation and in the absence of express authority to do so he can neither sell trust property to himself * * *."

Plaintiffs assert that defendants are precluded from self-dealing not from any indication of intention by the testator but because of the public policy which imposes a strict duty of loyalty. (Throp v. McCullum, 6 Ill. 614 (1844), People ex rel. Barrett v. Central Republic Trust Co., 300 Ill.App. 297, 20 N.E.2d 999 (1939). They say that defendants are in error in their approach in stating that the testator did not intend to prevent the members of the Clow family from purchasing the stock. The law, they say, requires an express authority to enable a trustee to sell trust property to himself (Kinney v. Lindgren, 373 Ill. 415, 422, 26 N.E.2d 471 (1940)).

Under the Company by-laws, persons whom plaintiffs would hold as trustees, had a specific legal right to purchase before the stock could be sold to an outsider.

Plaintiffs maintain the defendants "in effect, concede by their silence" that there were no written consents to the second transaction; no written consents by Harry, Sr.'s widow and two daughters; the consents actually given to the first, third and fourth transactions were invalid if clause (c) was for the benefit of the trust, and the "purported" consents of Beach, Pearl and Harry, Jr. were invalid by reason of their lack of information and failure to exercise judgment in executing the written consents solicited from them by the Company and William, Sr. They point out that consent without knowledge is totally ineffective.[50] They dispute defendants' interpretation of the word "heirs" and contend it is broad enough to encompass Harry, Sr.'s widow and daughters.[51] They maintain the consent, under clause (c) had to be in writing, so that "substantial compliance" as asserted by defendants by discussion of the sale by Harry, Jr. with his family was insufficient, and furthermore, Harry, Jr. himself had a "pathetic lack of information about each transaction." Plaintiffs claim they are not estopped to assert lack of consents because their trustee failed to obtain them in that they and the trust estate are in no way bound by any breach of trust caused or participated in by the Company and William, Sr., who undertook to procure for Mrs. Pryor all the necessary consents, as advised by Attorney Murray.

As to the obtaining of the requisite consents, defendants assert that under defendants' construction of the will the appropriate consents were procured, but even under plaintiffs' construction they were also obtained in that the widow and daughters of Harry B. Clow are not "heirs, devisees, executors and administrators" the legal title to the Clow stock having vested in Harry, Jr. as trustee and they simply having an interest in income. They claim that the will being drawn in 1908, the word "heir" must be taken as having the meaning it then had, i. e., one inheriting through intestacy.[52] Furthermore, there was substantial compliance in that Harry B. Clow, Jr., testified he discussed the matter with his mother and sisters and they had no objection to the sale. Finally, they maintain that plaintiffs are estopped because Mrs. Pryor did not seek the advice of any of the so-called consenters, leaving it to Mr. Johnson to procure those consents Mr. Murray thought necessary.

■ Defendants dispute that the granting of a power of consent makes the holder a fiduciary and precludes its exercise in his own favor, his status depending on "all the circumstances"[53] and the "relationship of the holder of the power to the trust, as well as the nature of the power, is an important consideration."[54] And even a fiduciary is not always precluded from self-dealing with trust property where the settlor did not so intend,[55] especially where "tes-

50. People ex rel. Walker v. O'Connor, 351 Ill.App. 545, 115 N.E.2d 808; People ex rel. Vestuto v. O'Connor, 351 Ill.App. 539, 115 N.E.2d 810.

51. Bouvier's Law Dictionary (Baldwin's ed.) 1934; 2 Page on Wills (Lifetime ed.), § 1009, p. 117; Harris Trust & Sav. Bank v. Jackson, 412 Ill. 261, 106 N.E.2d 188 (1952); Dillman v. Dillman, 409 Ill. 494, 100 N.E.2d 567 (1951); Illinois Probate Act, Ill.Rev.Stat.1961, ch. 3, § 63.

52. Butterfield v. Sawyer, 187 Ill. 598, 602, 58 N.E. 602, 52 L.R.A. 75 (1900); Lawwill v. Lawwill, 29 Ill.App. 643, 647 (1889).

53. 1 Restatement, Second, Trusts, Sec. 185, comment C (1959).

54. 2 Scott, Trusts, Sec. 185, p. 1358, 2 ed. 1956.

55. In re Mulholland's Will Trust (1949), 1 All E.R. 460; McLengan v. Yeisir, 115 Wis. 304, 91 N.W. 682 (1902).

tator knowingly placed his trustee * * * in a position which he knew might conflict with interest of the trust. * * * "[56]

It is noteworthy that on April 28, 1938, Mrs. Pryor signed a confirmation of sale of 600 shares, at $50 a share, to the Company; the document bore the consent of Charles R. Clow; and that of W. E. Clow, J. B. Clow, Pearl Clow and Harry B. Clow. A similar document, dated July 1, 1938, covering 500 shares at $50 a share was signed by Mrs. Pryor, Charles R. Clow, J. Beach Clow, Harry B. Clow, Pearl Libby Clow and W. E. Clow. Plaintiffs belittle such documents as being prepared by defendants and signed by unenlightened individuals. They were signed by educated adults, *compos mentis*, who sought no further information before signing. The defendants point out that the plaintiffs who sue are barred from raising any question regarding lack of consents because Mrs. Pryor did not seek any advice from any of the so-called consenters and did not seek any consents from them, and inasmuch as she could not claim invalidity on that ground neither can the plaintiffs.

As defendants point out, Charles, Jr., through whom plaintiffs claim, gave his written consent to each sale, the consent stating the number of shares, and the price at which sold. He had been consulted before each sale by Mrs. Pryor. These consents of Charles, Jr., therefore estop plaintiffs.

Clause (d) gives rise to a trusteeship, plaintiffs maintain, because it is the law in Illinois that persons who are given control over the actions of a trustee in the management of trust property are fiduciaries equivalent to co-trustees.[57] They further argue that because William, Sr. was a fiduciary under clause (d) requiring his consent to reinvestment, he was under a duty not to engage in self-dealing, his duty of loyalty not being limited to the reinvestment functions. They cite Wootten v. Wootten, 151 F.2d 147 (10th Cir., 1945), which holds that a trustee may not compete with his beneficiary in the acquisition of property, even though the interest purchased by the fiduciary is not the property of the beneficiary.[58]

The requirement of clause (d) that the brothers or their heirs approve reinvestment was unrelated to sales under clause (c) and simply endowed the brothers with an advisory duty to the actual trustee. The evidence here adduced would amply sustain a finding that the brothers carried out the duty in a highly commendable manner, resulting in the purchase of dividend producing stocks evidently far superior to any investment the trustee herself was capable of arriving at. Mrs. Pryor failed generally, however, to utilize the brothers' capabilities as financial advisors because her desperate financial need left no money available for decisions on reinvestment. She failed to make reinvestments at all of the trust proceeds received from later transfers of Clow stock to the Company. Was William, Sr. to police her actions? The will did not so charge him. Mrs. Pryor, furthermore, was forgiven her breaches of trust by these plaintiffs in the Mississippi consent decree, in their covenants not to sue.

The Court concludes that both under clauses (c) and (d) plaintiffs have set up plausible legal ten pins which all promptly fall when the will as a whole with the backdrop of the close family

56. In re Steele's Estate, 377 Pa. 250, 103 A.2d 409 (1954).

57. Wallace v. Malooly, 4 Ill.2d 86, 122 N.E.2d 275 (1954). Similarly, Gathright's Trustee v. Gaut, 124 S.W.2d 782 (1939); United States National Bank of Portland v. First National Bank of Portland (1943), 172 Or. 683, 142 P.2d 785, 143 P.2d 909; Lewis v. Hanson, 36 Del.Ch. 235, 128 A.2d 819, aff'd 357 U.S. 235,

78 S.Ct. 1228, 2 L.Ed.2d 1283 (1957); Restatement, Trusts 2d, § 185, comment h.

58. The decision went on to hold that " * * * the principle applies if the property purchased by the fiduciary for himself is so connected with the trust property or the scope of his duties as fiduciary, that it is improper for him to purchase it for himself."

Company are viewed in their proper relationship, revealing an unquestionable intent by the testator to give to his brothers and their heirs their established right to purchase the Clow Company stock, and to assist his own widow with their counsel in her reinvestment of the proceeds of such stock should she sell it. There is no escape from such a deduction from the facts herein, meritorious as are the legal principles plaintiffs adduce to thwart such intent when applied to facts to which they more properly appertain.

### Confidential Relationship Between William, Sr. and Mrs. Pryor

Prime reliance is placed by plaintiffs on the existence of a confidential relationship between William, Sr. and Mrs. Pryor. They state that all that is required in Illinois to establish a fiduciary relationship is that "trust and confidence are reposed by one person in another, who, as a result thereof, gains influence and superiority over the other." [59] Further basis is found in the Restatement, Second, Trusts, Sec. 185, which provides:

"Where under the terms of the trust a person has power to control the action of the trustee, if he holds the power as a fiduciary, he is liable for any loss resulting to the trust estate from a breach of his duty as fiduciary. His liability is similar to that of a trustee."

Plaintiffs maintain the evidence of William, Sr.'s confidential relationship is shown by insurmountable evidence—undisputed evidence—so overwhelming that no shadow of doubt remains as to its existence. They assert that defendants "made no effort whatever to prove that any of the pertinent facts regarding any of the four transactions had been disclosed to Mrs. Pryor as trustee, or to Charles, Jr.," so that they as servient parties had "entered into the transactions with eyes wide open and that the dominant party had no advantage through superior knowledge of the pertinent facts. Here it seems clear that none of the stock acquisitions could have been made if the pertinent facts had been disclosed. * * * She would have learned that the passing of the dividends by the Corporation was due in large measure to the huge unauthorized salaries and bonuses [60] taken by William, Sr. and his sons." Plaintiffs also maintain that Mrs. Pryor would have learned she was the only one required to pay interest on loans or to put up security; that she was entitled to elect at least one director thus enabling her to have had access to all the financial and business reports of the Company. Plaintiffs also stress the lack by Mrs. Pryor of "competent and independent advice before completing the transaction." They quote excerpts showing that she sought such advice from no one.

Further, plaintiffs say, "The rigid rule in Illinois is that where the confidential relationship exists the dominant party must show in order to sustain the transaction 'that he made a free and frank disclosure of all the relevant information he had.'" [61] The nondisclosure need not be intentional, nor need it be shown it was relied on. Of the many facts which William, Sr. did not disclose which he should have disclosed and did not, was that which they now contend, that he was not a trustee,[62] and the extent of his

59. Bremer v. Bremer, 411 Ill. 454, 465, 104 N.E.2d 299 (1952); McCartney v. McCartney, 8 Ill.2d 494, 499, 134 N.E.2d 789 (1956). Plaintiffs maintain that defendants erroneously assert that a relation of trust and confidence is not a fiduciary relationship (Bremer v. Bremer, supra; McCartney v. McCartney, supra) and the burden is not on the servient party to show there has been an abuse of a confidential relation. (McCartney v. McCartney, supra.)

60. Information allegedly "buried" in the Company's income tax returns and certified annual audits.

61. Works v. McNeil, 1 Ill.2d 47, 52, 115 N.E.2d 320 (1953); McCartney v. McCartney, 8 Ill.2d 494, 499, 134 N.E.2d 789 (1956).

62. (If he said he were not a trustee he would, according to his own conscience be lying because Mr. Murray had so termed him.)

508

own self-interest in the transactions. Mrs. Pryor and Charles, Jr. were furnished none of the annual certified audits, the detailed monthly financial statements, the income tax returns, the detailed balance sheets, or the profit and loss statements. The short annual reports were insufficient to enable the recipient to determine the value of the common stock. William, Sr.'s letters contained only "fragmentary financial information." Plaintiffs describe the fraud of William, Sr. as "deliberate, continuing and vigorous" and he was "aggressive, ambitious and skillful," guilty of "direct falsehoods," and the record as revealing "a depressing and sordid story of actual fraud. * * *"

They assert that to overcome the presumption of fraud arising out of a transaction within a confidential relationship, the dominant party has the burden of proving fair-dealing, including (1) full disclosure of all material facts, (2) the payment of a fair and an adequate price, and (3) competent and independent advice.[63]

Plaintiffs distinguish the applicability of the case of Harry Alter Company v. Chrysler Corporation, 285 F.2d 903 (7th Cir., 1960), which holds it "incumbent upon plaintiff to prove by a preponderance of the evidence that a false representation was made as to some material fact, that the defendant know of the falsity and intended that plaintiff should rely upon the representation, that plaintiff, in ignorance of the falsity thereof, did rely upon the false representation, and that damage to the plaintiff resulted from its reliance thereon." Plaintiffs point out that that case involved a situation wholly independent of a fiduciary relation and did not involve a trust relation. Plaintiffs state that where there is a confidential relationship, it is wholly immaterial that no misrepresentations were made "once the confidential rela-

tionship is established between William, Sr. and Mrs. Pryor as trustee, the burden is squarely on defendants to establish that full disclosure of all material facts was made to her, that fair and adequate prices were paid, that she had competent and independent advice, and that the transactions were not improperly induced."

Plaintiffs also distinguish the Moneta v. Hoinacki, 394 Ill. 47, 67 N.E.2d 204 (1946) case, which would seemingly require "domination" as a prerequisite to a confidential relationship, as being said in an *obiter dictum*, with citation of a holding not supportive of the *dictum*. Furthermore, William, Sr.'s "superiority and influence over Mrs. Pryor and her son was (sic) so great that it did amount to domination of them."

Plaintiffs dispute defendants' derisive comments that Mrs. Pryor was no longer Charles, Sr.'s widow at the time of the transactions, with citations upholding the proposition that a wife remains a widow despite her remarriage.[64] But, irrespective of a legal relationship, the important fact is that they regarded themselves in a close family relationship. "He was the blood uncle of her son," they say. They cite statements wherein William, Sr. said or wrote he regarded Charles, Jr. as if he were his son. They say William, Sr. "had the full advantage of this (brother-in-law) relationship, enhanced by his blandishments." And he "played hard upon her family ties by discussing the most intimate family matters, even going to the point of discussing her death and with which of her deceased husbands' spirits she should consort."[65]

Plaintiffs are prolific in finding other bases for lodging a trusteeship in William, Sr. Thus, they point out that he made numerous statements, some on the advice of his attorney[66] that he was a

63. Works v. McNeil, 1 Ill.2d 47, 115 N. E.2d 320 (1953).

64. In re Rhead's Estate, 288 Mich. 220, 284 N.W. 706 (1939).

65. It might rather be said that instead of playing "hard" on the family relationship, he was playing extremely light.

66. Despite the ableness of Attorney Murray, plaintiffs do admit he was not in-

trustee, which statements were correct, but even if not correct, it would bear upon defendants' being estopped to deny the trusteeship, the confidential relationship, and the actual fraud of William, Sr. through misrepresentations. Too, William, Sr.'s representations that he was a trustee also "contributed heavily to the creation of a relation of trust and confidence." They refute the assertions were "muddled thinking" on the part of William, Sr. and were "admirably suited to disarm any suspicion." Since Mrs. Pryor was told he was a co-trustee, she was "duty bound to follow his directions." She could rely on his putting the interest of the trust ahead of his own. Plaintiffs label William, Sr. as "the self-appointed guardian of her welfare."

Plaintiffs staunchly maintain that Mr. and Mrs. Pryor had no outside counsel, either legal or financial, on any of the four transactions. If their counsel were present, they were bypassed or represented others.

Defendants, on the other hand, deny there was a confidential relationship between William, Sr. and Mrs. Pryor, or a dominant-servient relationship; that although she had sought William, Sr.'s advice with regard to some permanent solution to her financial problems and he had consulted Mr. Murray and had written her a number of letters with regard to the possibility of creating a trust for herself and Charles, Jr., she consulted first with the law firm of Waring, Walker & Cox in Memphis and later with the Greenville firm of Wynn, Hafter & Lake, and completely rejected Mr. Murray's suggestion for the creation of a trust. The relationship between Mrs. Pryor and William, Sr. during the year 1935 remained as it had been in the past. He saw her but once during the year 1935 and that was when she came with Mr.

Hafter to present the assignment of November 19, 1935.

To refute factually the existence of a confidential relation, defendants point out that it was 25 years at the time of the first transaction since she had been the widow of Charles, Sr. She had married three persons thereafter, each unknown to William, Sr.; to Mr. Lawrence Peters from 1912 to 1918, with whom she lived in California; to Mr. Charles O. Pfeil for the years 1922 to 1927, with whom she lived in Memphis, and then to Lawrence Pryor on January 1, 1932, with whom she lived in Greenville, Mississippi. William, Sr., visited her but once, in 1915, in California.

Defendants deny the imputation that William, Sr. dominated and influenced Mrs. Pryor's decisions, and maintain that she did not to any extent entrust the handling of her affairs to him—the test mentioned in McCartney v. McCartney, 8 Ill.2d 494, 499, 134 N.E.2d 789 (1956). She did not act in all her business affairs under his advice and direction, doing nothing contrary to his wishes (the test in Lipscomb v. Allen, 298 Ill. 537, 132 N.E. 206 (1921)). Nor was his will imposed over hers or influence exerted upon her in making the decision. (Landau v. Landau, 20 Ill.2d 381, 170 N.E.2d 1 (1960)) They point out there is no record of William, Sr.'s having had any part in her handling of the business transactions connected with the settling of Charles, Sr.'s estate. Nor does the record show his having had anything to do with her business transactions during her marriage to Mr. Peters, or her marriage to Mr. Pfeil and the executorship of his estate. She had secured loans of $30,000 with a Memphis bank in 1931 and when she was trying to determine whether to sell some Texas Corporation stock held as security she consulted the President of the First National Bank of

---

fallible in that "he was wrong in sanctioning the subterfuge of having the Corporation hold the stock for six months before retransferring it to William, Sr. He apparently did not advise his client

properly about permitting the pledge of trust stock to William, Sr. and the use of trust funds to pay indebtedness to the Corporation and William, Sr."

Chicago.[67] Her first business contact with William, Sr. was in April, 1932, when she arranged to borrow from the Company so that $150 payments would be made each to her and Linda, the advances to be charged to William, Sr., and bearing 6% interest. At that time she was indebted to the Union Planters Bank to the extent of approximately $27,000.

Mrs. Pryor's independence of judgment, in opposition to any charge of domination, is demonstrated, defendants claim, by her refusal of William, Sr.'s July 30, 1934, offer to exchange some of her Clow stock for dividend paying stock he held. They insist that she had a remarkable understanding of business affairs, was mentally capable of protecting herself from any overreaching William, Sr. might have attempted. She had enough independence of judgment in 1918 to refuse to sell Clow stock to William, Sr. for $150, making a counter offer for sale at $200, which was refused. She had been named executor of two husbands' wills. She had dealings with banks and investment houses. She owed one bank $89,950 in 1933. She had the counsel of, among others, Mr. Pryor, a college graduate, who dealt in real estate. They had a 2,060 acre plantation with some twenty to thirty families thereon. First they grew cotton; then raised beef cattle. He came with her twice to Chicago when a possible first sale of the stock was discussed. She also had the advice of her son, Charles, Jr. Mr. Pryor stated that all the sales of the stock had been discussed by the three. They read the Company's financial statements and kept a file of them. Defendants also point out that Mrs. Pryor had the advice

of Attorney Wynn, a leading lawyer of Greenville and president of the Southern Credit Corporation. The Wynn firm had represented both the Pryors and Charles, Jr. as far back as 1932.

As to the claimed fraud and duress of William, Sr., defendants, denying that there was a personal, confidential relationship between Mrs. Pryor and William, Sr., maintain there was therefore no constructive fraud or burden of rebuttal. They point out that plaintiffs have the burden of proving the existence of such a relation. They state that the concept underlying a confidential relationship is that one person is in a position to dominate and influence the actions of another and that the other, reposing special confidence and trust, is in fact servient to the will of the dominant person. In such a case, fraud is presumed and a constructive trust is imposed upon the property secured by the dominant person who then has the burden of proving that he acted fairly in the transaction.[68] The relationship does not arise as a matter of law from the fact of family relationship.[69]

Defendants cite the 1960 pronouncement of the Illinois Supreme Court delineating the factors to be taken as a guide in determining the existence of a confidential relationship, thus:

> "Factors to be taken into consideration are degree of kinship, if any, disparity in age, health, mental condition, education and business experience between the parties, and the extent to which the allegedly servient party entrusted the handling of his business and financial

---

67. On June 8, 1931, Mrs. Pryor wrote directly to Mr. Traylor thus: "Dear *Mel*: I have thought over this matter considerably and I believe that it is much more advantageous for me to switch from Texas Corporation to General Motors and United Corporation. * * * I hope my small affairs will still receive your usual kind interest to widows and orphans, especially widows." (Italics supplied.)

68. Landau v. Landau, 20 Ill.2d 381, 386, 170 N.E.2d 1 (1960); McCartney v. McCartney, 8 Ill.2d 494, 499, 134 N.E.2d 789 (1956); Lipscomb v. Allen, 298 Ill. 537, 544–545, 132 N.E. 206 (1921).

69. McCartney v. McCartney, supra; Bremer v. Bremer, 411 Ill. 454, 104 N. E.2d 299 (1952); Apple v. Apple, 407 Ill. 464, 469, 95 N.E.2d 334 (1950); Chicago Land Clearance Commission v. Yablong, 20 Ill.2d 204, 170 N.E.2d 145 (1960).

affairs to the other and reposed faith and confidence in him." [70]

They also maintain that to establish the confidential relationship the evidence must be so strong, unequivocal and unmistakable as to lead to but one conclusion,[71] by "clear and convincing evidence," [72] "strong, unequivocal and unmistakable." [73]

In answer to the self-dealing argument of plaintiffs, defendants reply that since William, Sr. was not a trustee under the will for the trust, the principle of self-dealing was inapplicable; furthermore, the sale of the stock was to the Company and exchanged for the minority interest in the National Cast Iron Pipe Company to effect the merger, and the stock was distributed to the minority shareholders of the latter company.

Defendants state that the suggestion William, Sr. made to Mrs. Pryor that the estate be closed and a trust created was actually the idea of Mr. Murray after talking to the Northern Trust Company. In fact, he urgd her to see her own attorneys and she did see the Wynn firm and accepted their advice.

 The Court has studied with great care the decisions of Illinois bearing upon the creation and incidents of the status of a confidential relationship, such as plaintiffs assert existed between William, Sr. and Mrs. Pryor. It concludes that no such legal relationship existed here. There was great cordiality, long friendship, and real interest in each other's affairs. William, Sr. freely gave copious advice, little of which seems to have been followed. He tried to give assistance in solving pressing and perplexing financial distress. He worried about his nephew's recurrent marital problems. But he did not "dominate" Mrs. Pryor, nor was she "servient" to him. She did as she pleased. She consulted attorneys when she felt the need therefor. She conferred with bankers. She talked over her problems with her husbands, and with her son. She was thousands of miles away from William, Sr. during almost all of these transactions, with the exception of brief, occasional visits. She was a capable adult, used to handling very large sums of money and plantations. She was well-traveled. Her expenditures were tremendous. The facts as revealed by this record do not substantiate plaintiffs' assertion of a young and inexperienced widow with an infant child relying upon the predatory patriarch of the family of her first husband, deceased decades theretofore. There can be no question she fully understood the nature and effect of the documents she was executing. She suffered from no mental or physical impediment. She without question entered into the transactions "voluntarily, deliberately, and advisedly, knowing [their] nature and effect, and * * * her consent was not obtained by reason of the power and influence to which the relationship * * * might be supposed to give rise." (Zeigler v. Illinois Trust and Savings Bank, 245 Ill. 180, 197, 91 N.E. 1041, 1047, 28 L.R.A.,N.S., 1112.) [74]

---

70. Cunningham v. Cunningham, 20 Ill.2d 500, 504, 170 N.E.2d 547 (1960).

71. Chicago Land Clearance Commission v. Yablong, supra, 20 Ill.2d at p. 207, 170 N.E.2d at p. 147.

72. Cunningham v. Cunningham, supra, 20 Ill.2d at p. 504, 170 N.E.2d at p. 550.

73. Landau v. Landau, supra.

74. The rule is stated in Jones v. Washington, 412 Ill. 436, 441, 107 N.E.2d 672, 674, thus:

"Factors important in determining whether a particular transaction is fair and just include a showing by the fiduciary (1) that he has made a free and frank disclosure of all the relevant information which he had; (2) that the consideration was adequate, and (3) that the principal had competent and independent advice before completing the transaction."

However, this decision cited Masterson v. Wall, 365 Ill. 102, 6 N.E.2d 161, and Zeigler v. Illinois Trust and Savings Bank, 245 Ill. 180, 91 N.E. 1041, 28 L.R.A.,N.S., 1112. The Zeigler case quoted a still earlier case (Uhlich v. Muhlke, 61 Ill. 499) wherein it was said at p. 197 of 245 Ill. 180, 91 N.E. 1041, 1047, 28 L.R.R.,N.S., 1112:

■ One of the most recent expositions of the law of fiduciary relations in the State of Illinois was in the case of Boryca v. Parry, 24 Ill.2d 320, 181 N.E. 2d 124, decided March 23, 1962. It is very apposite here. The Court there said at pp. 327–329, 181 N.E.2d at pp. 127–129:

"It is conceded that a fiduciary relationship existed between defendant and her mother, with the former being the dominant party, thus bringing into operation familiar and well-settled principles. Where such a relationship exists, *the law presumes as fraudulent any transaction between the parties wherein the dominant party has profited, and the latter must rebut the presumption of fraud by clear and convincing proof that he has exercised good faith and has not betrayed the trust and confidence reposed in him.* If such burden of proof is not discharged by the dominant party, the transaction will be set aside in equity. (Hofert v. Latorri, 22 Ill.2d 126, 174 N.E.2d 866; McFail v. Braden, 19 Ill.2d 108, 166 N.E.2d 46.) *On the other hand, 'if a conveyance was not procured through improper means attended with circumstances of oppression or overreaching, but was entered into by the grantor with full knowledge of its nature and effect and because of his or her deliberate,*

voluntary and intelligent desire, the existence of a fiduciary relation does not invalidate the transaction.' (Clark v. Clark, 398 Ill. 592, 602, 76 N.E.2d 446, 451; see also: Matanic v. Krajach, 392 Ill. 547, 64 N.E.2d 885; Uksas v. Zelensky, 21 Ill.2d 303, 172 N.E.2d 359.) *Transactions between parties to a fiduciary relation, if open, fair and deliberately made, are as valid as transactions between other parties.* Schueler v. Blomstrand, 394 Ill. 600, 69 N.E.2d 328; Winkelman v. Winkelman, 307 Ill. 249, 138 N.E. 637.

"We are in accord with the master and chancellor that the evidence here *precludes any finding that defendant was the aggressor in the transaction,* or that the mother's actions were prompted or induced by misrepresentation, overreaching or fraud on defendant's part. Instead, it appears that *the deed and trust agreement under attack were executed as a result of the mother's own volition after a full disclosure of their nature and upon competent and independent legal advice.* * * *

"Nowhere in the record does it appear that *she .[grantor] suffered from either mental or physical impediment which would affect her ability to know and comprehend the nature and effect of the documents*

---

" 'To render such a transaction valid, it is only necessary to show that the other party had competent and disinterested advice, *or* that he performed the act or entered into the transaction voluntarily, deliberately and advisedly, knowing its nature and effect, and that his consent was not obtained by reason of the power and influence to which the relation might be supposed to give rise.' " (Italics not suplied.)

In Masterson v. Wall, 365 Ill. 102, 112, 6 N.E.2d 161, 166, the Court pointed out:

"It is true that Masterson was in dire financial circumstances when the contract was executed. He had no children to whom he might look for assistance. The * * * plaintiff, to whom he referred both in the will * * * in affectionate terms, refused to render aid and manifest-

ed no interest in his welfare until after the contract and deed were executed. The defendant, on the other hand, had given or loaned Masterson money on several occasions, and it was to him that Masterson was compelled to turn in November, 1934. *The plan of conveying the property to the defendant originated with Masterson. By acceding to his wishes, the defendant undoubtedly prevented Masterson from becoming an object of public, charity or an inmate of a charitable institution. Not a scintilla of evidence, however, even tends to show that any influence was exerted upon him to procure the execution of the contract and the conveyance. The provisions of the contract were such as to provide for him a reasonable degree of comfort in his declining years and to give him peace of mind.*" (Italics supplied.)

*she executed. * * * [I]t appears that a full disclosure of the nature and effect of the instruments was made to her [the grantor] and that she fully understood them.*" (Italics supplied.)

This is not a case similar to Hofert v. Latorri, 22 Ill.2d 126, 174 N.E.2d 866 (1961), where two daughters of the deceased brought an action against their brother and his wife to impose a constructive trust upon a two-flat building conveyed by their father and his wife to the defendants in joint tenancy, the evidence disclosing that the father was 77 years of age at the time of the conveyance and had suffered at least one stroke. The father had constantly consulted with the son about the property. That evidence showed a confidential relationship between the father and son, and was held under the circumstances, sufficient to raise a presumption of fraud and undue influence on the part of the son, and a decree imposing a constructive trust upon the property in favor of the plaintiffs was affirmed where defendants declined to offer any proof before the master and there was nothing in the record to rebut the presumption of fraud and undue influence. The Illinois Supreme Court said 22 Ill.2d at pp. 131-132, 174 N.E.2d at p. 869:

> " * * * Over the years the father had constantly consulted his son about 'what repairs had to be done to the house, who had to do them.' * * * Those were the circumstances that existed when he turned to his son for advice as to what should be done with the property, and they point clearly to the existence of a confidential relationship.

> " * * * What is at issue in determining whether a confidential or fiduciary relationship exists, for the purpose of establishing a constructive trust, is the state of mind of the grantor. *What is required is clear*

*and convincing evidence that he reposed trust and confidence in the grantee.* That state of mind, like any other, can be shown circumstantially. The defendants objected to the admission of evidence that Filippi turned over his bank account to his son with directions to use it to pay the father's bills and to divide the balance with his sisters. That evidence, however, was admissible to show the father's mental attitude toward his son. Unmistakably it established that a confidential relationship existed * * * when the bank account was transferred. * * *

"The defendants made no effort to rebut the presumption of fraud and undue influence that arose from the proof that a confidential relationship existed and that the dominant party had gained from the transaction. * * * There was no showing of adequate consideration, and no suggestion that the grantor had received any independent advice." (Italics supplied.)

"It has been held that a fiduciary relation exists in all cases in which there is confidence reposed on one side and a resulting superiority and influence on the other; likewise, the fiduciary relationship includes not only legal and technical relations * * * but it extends to every possible case in which a fiduciary relationship exists in fact and in which there is confidence reposed on one side and resulting domination on the other. * * * The relationship need not be legal, but it may be moral, social, domestic or merely personal. * * * " (Coppens v. Coppens, 395 Ill. 326, 335, 70 N.E. 2d 54, 59) Where that fiduciary relationship exists, "the burden is upon * * * [the one in the dominant position] to establish by clear and convincing proof the fairness of the transactions between them * * * ." (Ibid. at p. 335, 70 N.E.2d 54 at p. 60) Further statement of the legal principles [75] appears in

---

75. Similarly, see Perry v. Wyeth, 25 Ill. 2d 250, 253, 184 N.E.2d 861, 863 (1962), where it was said:

"It has been well established by this court that the mere fact of blood relationship, such as parent and child, does

Children's Home of Rockford v. Andress, 380 Ill. 452, 465, 466, 44 N.E.2d 437, 444 (1942), where the Supreme Court said: "To establish a fiduciary relationship by parol evidence *the proof must be clear, convincing and so strong, unequivocal and unmistakable as to lead to but one conclusion.* \* \* \* Such relationship being established the burden is on one benefitting by the transfer of property to show that it was procured fairly and without the exercise of undue influence. \* \* \* [T]o establish a fiduciary relation it is not necessary to prove actual frauds." (Italics supplied.)

The Andress case, supra, held that a stock transfer would not be set aside where the transferor had received the "fair value" therefor. In 90 C.J.S. Trusts, § 303, the rule is stated:

> "One of the most familiar doctrines of the law of trusts is that a trustee cannot purchase trust property from himself \* \* \*. The general rule does not apply where the purchase is for the use and benefit of the *cestuis que trust*, at their request; and a sale of the trust property by a trustee to himself for adequate consideration may be upheld where it is made with the consent of the *cestui que trust*, acting with full knowledge and independent thought, the parties being *sui juris* and dealing at arm's length, and there being no concealment of fact or misrepresentation \* \* \*."

Restatement, Second, Trusts, § 2, comment b. states the principles thus:

> "Although the relation between two persons is not a fiduciary relation, it may, nevertheless, be a confidential relation. A confidential relation exists between two persons when one has gained the confidence of the other and purports to act or advise with the other's interest in mind. A confidential relation may exist although there is no fiduciary relation; it is particularly likely to exist where there is a family relationship or one of friendship or such a relation of confidence as that which arises between physician and patient. \* \* \* *If one person is in a confidential, but not a fiduciary, relation to another, a transaction between them will not be set aside at the instance of one of them unless in fact he placed confidence in the other and the other, by fraud or undue influence or otherwise, abused the confidence placed in him.* \* \* \* " (Italics supplied.)

Neither Mrs. Pryor nor Charles, Jr. was a stranger to legal counsel. On many occasions they employed attorneys to assist them in their affairs.[76] A letter dated April 24, 1936, from Mrs. Pryor and Charles, Jr. to the Company, stated the delivery of a certificate for 500 shares of Clow Company stock which was delivered to the bearer, Mr. Hafter, "our attorney," and requesting co-operation with him. When Mrs. Pryor was having financial problems in the summer of 1931, owing the Union Planters Bank of Memphis some $30,000 she had been conferring with Attorney Walker of Memphis, and Mr. Melvin Traylor, *president* of the First National Bank of Chicago, who had advised her to sell her Texas Corporation stock. She had also consulted her father, Mr. Barth, and her son, but nothing in the record shows she consulted William, Sr. in 1931.

Plaintiffs presented evidence of the bookkeeper of Mrs. Pryor's attorneys to refute her consultation as to any of these transactions and to prove they had been

---

not establish a confidential or fiduciary relationship. \* \* \* The proof of such fiduciary relationship must be so clear and convincing and so strong, unequivocal and unmistaking as to lead to but one conclusion."

76. Attorney Wynn drew up a will for Charles, Jr. before he went into Ca-

nadian service; Mr. Wynn acted as executor for the estate. He also acted in having Hugh Clayton appointed guardian of Joanna. Charles, Jr. first came to the firm with his marital troubles. The first charge made to Charles, Jr. was September 14, 1935, and other charges were made to him in 1936, 1937 and 1940.

hired only occasionally and for very specific matters—they were not retained generally. While it might be said they were not hired for representation in these transactions, they were aware of some of them, and knew fully of Mrs. Pryor's private and financial affairs. They were available to be hired if thought necessary. It is inferable they would have spoken up to protect her had they felt protection was needed. Furthermore, her failure to seek their representation or consultation might be deemed significant as indicating her lack of belief that such representation was necessary.

The purchase by the Company of Mrs. Pryor's stock was not a hit or miss matter on her part. Her wire of April 15, 1938, to the Company states:

> "*Charles Larry* [77] *and I had Conference.* Decided Would Appreciate If You Buy Six Hundred Shares My Stock. Would Put Us Out Of Debt. * * *" (Italics supplied.)

It is understandable that plaintiffs deem William, Sr. sustained a confidential relation with Mrs. Pryor by virtue of his own voluntary assumption of the arduous chore of keeping her and her family solvent. The Court is also in full accord that William, Sr. had the duty of full and frank disclosure of all material facts, the payment of a fair and adequate price for stock Mrs. Pryor sold, absence of undue influence, and, where there was no possibility of competent and independent advice, with the principle of law quoted by plaintiffs from the decision of the Illinois Supreme Court in Works v. McNeil, 1 Ill.2d 47, at p. 52, 115 N.E.2d 320, at p. 322 (1953):

> "Where such a relationship exists at the time of a transaction whereby

the dominant party appears to gain at the expense of the dependent party, the transaction is to be deemed presumptively fraudulent and will be set aside unless the one in whom the confidence and trust is reposed establishes its fairness by clear and convincing proof. Clark v. Clark, 398 Ill. 592, 76 N.E.2d 446. Important factors in determining whether a particular transaction is fair include a showing by the fiduciary: (1) that he made a free and frank disclosure of all the relevant information he had; (2) that the consideration was adequate; and, (3) that the principal had competent and independent advice before completing the transaction."

The deposition of Mrs. Pryor revealed that she had discussed the stock transactions with her husband and with Charles, Jr. and they expressed no dissatisfaction whatsoever as to them.

It therefore seems evident that Mrs. Pryor sustained no servient relation to William, Sr. and he no dominant one to her. She conferred with others concerning the transactions. She was wise enough to consult an attorney when she felt she needed one.[78] She acted contrary to William, Sr.'s suggestions when she wished to. The degree of kinship was remote. There was no disparity in age or health. The evidence is not so strong, unequivocal and unmistakable as to lead to but one conclusion by clear and convincing evidence, that a confidential relationship existed as that legal concept has been outlined by the decisions. In fact, the evidence would indicate the very contrary.

Plaintiffs contend defendants have failed to overcome the presumption of

---

77. The statements of Clow Company seem to have been perused by Mr. Pryor at least for on October 16, 1937, he wrote Mr. E. F. Johnson that "In checking through my files I find that I have misplaced my copy of Clows last statement. I will appreciate it very much if you will send me another." It was sent him within two days of the request. It can be inferred from this that not only did Mr.

Pryor keep himself informed—but if he had wished any other information from the Company he would have asked for it, and it would have promptly been sent him. Evidently he did not feel the need for further information.

78. In fact, William, Sr.'s letter to Mrs. Pryor repeatedly admonished her as in May, 1935, to go see her lawyer, and his letter of October 29, 1935.

**516**

fraud raised by William, Sr.'s confidential relation, by showing fair dealing, claiming there was no "full disclosure * * * of all material facts with regard to these purchases of stock, and have not shown that fair and reasonable prices were paid for the stock, in any of the four acquisitions." They state that no annual audits, monthly financial statements, income tax returns, profit and loss statements or detailed balance sheets were furnished the Pryors or Charles, Jr. However, a stockholder does not automatically receive such documentary data, absent a request therefor. Plaintiffs assert the short balance sheet was an inadequate basis on which to determine stock value, which is undoubtedly true. But there is no evidence the Pryors ever sought more or were ever refused any information sought, or misled by any information actually furnished.

Plaintiffs cite many instances [79] of William, Sr.'s contact with Mrs. Pryor and others to substantiate their allegation of a confidential relationship between them, he the dominant and she the servient. The Court, however, reads additionally into these contacts an abiding interest of William, Sr. in Mrs. Pryor, her son's and her grandson's welfare—which interest she needed despite an adult son, three husbands subsequent to William, Sr.'s brother, and numerous other conferees, including attorneys and bankers. It can

see no reason for plaintiffs' feeling that William, Sr., a layman, had a duty to apprise Mrs. Pryor of her responsibilities as a trustee and police her activities when she had lawyers at her beck and call and used them frequently, and who were fully aware of her legal responsibilities.

Plaintiffs contend that Mrs. Pryor had "little or no knowledge of business affairs and demonstrated it most convincingly. * * * She was wholly naive on this— her most important business responsibility" in that she consulted no lawyer, banker, security expert or other trained advisor on any of the four trust stock acquisitions. She kept no records, or separate bank account and never filed fiduciary returns as trustee. The Court believes plaintiffs are in error in this assertion of naivete—witness the self-confident letter to President Melvin Traylor of the First National Bank of Chicago.[80] Her problem was her inability—a common defect—to keep expenditures within income. Also, she was saddled with a son with similar deficiencies.

The Court sees no reason for *penalizing defendants* because the trustee herself was, as plaintiffs called her "as unknowledgeable and improvident as a child" and possessed of "extremely poor business management." *She* was a trustee, *their* trustee, and one plaintiff's grandmother. Defendants should not be

79. Answers to interrogatories reveal that during the period 1930 to 1938 Mrs. Pryor had these conferences in Chicago:
 April, 1932, with William, Sr. and Mr. Johnson.
 December, 1933, unknown with whom conferred, but not William, Sr.
 December, 1934, Mr. and Mrs. Pryor conferred with Clow family members.
 January, 1935, They conferred with William, Sr. and Linda.
 January, 1935, They conferred with William, Sr. and Mr. Johnson.
 November, 1935, Mrs. Pryor and Attorney Hafter conferred with William, Sr. and Attorney Murray.
 April, 1936, Mr. Pryor and Attorney Hafter conferred with William, Sr., Attorney Murray and Mr. Johnson.
 November, 1936, Mr. Pryor conferred with William, Sr. and Mr. Johnson.

 June, 1937, Mr. Pryor conferred with William, Sr. and Mr. Johnson.
 January, 1938, Mr. Pryor conferred with Clow family members and Mr. Johnson.
 April, 1938, Mrs. Pryor and Attorney Wynn conferred with William, Sr., William, Jr. and Mr. Johnson.
 June, 1938, Mr. Pryor conferred with William, Sr., Beach Clow and Mr. Johnson.
 July, 1938, Charles, Jr. and Joanna conferred with William, Sr., Margaret Clow and Martha Sarver.

80. Plaintiffs belittle the letter as perhaps one dictated in whole or part by her attorney and as giving the poor suggestion of selling Texas Corporation shares and reinvesting in General Motors and United Corporation.

made to pay for her ineptitudes, irresponsibility and improvidence.

### William, Sr.'s General Intent and Character

It is necessary in order to determine William, Sr.'s true intent to relate a multiplicity of detail in order to deduce the motivation for his acts. Principally the bases for the determination lay in contemporaneous documents and transactions.

Plaintiffs contend that William, Sr. was "acting solely for the personal benefit and interest of himself and his own immediate family, rather than for the purpose of helping or aiding Mrs. Pryor personally or the trust estate of Charles, Jr. * * *." They glean from fragmentary items an overpowering desire on the part of William, Sr. to acquire common stock of the Company. They read into isolated and innocuous instances an intense greed for this stock in the Company which he founded. Such for example is the fact that at the end of each year the diary reflects the holdings of his own and other families of common stockholders.[31] Plaintiffs ridicule defendants' assertions that William, Sr.'s acquisition of the stock was not "inordinate or avaricious" and characterize a purchase by William, Jr. and Kent's wife of 500 shares from the treasury stock as "plundering" and an "unauthorized raid at an inadequate price" to maintain Clow family control to prevent outsiders' gaining control and making a quick profit to the detriment of the rest of them.[32]

William, Sr. was a man in his seventies at the time of these transactions. He was a happy family man, as is evidenced by his note to Mrs. Pryor on June 10, 1939, thanking her for her wire of congratulations:

"* * * We certainly are to be congratulated. Mighty few couples have been married fifty-seven years and had as happy a life as Margaret

and I have had—for which we are both very thankful."

Harry H. Wolf, certified public accountant for the Clow Company, stated that William, Sr.'s reputation was "excellent, the best." He was described by the present president of the Company, John Madden, as "one of the greatest men" he had ever known, and was held in that regard by the vast majority of his employees. "He had a terrific interest in everybody. He was a hard taskmaster. * * *" Mr. Mannion, senior vice president of the Continental Bank, said that William, Sr.'s reputation for integrity and honesty was good. William Clow, Sr. was not a man without humor. When he had been advised by Mrs. Pryor that she had just spent seven weeks in a hospital from an insect bite, he wrote her on October 23, 1939:

"I am wondering if you realize that you are getting to an age when you have got to take care of yourself. Now suppose you do it or the first thing you know you will be in a heap of a lot of trouble, for I might suggest that at the present time you have got three spirits waiting for you, and you are going to have a terrible time choosing which one you are going to stay with. I do not suppose you have ever thought of this, but you had better do some thinking for like myself you have gotten up to an age when it is mighty easy to step off into the unknown."

Mr. Pryor on his deposition stated that he had never, prior to the filing of this suit, had any occasion to think the Company had been unfair to Mrs. Pryor, to Charles, Jr. or himself, nor did Mrs. Pryor or Charles, Jr. so feel. Mrs. Pryor and Charles, Jr. never expressed any lack of confidence in any of them. None of them, to his knowledge, ever attended a stockholders' meeting; they never asked for a seat on the Board of Directors; there was never a time when he asked

---

31. To the Court this seems but a methodical and orderly bookkeeping of a fact, concededly and understandably vital to William, Sr.

32. Perhaps plaintiffs are presently enjoying the fruits of that perspicacious control, irrespective of this suit, by which they seek to augment their position.

about the Company that he did not get a full, frank answer.[33] *When he was asked whether anything had occurred since the transactions to make him think* *they were unfair, he answered in the negative.*

William, Sr.'s intent, as revealed by excerpts from his letters,[84] shows deep

83. On the whole, the deposition would indicate that Mr. Pryor did not seek to ascertain the information, and had but limited knowledge of the Company's operations.

84. Letter of October 12, 1934: "I offered you a proposition that would give you a small income, a similar one to your son and exactly the same to your grandson. * * * *I have no right to do it and I know the objections that will be raised if I do it.* There is no reasonable probability of your having any dividend on the stock for an unknown time. * * * I am stating these facts to you as a large holder of stock in the corporation, all of that stock being held as collateral for a loan that you are unable to pay. I have no thought or intent of ever taking the subject up with you again, for I have passed into my *75th year* and I do not intend to assume any obligations. * * * *The one and only reason for my so doing is that you, my brother's wife, your son and grandson may be taken care of.* * * * *If you are still not interested in the transfer of this stock to me, I very much prefer that any offer directly or indirectly made by me shall be canceled as of the receipt of this letter by you.* * * *"

Letter of October 22, 1934: "If you can take care of Linda and her baby by giving them some reasonable allowance, *it is far better for me not to buy the stock for I do not want it.*"

Letter of November 1, 1934: "[I]n the meantime consider every and any offer I have made to you in the past as canceled as of this date."

Letter of January 3, 1935: "Mr. Murray said today that it would be absolutely legal and proper for you and Charles to agree to the sale of all of your stock to this company and reinvest the whole amount in securities acceptable to you, Charles and myself, and approved by the heirs of Harry and Jim."

"Letter of January 28, 1935: "So far as selling an additional number of shares to me for reinvestment, *that is simply a question for your good self to decide* when you want an income in excess of $150.00 a month."

Letter of January 29, 1935: " * * * [L]ater on if you feel that you want to convert another 1250 shares, you take it up with me and I'll see what I can do at that time, for hereafter the company can-

not make any purchases and *as far as I know I would be the only buyer, and I am a buyer of none excepting your shares and of them only enough to help you live as you should do.* * * * Don't make any decision now. * * * I could not buy a share of it, or, rather, furnish the money to buy the securities for a share without borrowing. * * * [I]f the time comes when you feel that you need more income you write me and I'll do the best I can for you."

Letter of January 31, 1935: "We have the confirmation of sale to us of the 1250 shares of Clow Common at $25.00 a share. * * * As I understand it, if this sale of 1250 shares at $25.00 a share took place, you said you wish to buy back the 219 shares—that is to say, to have that sale cancelled. Am I right? Shall I instruct the Company to cancel their purchase from you of the 219 shares at $15.00 a share and record those 219 shares as still in your name—never sold? I advise your so doing."

Letter of May 15, 1935, stating that William, Sr. and Mr. Murray had been giving a great deal of thought to the situation confronting her, and Mr. Murray "feels that there is only one safe way in which help can be given to you and Charles and settle at the same time Charles's complicated marital difficulties, and that is to close the estate. There is no authority in the will to sell the stock and divide the proceeds, but there is definite authority to exchange the stocks and then a division could be made. If you and Charles can agree between you on what from your point of view is an equitable division, I will seriously consider taking over the remaining stock * * * on the same basis as the 1250 shares were taken by the company. *Now you and your husband talk it over* and write me what you want to do not later than Saturday. * * * If you do not want to do it, we will just forget all about it and I will stop worrying and fussing over the situation that the lawyers tell me I cannot help except in this way."

Letter of May 28, 1935: "I have honestly tried to convince myself that I should purchase your stock, but I can't do it. If it were a security that you could sell on an open exchange where I had to pay the price made by the market I might do it, just as I have bought our pre-

interest in the personal affairs and financial distress of Mrs. Pryor and Charles, Jr. They also reveal an aged man fully aware of the infirmities of life, with af-

ferred stock with three years dividend due on it at $50.00, and our bonds far below par. *I could never feel satisfied with purchasing stock held by my brother and willed as it was, and if ultimately dividends were paid thereon I would benefit by the purchase.* My financial affairs were all adjusted some years ago. I will be 75 years old. * * * I can live quietly and comfortably, if all goes well, the rest of my life on the income from securities that we own, and it is that store of securities that I would have to disturb if I bought this stock. I would have no regrets in so doing, but the thought is that *I do not wish to eventually profit by a purchase made necessary by your condition. The cold hard facts are that I feel I would not sleep well if I made this purchase and profited by it.* I know your situation is desperate, but so far it is entirely a financial condition. * * * These hard times are not going to continue much longer—at least that is my belief. * * * If this company should succeed—as I believe they will—and some time in the future commence paying dividends on the common stock, the money I have received on the stock I would have purchased from you I could not use with any satisfaction to myself. * * * "

Letter of May 28, 1935 (from William, Jr. to Mrs. Pryor): " * * * I am glad that Dad does not feel that he can buy your remaining common stock. Personally, I agree with the position he has taken in the matter, particularly as he is the sole surviving trustee under Charlie's will. Furthermore, *your stock is actually worth considerably more than Dad, or anybody else for that matter, would be justified in paying you for it today.* I feel very differently about the stock which you recently sold to the company. * * * In the first place, it only represented the sale of somewhere between 20 and 25% of your stock, and * * * put it in a security that gives you at least a secure minimum income. * * * I also feel that the price was entirely fair, although it was of course less than you or I would sell the stock for, unless we needed to—just as *everything else that you and I would have to sell today would have to be sold for less than we would sell at unless we had to.* But all things considered, I am thoroughly satisfied with the sale of the 1250 shares both from the company's point of view and from the standpoint of fairness to you. * * * But I feel altogether differently about your remaining

stock. * * * *I feel that some time in the near future that stock of yours is going to have a real value again, and I would hate like the devil to see you sacrifice it.* * * * All things considered, we had had a thoroughly satisfactory year—in 1934, which while it did not give us any money to pay dividends, at least got us out of our dangerous indebtedness and with prospects looking much better for 1935. * * * I myself have faith in the company and have faith that before a very long time we will be financially successful again and that dividends will come to you to help you out of all your present troubles. * * * I honestly would bet that sometime next year we will resume some kind of common dividends. * * * [M]*ake up your mind to hold out a little longer* in some way * * *. Hattie dear, I just know things are going to be better soon. So cheer up, dear, better times are coming and it won't be long."

Letter of June 5, 1935: "I deeply regret all the troubles you are going through and could help you to a great deal better advantage if I were not a trustee under my brother's will and the only one living. I will not do anything that would lay me open to criticism whether I were living or dead."

Letter of June 21, 1935: "All of these troubles of yours and the trouble Charles is in can be cleared up in the way Mr. Murray suggested. Now understand clearly that *I have no desire to do this*—that *my affairs have been settled,* as I hoped, permanently. Both Margaret and I are in our *seventy-fifth years* and what I had set aside was for our support in our old age and without any reference to any dividend that might in the future be paid by this company. To establish the trust fund Mr. Murray suggests, means taking just that amount of income from us, and if it is ultimately accomplished I will do everything in my power to replace the securities in the fund established for Margaret's and my support in our old age. But, Hattie, I have got to settle it quickly for I cannot continue this constant strain of trying to find some way to help you and Charles out of your troubles. If the trust idea does not appeal to you or to Charles, well and good, we will forget about it and I don't want it brought up again."

Letter of July 3, 1935: " * * * You have got to realize, Hattie, that I am 75 years old, and I am only staying here and making the best of my time that is left. I have worked hard for many years

fairs settled and a disinclination to disturb them by the acquisition of more Clow stock.

In response to her letter of reply Mr. Clow, Sr. wrote on May 10, 1938:

"The best news in the letter you wrote me Thursday, May 5th, was the fact you do not need the additional funds. However, I want you to appreciate the fact that if in the future you may want to dispose of some of your stock there may be no way for me to manage the transaction for you."

A letter from William, Sr. to Mrs. Pryor, dated May 20, 1935, states:

" * * * [Y]ou are certainly up against it harder than either one of us anticipated. The lawyer very definitely says that I cannot safely buy the stock; *that I am a trustee of the will* and consequently even if Charles signed the papers and was agreeable to a disposition of the stock * * * in the years to come and I am going to enjoy, as best I can, the rest of my life. In making the offer I did to you, it means a reduction of Margaret's and my income just as much as it increases yours and Charles'. Now, if you do not comply with my request I'll just call the whole thing off and do what they all want me to do. * * * [Y]ou know we dare not do anything without having his absolute signature * * *."

Letter of July 17, 1935: " * * * That is the one and only reason I have for endeavoring to make some arrangement that would insure the boy an income and have it so secured that it could not be taken away from him entirely."

Letter of October 7, 1935: " * * * I made you a proposition once to exchange securities that I am holding for investment for all the common stock now held by you and Charles, and that's the one and only thing I will do. If I were to sell the stock and receive cash for it I would have a big income tax to pay, and I am not going to do it. I can trade the stock and put it in trust—the income to go to you during your life time—and that income to revert to Charles at your death. * * * I do not want to do it and *I am very frank in saying to you that I do not want to do it. I do not know when the stock will pay a dividend* for we owe now three years dividends on our preferred stock

the stock became very valuable, he or *one of the future wives that he may marry, or those that he claims now to be wives of his, or their heirs, could attack the settlement and give us all kinds of trouble."* (Italics supplied.)

How prophetic! The letter continues:

"I have not the slightest objection to buying the stock if it can be done legally. * * * I guess I have got to turn the whole thing over to you. I have done the best I could and failed. Lawyer and auditor are set against my buying the stock. *You have good lawyers in Memphis and you can tell them the situation better than I can. * * * You can say to your Memphis lawyer that if he can find any way by which I can legally purchase the stock by transfer of dividend paying securities in accordance with the will, I will gladly do it. * * * I* am no lawyer, but I have read that and owe $1,163,500.00 on the old bond issue. * * * Now you are just as good a judge as I am of what that common stock is worth today. * * * I made up my mind when we did not come to an understanding last time that I was through with it and I ought to stick to that right now because when all is said and done *I am in my 76th year and I have no right to dispose of dividend paying stocks to take up one that is not paying a dividend,* no matter how attractive it might be in years to come. I am going to very frankly say to you that there are only two inducements for my doing it. First, to make the income available to you for you have had almighty hard sledding for some years and I would like you to feel that you are safe so far as income is concerned for the rest of your life. Second, if you were to die suddenly * * * Charles would inherit the estate at once and there is no telling what complications would ensue. * * * When I am not receiving dividends on my common stock, we have needed every cent of the dividends received from the investments I made in the past to take care of us and *to make the deal now means that that income is to be cut down and I have got to rely on the uncertainties of the future and I am too old to do it. * * *"* (Italics supplied.)

will pretty carefully. * * * I believe that the securities now in your possession for life can under that will and with Charles's full consent and approval be sold to me for an agreed number of dividend bearing securities that I now hold. * * [Y]ou have plenty of time to talk it over with your attorney in Memphis and let me know definitely what you can do." (Italics supplied.)

Because of their invaluable aid in getting the true climate of these transactions and William, Sr.'s character, excerpts from many of the communications are set forth in the margin.[85]

85. Four page letter from William, Sr. to Hattie, dated October 29, 1935:

"I want to commend strongly the three divisions, if you please, of the estate; exactly as you have outlined them. I have not consulted our attorney and I am not entirely certain that legally everything could be put in your hands, but I am past 75 years old and the only trustee left, and from my point of view you are the best administrator of the estate—you are Charles' mother—and the child's grandmother. * * * No exchange that I might make with you will in the least inconvenience or discommode Margaret or myself. * * * I did not like the idea of exchanging the stock and increasing my holdings in this company for all my arrangements have been made and were made some years ago, so that in case of my death my heirs would not be robbed by the government by their horrible, awful income and inheritance taxes, so that my holdings here were divided among the children and Margaret, and if I secured the stock you hold it would take some years for me to give it to the children without paying a heavy gift tax. That is what I have got to consider. * * * I do not know when we will pay dividends on the common stock [goes on to give the statement of what owed bank]. No dividends can be paid on the common stock * * * until all dividends are paid on the preferred stock. * * * This month we hope the total shipments from all the plants will at least equal production, and unless, it does so this month and November the plants have got to be closed. * * * I hesitate to tell you how complimentary our bank and others interested in the organization have been. I have gone through every panic and depression since 1876. This is the longest one and the first and only one for which no future can be safely predicted. [Then much about Charles, Linda, and the woman in California whose marriage was declared illegal.] I am assuming from one of your former letters that you have consulted an attorney and you are at perfect liberty to show him this letter that he may understand clearly my position and my sincere wish to be helpful to you and to have you adjust the estate in a manner you believe fair and right, and do it now rather than take the chances of dying and leaving it a tangled mess in the courts."

Letter of December 3, 1935, from William, Sr. to Hattie:

"As you know your attorney has written a letter asking that the stock be issued in your name in 500 share lots and has given his reasons. Mr. Johnson immediately took the matter up with Mr. Murray who is going into the situation thoroughly. Mr. Murray told me that he understood you were going to borrow $15,000 from a bank in Greenville and repay fully the money loaned to you. Right now I want to assure you that that will please me an almighty sight better than buying 500 shares of stock from you. I am fully satisfied that I can invest all of my money in stocks of companies whose standing I know that ultimately will give me a most satisfactory return and at my age, it is an almighty sight better for me to have any surplus capital in that kind of collateral. But if you are going to do this, you are at liberty to tell the bank that you have the following firm proposition from me. * * * I will guarantee to take that stock at face value of the note. Further, if they loan you an additional $15,000, the money to be used in retiring the mortgage on your Kansas City property, I will guarantee to take that up in the same way. My one object in making these written statements to you is that you can have a home that is not mortgaged and live in it without having any debt such as has been referred to and further if the mortgage on your Kansas City property is paid you will have a nice income from this property. My suggestion in this connection is based on the fact that in my opinion if you should die * * * the estate would be precipitated into all kinds of court proceedings and be but a repetition of Charles Dickens' famous lawsuit. * * * When it was all over, Charles would be without any income. * * * Now, all of this is preliminary to the statement that in my opinion I cannot help you at all unless the estate is closed and I am relieved by court action as executor and the estate ordered turned over to

Nor was Mrs. Pryor's evaluation of William, Sr. less generous. She testified at her deposition: "I had implicit confidence in Will Clow." She was asked,

you *on the basis reported to us by your attorney*. Until so reported, not one of us had the slightest idea ·that you had advanced over $60,000 to Charles for which he was indebted to you. That puts an entirely different face * * * on the whole matter, and there is no question in my mind that under conditions as they are now reported to us, the only way we can clarify it is to turn the stock over to you so that you can have the use of the income for the rest of your life. * * * I retire from it as executor, and by court action turn it all over to you. When the court makes this decision, neither of the women with whom Charles is now involved or with whom he may be involved in the future, will have any recourse on me. Charles is just as good as good can be undoubtedly while Mother is looking on and when all the income comes from Mother. *But if Charels gets more than about ten miles from that plantation, in my opinion only God can help him—and God may be busy elsewhere.*"

Letter of Sidney Murray to Attorney Jerome S. Hafter, December 10, 1935: "I wish to acknowledge your letter of November 25 * * * in respect to the transfer of the common capital stock of James B. Clow & Sons now held on the books of the Company in the name of Hattie B. Pryor, Trustee. I also note the contract enclosed in which Charles R. Clow has sold, transferred and set over all of his right, title and interest in and to this stock as remainderman to his mother, Mrs. Hattie B. Pryor. * * * I have been examining the law to see whether or not James B. Clow & Sons, having knowledge of the will of Charles R. Clow, in which will Mrs. Pryor is made Trustee of this stock for the benefit of her son, Charles R. Clow, can legally transfer this stock in accordance with the request of Mrs. Pryor to her individually on the theory that her son, the remainderman has assigned all of his interest to her. I think you will appreciate it is an involved legal question and James B. Clow & Sons, a corporation, must be fully protected from a legal standpoint in transferring this stock.

"I think James B. Clow & Sons could properly issue the stock to Mrs. Pryor subject to the terms and conditions of the will of Charles R. Clow, dated February 17, 1908, and the contract of assignment of Charles R. Clow, her son, a copy of which you sent me, but whether or not they can transfer it to her individually as her own individual property raises a different legal question. * * * [Goes on to recite terms of will re her sale and reinvestment with consents]. It might be that you will determine to have a friendly legal proceeding instituted in Mississippi or here in which the courts would adjudicate the rights of Mrs. Pryor in respect to the will and the contract of assignment recently made by her son, and also the duties of Mr. W. E. Clow, Sr., et al. in respect to the will, at the same time.

"James B. Clow & Sons have no feeling whatever except to do what is just, proper and legal in this situation, but it naturally must, for its own protection, not be involved in a lot of litigation and expense and a possible claim for damages if it should develop that this stock is transferred to Mrs. Pryor in accordance with her request without the Company having the legal right to do so."

Letter from William, Sr. to Hattie, dated December 19, 1935, tells about a conference of Mr. Hafter with Mr. Murray and was advised they came to "some adjustment—the details of which I do not understand—but Mr. Hafter, I believe, is to pay me the amount of the loan. *The net result of it all is that all of the stock will be in your hands and in Mississippi, and that will take a great big load off of my mind.* * * * As long as the stock is in my hands either one of the women could bring an action that would tie it up, and in your hands Mr. Hafter says under Mississippi law you can hold it. * * * [It goes on to give her a lecture on improving her own living conditions]. You are borrowing the money from the bank to pay this loan. I do not like that because it is making another debt, and I do not like debts, but just the same it pays the loan and I am thankful to get the money."

Letter of December 23, 1935, from Mr. E. F. Johnson to Mrs. Pryor enclosing four letters, three for her to sign and one for Charles, and when they are returned he says he would send the check for $1,-434.11 and the 3500 shares of Clow stock and the 1542 shares of U. S. Pipe Co.

Letter from William, Sr. to Mrs. Pryor of December 23, 1935: "Mr. Johnson is writing you in regard to the purchase by the Company of 500 shares of the Company's stock for $15,000. You will recall that in the understanding we have (when I first made the loan), the price of the stock was to be $25 a share, but *I asked for and obtained an increase—mak-*

"Has anything come to your attention since you sold that block of stock that Will Clow treated you unfairly in connection with the transaction?" to which she

ing it $30—for I wanted the amount to be sufficient to repay your debt with interest and give you plumbing in your home that you should have. * * * Now seriously you and your husband must remember that if you are borrowing any money, sometime, somehow, somebody has got to repay it or you lose your collateral. The next time you are inclined to borrow any money, for goodness sake write me first."

Letter from William, Sr. to Hattie, dated January 5, 1938, saying that a check sent her should never have been sent but should have been \retained in the surplus funds of the Clow Company; that their capital actually was in excess of their requirements; he recites the Company was lucky to have purchased supplies when the prices were very low. He told her to be a little careful and put something by for a rainy day as "it is very likely to be very rough weather and the storm may strike us any day."

Letter of February 11, 1938, to Mr. Pryor from William, Jr. He wrote: "Of course we have no means of controlling what Hattie does with her 3100 shares of our common stock, but *we feel very deeply that for Hattie's own good she should not either sell any more of this stock or jeopardize it in any way.* After all, as long as Hattie has this stock free and clear from any encumbrance the reasonable probabilities are that she is going to be relatively comfortable the rest of her life. The stock, of course, has had its vicissitudes like everything else, but over a period of a great many years it has always managed to do pretty well. * * * *We both feel so strongly (Kent and Jr.) on the subject of Hattie's keeping this stock free and clear from encumbrance of any kind, that we have decided that we will not be a party to making it easy for Hattie to dispose of or lose any of her stock.* Just bear in mind that she started out with something over 5,000 shares, and for one reason or another she has found it necessary to dispose of something over 2,000 shares of the stock until now it is down to 3,100 shares. * * * *Hattie would be ill served to get rid of any more stock or to jeopardize her holdings.* * * * I cannot feel justified in making it easy for Hattie to run the chance of losing another 1,000 shares of this stock. The above is Kent's and my primary reason for not wishing to do what you request in your letter of February 3rd. Our secondary reason is that *we do not wish under existing conditions to obligate the com-*

pany in any way to put up $50,000, which we might have to do if the various transactions which you propose turned out the wrong way. Please believe that this decision of ours is not due to any lack of friendship for you and Hattie. It's really due to the fact that we have such a friendly feeling for you and Hattie that *we do not want to be a party to a transaction which—at least according to our lights—is an unwise one.* [He advised that they liquidate the plantation and get in a sound business.] * * * [G]et into some safer kind of enterprise which will not jeopardize either the income or the principal which you can be relatively sure of in connection with Hattie's 3100 shares of our stock. * * * Kent and I have firmly determined * * * not to be a party to any further transactions the result of which might be the loss on Hattie's part of any more of our common stock."

Letter from William, Jr. to Hattie, dated April 1, 1938, partly social and then goes on "Now about dividends. You have asked a pretty hard one. As you know, we have already declared $1.00 a share, and in the natural course of human events we should declare another $1.00 a share on June 1st, presumably followed by one on September 1st, assuming that nothing happens to business. Then as usual, our final dividends will depend on earnings of the company. Last year we paid a total of $8.00 a share, but I think it is a bit optimistic to anticipate that much this year.

"*However, you might let me know how $1.00 a share on June 1st and $1.00 a share on September 1st would fit your present requirements.* In other words, how the picture would look to you if you could be sure of that much money within that time. In fact, give me some idea of just what you feel you have absolutely got to have, and you can count on me in helping you in any way possible consistent with the rights of the other stockholders. In fact, *I think they will all join with me in wanting to stretch a point if it will be of assistance to you.* It is my personal opinion that we will absolutely be able to declare the $1.00 dividend on June 1st and on September 1st, but beyond that I frankly don't care to prophesy.

"However, to give you a note of encouragement, I will say that, taking everything into account, our business is unbelievably good. By taking everything into account I mean taking into account what we hear about other businesses. My ex-

answered, *"Not at all."* Still later she said in answer to the question as to whether she was satisfied with the price she received for the stock, "Well, as I

planation of it is as follows: The cast iron pipe industry did not share in the so-called 1936—early 1937 boom. * * * [W]e didn't get a boom—we just got a nice healthy little increase, and consequently at the present time we are not feeling the great recession that has struck the other heavy industries. My own private opinion is that on June 1st of this year we will find ourselves just as well off from an earnings standpoint as we were on June 1st of last year—which I think you will agree with me is a phenomenal showing. * * * Fortunately, we are well prepared for anything that happens because you may be pleased to know that for the first time in *sixty* [his italics] years James B. Clow & Sons doesn't owe a nickle [sic] to anybody." [Then he goes on to prophesy that it might pay $5.00 dividend that year, but she wasn't to count on it, but she should let him know her requirements.]

Letter of April 9, 1938, from William, Sr. to Hattie saying he was 78, had gotten together $40,000 which he was waiting to invest when the market got to rock bottom. He said he was too old to borrow money and he was too old to take any more chances with death. He goes on: *"Now I will take from you either 500 for $25,000.00, 600 for $30,000.00, 700 for $35,000.00 or 800 for $40,000.00. It is immaterial to me which you accept.* * * * but my suggestion cannot be any different than it was yesterday. You will have plenty left both for your use during your life and for your heirs at your death, but *my suggestion is that you not only take all that you need to get out of debt, but enough to give you a respectable bank account so that you will not always be hard up.* There is not a particle of sense for your living that kind of life. You have only one life to live and it's all nonsense for you to keep going along the way you are—everlastingly and always hard up. * * *

"The offer I am making now I cannot leave open for if I do not buy the stock from you I want to be absolutely free to make the purchase of the stocks I have in mind and which, by the way, I mentioned to you. If you want me to buy any portion of the stock, I would very much prefer you telegraph me Monday. If I do not hear from you, I shall assume I will be free to use the funds I have in mind—if I have an opportunity to do so, as I think I will have almost any day. I am not going to do anything at least the first half of Monday. After that I want to be absolutely free. I am all out of debt—a very unusual experience for me. * * * I am determined to stay out of debt."

Letter from William, Jr. to Hattie, dated April 12, 1938: "I am afraid I have been a very poor ambassador. I have done everything that I could possibly do, but I got up against a stone wall, for legally the corporation cannot loan you money nor can they advance you prospective dividends. * * * *Dad, of course, is willing to buy some of your stock, but personally I do not like to see him buy it and I equally do not like to see you sell.* I think it is the worst kind of investment policy for Dad to increase his holdings of Clow common stock. *You probably will remember my telling you that when he bought that last stock of yours at $50.00 a share (I think that was the price) a proportionate share was offered to the other large stockholders, like Beach, Harry Clow Estate, etc., and none of them would take any of it. Consequently, Dad bought it all himself. In spite of everything that Kent and I can say to persuade him not to do it, he will buy more if you want to sell it to him—which, as I told you personally, I do not think you ought to do. The stock is worth more money in my opinion than Dad or anybody else would be justified in paying you for it, but nevertheless it cannot be sold except to a buyer like Dad who has such complete and sentimental faith in the company that he will go on buying the securities of this company when every sound rule of investment policy dictates that his money should go into good securities outside of this company, but Dad has his own ideas and nobody can change them.* However, it is just impossible for the company to loan you money in anticipation of the dividends. Besides getting the information from Beach Clow and Earle Johnson, I have checked with our attorneys and those are the facts. It seems to me that if you are bent on continuing in the cotton business, the only thing you can do is to make a deal with the people to whom you owe money now, and in view of what I am about to tell you I think they ought to show you reasonable consideration through at least one more planting season. I believe it is just about as certain as anything can be in this business world that you will receive this year at least $4.00 more per share on your common stock. That amounts to something over $12,000.00 which goes a long way toward liquidating the present in-

told you this morning, Mr. Price, I felt that Will Clow would protect his brother's widow and would do the best in his power for me. Q. Has anything come to

debtedness. [He goes on to say there is a possibility of an $8 dividend and to tell her they had a very excellent first quarter and enough business on the books so that April and May are assured, and he was convinced they would have a relatively good business in the last half but that remained to be determined.] * * * I have devoutly hoped to be able to write you that we could turn the money over to you that you needed by April 15th. * * * [I]t simply cannot be done. We might find ourselves in serious difficulty. * * * The directors * * * would not only be liable financially if anything were to go wrong, but we might be even liable for criminal prosecution. I do not really know the details of the law—I simply accepted our attorney's statement that it could not be legally done. I am awfully sorry to have to throw this problem back into your lap, but *I am somewhat encouraged by the thought that your attorney seemed to think that some kind of a reasonable deal could be made with the people to whom you owe the money,* and I myself should think they would take a very lenient point of view toward the situation, particularly in view of the fact that you are absolutely certain to receive a substantial amount of money this year which can be used toward liquidating the debt."

Letter from William, Sr. to Hattie, dated April 20, 1938: "I have not sold the $40,000 securities that I took out of the bank vault, but if your final decision is that $30,000 is all you want, I am going to invest the remaining $10,000 in just the securities that I told you I intended buying when you were here—and then I am through. *While I have not promised our people that I would not buy any additional stock, I know they will strenuously object if I do, so we had better figure that this transaction closes my purchases of Clow stock.* I am writing you so that you will know that I will act just as quickly as Mr. Sidney Murray says the provision that is typed on the stock can be ignored, but neither Mr. Johnson nor I know what was done once before when stock which was similarly marked was handled."

Letter of April 26, 1938, from William Clow, Sr. to Hattie stated that the delay in handling the stock was due to lack of formal consent from Charles, Jr. which was necessary. "Furthermore, I cannot buy the stock, as I supposed I could, and *our people object to my buying for the* company more than 600 shares. However, I told you that I would take up to 800 shares and this is the last call on my doing so * * * unless you decide when you receive this letter on the maximum amount of the company stock you want to sell and advise me at once—sending the proper papers—it is all off and nothing will be done except for the 600 shares for which papers are now being signed.

"The legal aspects of the subject were not considered by me at all—in fact, I knew nothing about them. I have been ready all the time to take up the stock and the delay has been in preparing the stock for transfer, and now—as you know from Mr. Johnson's letter—*I have to step to one side and the company buy the stock.* So please decide among yourselves just what you want to do and then let us close the transaction in a way that is entirely satisfactory to your good self."

Letter of June 15, 1938, from William, Sr. to Hattie saying that she should not worry about the June dividend, they did not declare it, but he sticks to his bet that before the year is out they will have declared a total of $5.00 a share on the common stock, which meant $4 more, inasmuch as $1 had been declared March 1st. He sticks to his opinion that $5.00 will be declared but it was only an opinion and she was not to spend it before she got it. *"No use telling you again that I was sorry you decided to sell your stock. However, that was a decision that you had to make and I couldn't be too insistent upon it for the reason that I might be wrong; namely, you might make more out of selling your stock and going into the cotton business than you would have made out of keeping the stock.* However, it's all over now and the only thing I can do is to devoutly hope that the cotton venture turns out extremely well. * * * Hope you have a swell time [in California] and if you come back by way of Chicago, I will be mighty glad, as always, to see you."

Letter from William, Jr. to Hattie, dated June 16, 1938, tells her that evidently Linda is trying to sell some of her stock and stating that it is "Dad's understanding * * * she is not permitted to sell this stock without getting your permission. As I believe I wrote you sometime ago, *immediately after Linda got her stock we were offered small blocks of Clow common at prices as low as 22*—and we took this stock to be Linda's. * * * Dad feels very strongly—and I agree with him—that at least for a reasonable length of

you since that time that would change your mind? A. No. Q. Up to his death you had complete confidence in him? A. Why *certainly*." (Italics supplied.)

time we ought not to permit Linda to sell that stock. She has absolutely no idea of money. If she could get your permission she would probably sell the stock for anything she could get for it—and after the proceeds were gone she would have nothing and therefore could do nothing but live on the baby's income." [And then would come begging to them so he suggests that she not give her consent.]

Letter dated July 1, 1938, from William, Sr. to Hattie said they were sending a $1,000 check to the Greenville Bank in response to a telegram although it was "questionable they could do it." He says when the signed paper comes through they would send $9,000 more, and would deposit $25,000 in the Northern Trust Bank. He tells her he had given some of his property to his three children and if she had come through Chicago on her way home he would have shown how he divided it and he urged her because of the heavy estate tax to give tax free gifts to Charles and his wife each year. He also said if she wanted to confer with a lawyer she could see Mr. Murray.

Letter of July 6, 1938, with signature cards for Northern Trust Company, saying he was sending her husband a check for $9,000.

Letter of September 13, 1938, from E. F. Johnson, Treasurer, inclosing check for $3,755, being a dividend of $4,000, for $2 on each share of stock standing in her name on that date, less an advance of $190, and Federal stamp tax of $55.

Letter from William, Jr. to Hattie, dated October 24, 1938: "Glad you liked the dividend and I am sure it wasn't a bit more useful to you than it was to me. And, confidentially—but for heaven's sake don't spend it yet—I am expecting more dividends this year. Earlier in the year prospects were relatively doubtful, but this big new spending program of the Federal Government has commenced to throw us a lot of business and will throw us a good deal more before the year is out. * * * [B]y and large these spending programs have been *exceedingly helpful* [his italics] to James B. Clow & Sons. * * * [T]he government spending program is going to end up by making at least for us, a pretty good year out of what might otherwise have been a pretty thin year. It really now looks as if we will have an excellent fall business, and if so it will mean additional dividends."

Letter of October 26, 1938, from E. F. Johnson to all common stockholders inclos-ing check for $1 dividend for each share of common stock standing in their names on October 26, 1938.

Letter of December 6, 1938, to all common stockholders from E. F. Johnson, treasurer, inclosing check for $2 for each share held on December 6, 1938.

Letter dated December 9, 1938, from William, Jr. to Hattie, social in nature, and also stating that there was a bare possibility there would be one more dividend although only for $1. "As I have told you, this government business has been a godsend to us and has given us the best last quarter business since I can remember and if we are able to pay one dollar more a share, it will mean that we have paid in '38 the same amount of dividends that we paid in '37. * * * In spite of this extra fine fall business, the year 1938 as a whole will not be quite as good a year as 1937 because we got such a bad start, but in view of the improved financial condition of the company it is our hope to be able to do for both stockholders and employees just as well in '38 as we did in '37. Just what '39 has in store, I do not know, but we will go into it with a nice backlog of orders. * * *"

Letter from William, Sr. to Hattie, dated December 12, 1938, stating the possibility of another dividend that month. It was social in nature, but commended her for spending her dividends.

Letter from William, Sr. to Hattie, dated June 15, 1939, telling about how low real estate was selling for. He told her how they operated during the depression keeping their men working part time instead of closing down completely so now they had the employees' good will. He said: "I am reciting the commercial situation because it is desperately bad." Then he goes on to recite the amount of building permits in Chicago, stating that for the last year it was 6% of what it had been in 1925.

Letter of acknowledgment to Messrs. Wynn, Hafter & Lake of Greenville re Clow stock, dated July 9, 1940, and stating Mr. Murray would contact them further after contacting Clow Company, and another letter between the same parties dated July 12, 1940, to same effect, and stating they would transfer stock immediately if papers were in proper shape.

Letter of July 19, 1940, from Kent to Hattie, apologizing for her not getting a $1,500 check due to his absence and Beach's failure to carry out his instructions. "The following is personal between

Mrs. Pryor's affection for William, Sr. is expressed frequently in the documents in evidence. In one letter dated simply Tuesday, she stated: "We will send you a telegram Christmas Day. I will be with you and your dear family in spirit." In a letter of January 3, 1936, she said: "Thanking you all for the great amount of trouble that you have been to in getting this all straight." Her husband echoes her sentiments when he wrote on January 2, 1936, " * * * [W]e all appreciate the great amount of trouble that you have all been to." A letter of December 19, 1934, stated:

"There is no way for us to tell you how grateful we are for the unceasing interest you have always had, in this situation, and I am glad that you were so insistent that Hattie come there, because I know we arrived in the nick of time."

When Mrs. Pryor wrote in respect to the turning in of a pro rata interest of stock for the merger proposal, she said:

"I know whatever the officers of our Company decide to do is best for everyone concerned."

She wrote him again thanking him for a check which permitted her to procure the release of a bracelet which had been pledged two years before and said:

"It is impossible for me to express in words how grateful I am but my heart is lighter and my mind relieved. You must always know how much I appreciate your effort to help me. * * * [P]lease accept for yourself my sincere affection and *deepest admiration for your honorable self*." (Italics supplied.)

The cordiality and affection of Mrs. Pryor and her family were returned in full measure by William, Sr. and his

you and me. I understand that you have already sold quite a bit of your Clow stock to W. E. and that he has written you, suggesting that you sell some more and buy additional land. I can't help but tell you that I think this would be a terrible mistake for you. A farmer's life at the best is up and down—even more so than the earnings of a manufacturing company. The dividends you have been getting from the Clow stock have, I am sure, been one of your most steady sources of income. You have already reduced your holdings materially, and I think you would be making a serious mistake for Charles' future and for your own future to reduce any further your holdings of this stock in order to invest the money in farm property. I don't mean to be arguing against Dad, but he has one viewpoint and I hold another. I know that Bill has urged you in the past to continue to hold our stock and I just want to add my advice along the same line. [He goes on and tells her the evil of borrowing.] * * * I hope you won't mind my giving you this friendly advice. Remember me very kindly to Charles. I am delighted to hear that he is getting along well. You know he was always quite a favorite with me."

Letter of July 19, 1940, from William, Sr. to Hattie: dated July 19, 1940: " * * * I have always had, if you please, a fatherly interest in my brothers'

boys." He goes on to recite what each nephew is doing. "Charles was admittedly a little wild and you never knew just where you could put your hands on him. Now you have got him down where you can take care of him very nicely. He is a bright boy and I do not care how large the plantation is, if Charles likes it he has got brains enough to manage it. If you want to buy additional acreage—it doesn't make any difference how small or large it may be—I will be glad to furnish you the funds so that you can do it. Sooner or later Charles will inherit all of the assets, and I think you and I know we would feel a good deal happier if he had a nice home and an acreage that paid him to stay right there and cultivate it." He goes on to state he would be *80* in the fall. He says he knows he won't live long.

Letter of July 29, 1940, from Wynn, Hafter and Lake to Clow Company asking that the 2000 shares of common stock be reissued under agreement of November 18, 1935, and asking the reissue of four certificates for 500 shares each to Hattie B. Pryor subject to the terms and provisions of the Charles Clow will to have the stock read as it did when originally issued, leaving off the agreement dated November 18, 1935, which was in accordance with an agreement signed by them dated July 26, 1940. (Italics supplied.)

family. They were welcomed at the Clow summer place. Charles, Jr. and his wife stayed with William, Sr. after a hospitalization. When the William Clow, Srs. were unable to visit Mrs. Pryor when they were south, William, Sr. wrote Mrs. Pryor on March 2, 1939:

"I * * * regret more that we could not go to see you than you possibly could regret not seeing us. * * * I am very thankful to hear the goods news you give me and know that Charles has not turned over a new leaf—but a whole book."

In April, 1939, he wrote: "If it gets too hot in Mississippi this Summer just come up and look in on us at Lake Forest and we will be glad to see you." Their friendly relation is revealed in a letter of May 23, 1939, from William, Sr. to Mrs. Pryor:

"How ridiculous of you to suggest to a young gentleman like me to 'be good'—when it's a policy which you have never followed in your life yourself. * * * Sorry you had to pay some of Charles' bills with the last dividend, although I suppose that is becoming sort of a habit, but it does seem to me that the young man ought to soon be standing on his own feet."

In a letter of November 16, 1937, Mr. Pryor wrote William, Sr.:

"I just want you to know that we have received all of the equipment ordered from you and since it has all been installed we feel like we are now in the city. You were mighty nice to let Hattie have that money. * * * *"

William, Sr. was not devoting his sole efforts in allegedly getting Mrs. Pryor's stock from her. She forwarded a valuable bracelet to him to sell in order to raise funds for her, in January of 1936. Also in 1936, he was involved in arranging for plumbing fixtures for the Pryor place. In the fall of 1937, he saw to their getting a light system from Kohler, also a water system pumping outfit.

In response to a letter of inquiry from Mr. Pryor as to when the next dividend might be expected because of heavy hospital bills and poor cotton proceeds, William, Sr. wrote to Mr. Pryor on October 29, 1937:

"* * * You may have ample funds to take care of your expenses at the hospital and your going to Florida, but if you have not and will let me know the amount you need I will endeavor to take care of it as a debit against your next dividend."

Mrs. Pryor replied:

"Thank you very much for your letter. *As always, taking an interest in me.* * * * You were kind enough to offer to send money to me, and you do not know how I appreciate your thought. * * * I do not know what plans you are making for the December dividend but if it will be around the amount we received last year, if you could let me have five thousand now I could pay Charles' and my bills that otherwise would have to wait. * * * *Thank you, oh so much Will. God bless you and keep you.*" (Italics supplied.)

William, Sr. was bearing the constant burdens of his brother Charles' family. Thus on October 10, 1934, Linda, Charles' first wife, wrote to him:

"Before replying to your kind note I wrote to Mrs. Pryor *with no response.* I am taking this occasion to write you again telling you we are destitute and Mother is very ill. We have not even enough money for food and I was obliged to borrow a couple of dollars for the absolute necessities; that has run out and we have exactly twenty cents left * * * and I am on my way out to buy butter with that. * * * *Something has to be done.* [Linda's italics.] Out of the *kindness of your* heart isn't it possible to have a few dollars to tide us over until something can be arranged or any way so we can get some food." [Linda's italics.]

Nor is William, Sr.'s greed for Mrs. Pryor's stock displayed in his letter of February 2, 1936, to Mrs. Pryor:

*"I am mighty thankful to have your letter* \* \* \* *which in effect tells me that I do not have to buy your stock.* I lost quite a lot of money in taking up your dividend note, for I took it on the basis of preferred stock while I could have invested exactly the same money in depreciated stocks that would have given me a very considerable increase in interest on the money and the absolute certainty of doubling its value within possibly three to five years. Larry told me how badly you needed the money and what a loss it would be to you not to have it. I think he said there would be a foreclosure on some of your property, but what he said appealed to me so that *I told him I would take the stock on the basis of the value set on the stock by our Treasurer, Mr. Johnson, and Kent for someone else a few days before. Every one of our people protested against my purchasing the stock and said I had no business to do it—that I have all the Clow stock I ought to carry.* For a time it looked as if I would be fined by the government if I took on any more. However, Will investigated it and told me that it would be all right if I did not take more than the 500 shares I had agreed to take." (Italics supplied.)

And when Mr. Pryor wrote that in order to get a crop loan from Southern Credit Company in 1938, they wanted to put up the Clow stock as collateral, they had to have a definite bid therefor in order to establish its value and asked that a value of $50 be placed thereon although it was worth "possibly" $100, William, Jr. wrote a stern letter back. He pointed out that Mrs. Pryor had started out with 5,000 shares but was reduced now to 3100 shares.

It is difficult to envision one writing this letter as a glutton for power at his aged sister-in-law's expense (letter of April 7, 1936):

" \* \* \* I know I feel better to think that you have plumbing fixtures at your home. The only fault I find with you is that you have not put in enough. After you have lived about a month with these fixtures, you had better look things over and you will find places to put more that will make your home a lot more attractive.

"While you are thinking about it, just remember that you have only one life to live. \* \* \* Take my advice and have everything of this kind needed in the house, including the kitchen, and I would not stop unless I had two bath rooms. Then you can invite guests and feel that you are respectable. \* \* \* You have had pretty hard sledding for quite a long time. The skies are brighter now and my advice to you is to enjoy life—when you can."

Another letter of December 3, 1936:

"I am wondering if you will be any more pleased to receive the inclosed check than I am to send it to you. It has been a long hard struggle and the common stockholders have suffered plenty, but we have done what many another concern has not been able to do. We have landed on our feet with our old organization intact. They have proven their loyalty for we did not lose a single one and we went through as near whole as you can get it in this country. The maximum reduction in salaries was 60%.

"Now I am going to venture a few suggestions, because I want to see you comfortably fixed and with a backlog for the next depression. My advice to you—and it is very strongly given—is that you use the money first of all in cleaning up the mortgage on your Kansas City property. \* \* \* After paying all your debts so that you will get rid of interest, devote enough money to give you

every reasonable comfort on your plantation. I would go so far as to put in a Kohler electric machine. Then you can use many labor saving devices and give you electric light, and the cost of operation is very little. * * * Now all of this advice is sent to you because I want to see you enjoying life better than you have for some years. You have taken your share of the burden without any complaint and I want to see you enjoying what is coming to you now, and I hope you will."

William, Sr.'s interest in Mrs. Pryor was not a perfunctory one, but of real concern for her well being physically and financially. Time and again he wrote her urging her to take more care of her health, to slow down and take less responsibility for her family, and to better her surroundings. Such is the letter of January 28, 1937, which read in part:

"After reading the nice letter you wrote me from Miami Beach, I am willing to forgive all your sins of omission or commission and love you still.

"You certainly have had a hard time of it and you have got to * * realize that you are older than you were twenty years ago. You have got to change your diet—probably eat half of what you used to eat and sleep half again as much—and in every way take care of yourself. There is a lot of responsibility resting on your shoulders.

"I am very sorry indeed to learn that you went back to the plantation with Larry * * * from my point of view you should have stayed at Miami for at least another month. * * * You cannot play with pneumonia. * * * "

William, Sr. attempted by indirection to plant some financial wisdom in Mrs. Pryor, in a letter of November 30, 1938. He wrote:

"Now, young lady, a word of advice, just because we are going so darn strong right now don't get it

into that pretty head of yours that we are going to keep it up. In other words, what I am getting at is that you had better save a little of this money you are getting in dividends and either pay off all your debts—if you have any remaining—or invest it in good securities. * * * "

On May 23, 1939, he wrote her:

" * * * Also, my suggestion to you is not to put too much of your dividends or earnings from the farm —back into the farm. You have got a pretty big farm now and it's not desirable to get all your eggs in one basket. If you have got some extra money besides what you need for your expenses, if I were you I would put it into gilt-edge securities of some kind so that you will be building up a little something outside of your Clow stock. * * * This may be gratuitous advice, but I know it's good. * * * Incidentally, when I said 'good securities,' believe me I really mean *good*. If I am buying common stocks—which I am now because they are cheap—I buy nothing but stocks like U. S. Steel Common, General Electric, International Harvester, United Fruit, Atchison common, Kennicott Copper, Standard Oil of New Jersey, etc. In other words, nothing but the *bluest of blue chip common stocks*. [Mr. Clow's italics.] They may not pay dividends for a while, but if they are bought cheap you will make a lot of dough out of them. Then when stocks of this kind get high—which they are bound to do in the next two, three or four years—I sell them and buy absolutely nothing but government bonds. That's my invariable policy and I commend it to you—and in addition I never buy on margin. * * The time to buy these blue chip stocks is when everybody is scared and the prices are low. The time to sell them is when everybody is in the 'whoopee' mood and prices are high. * * * "

His interest in Mrs. Pryor and her family is evidenced by the letter of September 22, 1937:

"I am mighty sorry to have your telegram that Hattie is in the hospital and trust you have written me to tell me how serious is her sickness. However, I am thankful to have good news at least once in his life from Charles, and if the boy is doing well now my personal opinion is that Hattie should make his plantation home so attractive and comfortable in every way that this new wife will want to stay with him and he with her [He advised fixing up Charles' place] * * *. If you can keep her there for a few years, the chances are that Charles will be settled for life."

Mr. Pryor wrote William, Sr. for advice as to what course he should pursue as to Mrs. Pryor's health, she having been hospitalized five times during the year. On October 1, 1937, Mr. Pryor wrote:

"Frankly, I am very much worried about her susceptibility to these infections. * * * I am wondering now what she should do when she is able to be up again. I would like to know what *you* think is the best course to pursue." (Italics supplied.)

On October 7, 1937, he replied to Mr. Pryor:

"I am very greatly concerned over Hattie's condition. Possibly there is some climatic condition that affects her, but that is a question which would have to be settled by her physician. * * * I strongly commend all that you have been doing for Charlie. From my point of view the more comfortable, and, if you please, luxurious, you make his plantation home, the better it will be for both Charles and his wife."

On October 13, 1937, he wrote Mr. Pryor:

" * * * I think you are making a big mistake in not ordering the pump, as well as authorizing the shipment of the electric plant. Hat-

tie has been getting some very handsome dividends from us. I hope she is entirely out of debt and that she has paid off her Kansas City mortgage, so that that property is clear. The reasonable probabilities are that she will get an additional dividend before the end of the year. She cannot take the money away with her. She has had pretty hard sledding for the last five or six years, and my advice to her would be to put the plantations—both hers and Charles' in just as good shape as money can put them and enjoy the returns on the stocks she holds. * * * "

The Court has read with extreme care the entire résumé of the diary of William E. Clow, Sr., and also the correspondence between him and Mrs. Pryor and her family, throughout the years. Correspondence from his sons to the Pryors has also been studied. Briefly stated, these documents reveal an amazing continued interest by William, Sr. and his family, in the welfare of Mrs. Pryor and her descendants, and their desperate plight during the long depression. They also evince a real concern over Charles, Jr.'s recurring marital difficulties. They show an effort by William, Sr. first to mold, and then to correct the character deficiencies of Charles, Jr. There is constant admonition to Mrs. Pryor to restrict her financial overindulgence of Charles, Jr., which advice went unheeded. Despite Charles, Jr.'s shortcomings, the Clow family displayed genuine affection for his amiable, charming personality. They took him into the family business but he evidently was not inclined to business routine, and in contrast with his cousin, Beach Clow, failed to make the grade in the Company. Plaintiffs maintain Charles, Jr. was discriminated against in his employment by the family company, salary-wise, being given a mere pittance. There is evidence, however, that he was treated even better than other comparable employees.

The Court is completely unconvinced by plaintiffs' brilliant fabrication, their assembling of unrelated facts into a

mosaic aimed at depicting William, Sr. as a despicable rogue fleecing his brother's untutored widow and infant son solely by his lust for power in the Company he himself founded and in which he already owned, within his own family, a majority control. Why did this man, painted by plaintiffs as a greedy ogre, take all the trouble to try and sell Mrs. Pryor's diamond bracelet to gain her funds; why did he try to save her Kansas City property so she would have income; why did he take the trouble to convert the proceeds of her transactions into a dividend paying stock; why did he try to persuade her to improve her living conditions with modern plumbing; why did he try to give her advice on the running of the plantation; and most significantly, why did he try so desperately to save Charles, Jr. and these very heirs' fortune for them when he seemed so unmindful, as plaintiffs view it, of all save himself?

The Court agrees with the statement of Attorney Murray made in his memorandum of October 27, 1938, to Mr. Johnson that any criticism of William, Sr. in respect to the sales by the Company of the Clow stock to William, Sr. "would not be justified."

The record is replete with concrete documentary evidence that William, Sr. was not "acting solely for the personal benefit and interest of himself and his own immediate family rather than for the purpose of helping or aiding Mrs. Pryor personally or the trust estate of Charles, Sr." He was the one to whom she turned for assistance when her improvidence got her into financial difficulties. *She* was not here complaining she had been taken in by him and bilked of trust stock. He was her staunch and ever-dependable friend. There can be no denying he was interested in the stock —he founded and piloted the Company for decades; he wanted to maintain it intact for his and his brothers' sons and heirs. Those sons steered the Company through the depth of the depression and made it the successful company it re-mained—still amply contributing to the plaintiffs' support through the trust stock their ancestors were not forced to part with in their vicissitudes.

If William, Sr. were the greedy ogre defendants picture him to be, and "known" to be even before Charles, Sr.'s death through the incident of the agreement changing his father's will—why didn't Charles, Sr. expressly omit him as an ostensible fiduciary guiding his "young and inexperienced wife and infant child" rather than naming him to appraise her reinvestments?

 There is not a scintilla of doubt in the Court's mind that William, Sr.'s intent was beneficent.

### *Fraud of William, Sr.*

 Plaintiffs variously charge William, Sr. with "strategems and devices" concealing "pertinent facts," giving "fragmentary information likely to cause her to sell" and omitting "to tell her that which might lead her to retain the stock," misrepresenting "material facts," using pressure by "postponing dividend payments and denying her loans, freely made to other stockholders," influencing "her through a show of affection for her" and her son, daughter-in-law, and grandson, exaggerating Charles, Jr.'s personal problems and deprecating his financial judgment, misstating the "law applicable to Charles, Sr.'s trust," making "veiled threats to call the loans made to Mrs. Pryor personally," and urging her "to spend more money for herself and son."

With extreme earnestness and remarkable and exhaustive research, plaintiffs have presented their cause, picturing William, Sr. as a man with an unswerving desire to acquire and maintain at all costs a majority control of the Clow Company. They portray him as an outwardly beneficent man, who actually was predatory, gaining control by taking advantage of his impoverished sister-in-law who had no knowledge of the real value of the Clow stock, whereas he was in full possession of the true facts of its great value, much in excess of the prices paid

her. They paint a Dr. Jekyll and Mr. Hyde portrait of William, Sr.[86]

Plaintiffs maintain that the uncontradicted evidence here not only established the presumed fraud of William, Sr. but goes even further and establishes actual fraud on his part, and there is no ground on which equity jurisdiction is so readily and freely exercised as that of fraud.[87] Fraud, they say, includes anything calculated to deceive, by suggestion of false or suppression of truth, by speech or silence, and if fraud is proved it vitiates all transactions touched by it.[88] They claim that "all the many facets of William, Sr.'s improper conduct towards Mrs. Pryor" fall within the definition of fraud—he "remained silent," "suppressed vital information," "told half truths" or "falsehoods," and "colored the truth." [89]

Plaintiffs assert that some of the facts, which were concealed from Mrs. Pryor with respect to actual fraud, and William, Sr.'s campaign, to acquire the trust stock, were the failure to disclose "any information about the unauthorized salaries and bonuses paid to William, Sr. and his sons and the illegal loans and advances made to them by the Corporation and the other loans and advances to other members of their families." They say:

"* * * [I]t was the duty of William, Sr. in his capacity as controlling stockholder and principal officer of the Corporation to have disclosed all of the facts relating to the Corporation, including the misappropriation of corporate funds through illegal compensation and loans as well as all other pertinent financial information relating to the condition and trend of business of the Corporation before attempting to purchase the shares of a stockholder such as Mrs. Pryor as trustee."

Plaintiffs staunchly maintain there is "a wholly independent basis for recovery * * * in the mass of evidence of *actual*

---

86. "He played his sweet music of trust and confidence on many strings. He emphasized their family relationship as well as his trust relationship. He expressed a fatherly interest in Charles, Jr. and said that since the boy was fatherless he would treat him as his own son. * * * He professed great concern for the welfare of Charles, Jr.'s wife and infant son. He appeared indignant over the separation of Charles, Jr. and Linda, and of Charles, Jr.'s failure to provide for Linda and the child. He professed concern over Mrs. Pryor's health and what would happen to the trust stock after her death. He urged Mrs. Pryor to spend more money to improve her living standards. He portrayed himself as always putting the interests of Mrs. Pryor and Charles, Jr. ahead of his own personal interests. His offers to buy trust stock were stated to be for her benefit and his detriment. He held himself out as the one entrusted by his brother Charles, Sr. to protect the interests of Mrs. Pryor in the business of the Corporation. * * * William, Sr. had a special talent for winning the confidence of widows. * * *"

"He repeatedly asserted to Mrs. Pryor in his letters that he was a 'trustee,' the 'sole trustee,' or 'the only living trustee' under Charles, Sr.'s will. * * * These representations were crucial in winning Mrs. Pryor's complete confidence which was essential to the acquisition of the trust stock."

87. Wright v. McKinney, 287 Ill. 529, 122 N.E. 813 (1919).

88. People ex rel. Chicago Bar Association v. Gilmore, 345 Ill. 28, 177 N.E. 710 (1931).

89. However, it might be pointed out that: "The law requires men, in their dealings with each other, to exercise proper vigilance and to apply their attention to those particulars which may be supposed to be within reach of their observation and judgment, and not to close their eyes to means of information which are accessible. A plaintiff, then, cannot rightfully complain of deceit with respect to any matter as to which by the exercise of ordinary care he could have detected the deceit, and if, by an ordinary degree of precaution, he could have ascertained the falsity of an allegedly false representation, plaintiff cannot recover in an action for deceit." I.L.P., Fraud, Sec. 14; Dickinson v. Dickinson, 305 Ill. 521, 137 N.E. 468 (1922). "* * * [O]ne who has suffered from fraud and deceit ordinarily should act promptly, upon obtaining knowledge of it." I.L.P., Fraud, Sec. 35; Fuller v. Garber, 296 Ill.App. 389, 16 N.E.2d 251 (1938).

*fraud* on the part of William, Sr." (Italics theirs), the proof of which is "extensive and overwhelming," to be found in his letters to Mrs. Pryor, his diary, the Corporation's correspondence with the Continental Bank, and the financial records of both the Corporation and the Continental Bank. The alleged fraud falls into three "categories": "(1) William, Sr.'s fraudulent campaign to acquire the trust stock from Mrs. Pryor as trustee; (2) his misrepresentations to Mrs. Pryor, and (3) his concealment of facts and information from her."

Defendants on the other hand press the legal proposition that active fraud and duress require proof of intentional and relevant misrepresentation or concealment, and actionable misrepresentation in the form of a statement of fact which is made for the purpose of inducing another person to act must be untrue, be knowingly made, be believed and relied upon, and the statement must be material.[90] The Seventh Circuit Court of Appeals so held in Harry Alter Company v. Chrysler Corporation, 285 F.2d 903, 906 (7th Cir., 1961). Concealment involves intentional nondisclosure that might justifiably induce the other party to act or refrain from acting. The matter not disclosed must be material to the transaction and it must be withheld by a person who had a duty to disclose.[91]

Defendants also insist that William, Sr. did not misrepresent the business and the prospects for dividends, and their proof shows that all of his prognostications were within the realm of sound business judgment. They were his honest, true opinions.

Plaintiffs point out that defendants employed no outside analyst to determine the value of the stock purchased from the trustee. The Pryors and Charles, Jr. consulted no lawyer, banker, accountant or any other person on any of the four stock acquisitions and therefore had no

independent advice. But Mrs. Pryor and Charles, Jr. were not persons untutored in appropriate sources of assistance. Charles, Jr. had employed the Wynn firm in August, 1935, to represent him in his marital difficulties and his interest in the trust stock was discussed, which resulted in the November 18, 1935, document. Mrs. Pryor did not accept unquestioningly William, Sr.'s advice as is shown once[92] by a letter of inquiry, asking enlightenment.

A very recent Illinois case, Brubaker v. Gould, 34 Ill.App.2d 421, 180 N.E.2d 873 (1962), also involved the issue of fraudulent inducement of transfer of stock. The Court found, 34 Ill.App.2d at p. 432, 180 N.E.2d at p. 877:

> "* * * [W]e believe that the evidence * * * sustains the allegations that the May 9, 1951, assignment was procured by Lahman by means of false and fraudulent misrepresentations, deliberately made with the intent to defraud the Brubakers of their complete interest in the stock."

> "Lahman freely admitted that he spent months trying to persuade the Brubakers to give up their stock. * * * *"

Many specific acts of fraud were enumerated, false statements, false affidavits, and collateral agreements. The Court held 34 Ill.App.2d at p. 433, 180 N.E.2d at p. 878:

> "Fraud is established by evidence of circumstances and facts which are inconsistent with an honest purpose and which convinces the mind of the existence of fraud. The proof should be clear and convincing in its nature, so as to leave the mind well satisfied that each element has been established. (In re Estate of Baumgarth (1960), 23 Ill.App.2d 319, 326,

---

90. Johnston v. Shockey, 335 Ill. 363, 366, 167 N.E. 54 (1929); Krankowski v. Knapp, 268 Ill. 183, 190, 108 N.E. 1006 (1915); Prentice v. Crane, 234 Ill. 302, 307–308, 84 N.E. 916 (1908).

91. Morris v. Thompson, 85 Ill. 16, 17 (1877); Mitchell v. McDougall, 62 Ill. 498, 502–503 (1872); Restatement, Torts, Sec. 550, 551 (1934).

92. PX 2420-A.

163 N.E.2d 201; 19 I.L.P., Fraud § 47.)"

Defendants point out that Mr. Pryor, a college graduate and state legislator, had participated in these transactions with Mrs. Pryor, yet he knew nothing questionable about any of the sales, and although a party to this litigation after Mrs. Pryor's death, did not appear. They also point out that Mr. Wynn, with a duty as executor of Charles, Jr.'s estate which was kept open for thirteen years, even after this suit was begun, made no claim that the transactions were unfair.

Mr. Kiddoo, witness for the defendants, in examining the letters of William, Sr. to Mrs. Pryor, found no misstatements of fact or any predictions that were beyond the realm of, or inconsistent with, sound business judgment. He testified that all William, Sr.'s suggestions made to Mrs. Pryor were sound financial suggestions. The proceeds of the first sale were reinvested to gain income for her to meet the necessities of life; she was in financial distress and needed income. Mr. Kiddoo felt that the suggestions of William, Sr. were made to accomplish that end. He thought it was perfectly proper to convert the Clow stock into interest bearing securities. He testified that it was his opinion that the Clow stock was sound and its position sound, but that other stock or securities would have been preferable to the Clow stock as an investment for the trust in 1935. Plaintiffs sought to assail the soundness of William, Sr.'s advice to Mrs. Pryor by minute cross-examination of his correspondence with her, tediously asking seriatim, whether each letter contained sound business advice, and always elicited an affirmative answer from Mr. Kiddoo.

Mr. Douglas, son-in-law of William, Sr., and witness for the defendants, vehemently stated that the failure of the Board of Directors to pay common stock dividends was "absolutely not" due to an attempt to embarrass Mrs. Pryor financially. He explained the reason to be that the directors were unanimous in the feeling that the security and safety of the Company were the first thing to be considered; the Company had been through an extremely dangerous and difficult time; the first mortgage was practically a stranglehold on it and they were all determined to pay off that dreadful first mortgage before they could freely indulge themselves in common stock dividends. He further testified that the January, 1935, sale of Mrs. Pryor's stock occurred because she was very acutely pressed for money and the sale of the stock *was requested by her*, and her representatives and agents.

Mr. Douglas further stated that it had been discussed at the directors' meeting as to what should be done with the treasury stock, and it was thought to be a good idea to resell it and then an offer was made to the various individuals. He did not want it at that price. William, Sr. took it.

When inquiry was made of Mr. Douglas as to his corporate experience as to whether advances were charged interest, he replied they were not because they are charged against salaries and collected at the end of the year, and as a whole they were so collected by the Clow Company, with the exception of the advances to William, Jr. In commenting upon the letter of William, *Jr.* of May 18, *1942* (upon which plaintiffs place great emphasis), which included, witness said, "statements made by a man who had been and was under medical care for mental disturbances," Mr. Douglas said that the statement "We [93] have all got to stick together" was abnormal, and "extravagant, inaccurate statements." That letter also contained the statement:

"Incidentally I negotiated the deal with Hattie Clow to assure this control; * * * since then of course Dad has added to the control by

93. Letter read: "It is important for Kent, Martha and me to stick together * * * because combining our three interests we control Clow and Sons."

purchases which Hattie had to make to him during the depression."

Mr. Douglas said that to the best of his knowledge, William, Jr. did not do any "engineering at all of the affair."

A letter of May 23, 1935, from Attorney Walker of Memphis, illustrates the pressure upon William, Sr. to procure the sale of Hattie's stock, as well as the availability of legal counsel to her and their consultation. It stated:

> "Hattie has shown me your letter of May 20th relative to the stock in James B. Clow & Sons which is held in trust for her during her lifetime.
>
> "Hattie is in a terrible jam if she cannot get some relief out of this stock and it is very difficult for me to make any suggestions without having a little more knowledge of the situation. In your letter you speak of having consulted the Company's lawyer and that he was very much opposed to your purchasing the stock."

Out of all the multitudinous contemporaneous documents written by the alleged malefactor, there occur but these few fragmentary statements capable of any indication of a desire by William, Sr. to acquire the stock of Mrs. Pryor. On August 10, 1940, he wrote her:

> "I wrote you a letter quite a few months ago to which you made no response. I wrote you that if you wanted to sell any portion of your stock I would be glad to take it from you at par. Under existing conditions I cannot leave that offer open."

Two weeks later he wrote her a very friendly, chatty letter stating he approved of her creating a trust for Charles, Jr. because of his inability to hold on to money.

William, Sr.'s diary records that on December 15, 1934, he told Linda and Hattie that he would not buy the third of the stock, that instead he would advance them funds at six per cent interest against dividends on Clow stock. April 9, 1935, he wrote that he had had lunch with Attorney Murray who told him not to buy Hattie's stock—such a purchase would be likely to be set aside. On May 25, 1935, he wrote in his diary, "Home with Jr.; talked over Hattie's case and I decided not to buy stock."

The overpowering need of William, Sr. for control of the Company through the purchase of Mrs. Pryor's stock is not too evident when the chart revealing the percentage of shares voted by William, Sr. from 1928 through 1942 is studied. In 1930, long before the first purchase in 1935 was effected, William, Sr. voted 99.40% of shares present, and the lowest percentage voted by him in this interval was 61.25% in 1933.

One letter of William, Sr. stated that he was glad that Mr. Murray agreed that a transfer of the stock to him by the Company was legal because he could then "rest in peace knowing that none of Charles' ex-wives can take that which I know his father wanted him to have."

There can be no question of William, Sr.'s continued interest in the Company he had helped found over a half century before. On November 27, 1939, he wrote to Mrs. Pryor, "I am now in pretty good health and I am doing the best I can to take care of my health that all three of us may be able to look after the interests of this company, the welfare of which means so much to us."

A letter dated March 1, 1937, from William, Sr. to Mrs. Pryor states that:

> "Our stock is being offered on the Chicago market, but so far *there have been no sales*, as no stock has come into the office for transfer. We have just assumed that it was either Linda's or her lawyer's, although there has been no transfer of the stock to her attorneys." (Italics supplied.)

Two things are evident from that statement—*there were no buyers* for the stock on that date, and William, Sr. did not

buy it then although it is in the interval when he is said to have been grasping for the stock, both before and after this date, from Mrs. Pryor.

It is possible that as plaintiffs contend the sale of the trust stock to the Company and then several months later to William, Sr. was a device to circumvent the Company's counsel's belief unjustified criticism might arise to a direct sale. However, if such were the fact, and the evidence does not so indicate, that would not *per se* condemn the transfers as illegal. Had this device not been utilized, plaintiffs would in all probability be in a far worse position today. Mrs. Pryor would have undoubtedly lost all her (the trust's) stock to the creditors to whom she had pledged it as collateral.

Mr. Earle F. Johnson, when called as an adverse witness, stated definitely that *William Clow, Sr. never initiated any transactions in stock with Mrs. Pryor,* that it was always a matter of her being in financial distress and appealing for help.

Harry B. Clow testified that there was "certainly" no agreement when the Company acquired Mrs. Pryor's stock that it would be resold to William, Sr., and he had no such understanding or agreement. Mr. Johnson also testified that when the Company purchased the Clow stock from Mrs. Pryor it was bought with no strings attached and was available to anybody who had the money and who wanted it. When asked whether it was understood at the time the Company bought the stock that William, Sr. would repurchase it, he stated the contrary to be the fact.[94] He also testified that the Company was reluctant to buy any more of the Clow stock from Mrs. Pryor.

It is wholly evident to the Court, therefore, that not only is there no evidence establishing actual fraud on the part of William, Sr., but the evidence proves the contrary to be the fact, that he committed no fraudulent acts in the arranging of the Company's purchase of Mrs. Pryor's stock at her request and at prices others suggested. He made no affirmative misrepresentations; she relied on no statements by him. He concealed nothing from her, and she asked for no information.

*Management of Clow Company—Advances—Company Finances*

Plaintiffs stress William, Sr.'s control as president and chief executive officer

---

94. Sidney Murray wrote to Mr. E. F. Johnson in response to an inquiry as to whether William, Sr. could buy the stock of Mrs. Pryor within one month after the Company's purchase, thus:

"I think Mr. Clow misunderstood me in respect to the purchase of certain shares of common stock held by Mrs. Pryor. Mr. Clow should not buy the stock from Mrs. Pryor as we have discussed. The Company should buy it if it desires and after a period of around five or six months if the Company desires to sell it to Mr. Clow, Sr. for a fair and reasonable price, there is no objection to it. But when the Company buys the stock from Mrs. Pryor there should be no understanding that it is to sell it to Mr. Clow, Sr. and the Company will have the option to sell or not to sell to him as it desires."

In further elucidation of the problem, Mr. Murray wrote Mr. Johnson on October 27, 1938:

" * * * I think it inadvisable for Mr. Clow, Sr. as Trustee under the will of Charles R. Clow, deceased, to buy any stock held by Mrs. Pryor as Trustee under this will. If Mrs. Pryor desires to sell some of the Clow stock held in this estate to Clow & Sons, Clow & Sons has a right to purchase this stock if it so desires. If Mr. Clow, Sr. desires to purchase additional common stock of the Company, and the Company desires to sell it to him at a reasonable price, *the fact that this stock was formerly held by Mrs. Pryor as Trustee and sold to the Company would not make it improper for Mr. Clow, Sr. to buy the stock.* This stock, after Clow & Sons have purchased it from Mrs. Pryor, is turned back into the treasury of the Company and is treasury stock. Assuming, as I do, that there is no connection between the sale of this stock by Mrs. Pryor to the Company and the purchase of additional stock by Mr. Clow, Sr. from the Company as treasury stock, I think it would be advisable so Mr. Clow, Sr. would be free from criticism (*which would not be justified*), that he delay his purchases for five or six months." (Italics supplied.)

of the Company from 1908 to 1942, presiding over the Board of Directors, etc. They state, "In the Corporation his word was always final" including "personally fixing and regulating * * * compensation." Mrs. Pryor on her deposition testified that she felt the Clow Company had been a pretty good company in which to hold stock and she was satisfied with the management all through the years, and that they did everything they could to make money for her. Mr. Pryor's confidence in the management of Clow Company was shown by his letter to William, Sr., dated January 26, 1937, heretofore quoted, commending its accomplishments. Dr. Anderson, plaintiffs' expert, concluded the Company was reasonably well managed. The Company's bank in several letters [95] gave high commendation to the management. The fact that plaintiffs seek stock rather than damages is proof itself of their appraisement of the management.

■ Plaintiffs berate the failure of the Company management to declare dividends during the interval of the four transactions, such failure being well nigh the proximate cause of Mrs. Pryor's financial distress. They charge the failure to have been premeditated to achieve her financial troubles. However, Harry B. Clow said that the matter of dividends was discussed at every meeting, and that his branch of the family was as anxious for the resumption of dividends as anyone else, and that there was no time that dividends could have been paid when they were not paid and they were resumed as soon as possible. Defendants explain there was no design on the part of William, Sr. to pass dividends so as to embarrass Mrs. Pryor. Rather, in January, 1935, the provisions of the trust indenture prevented the Company from declaring the dividends from Spring of 1932 to the Fall of 1935, and furthermore it would have been imprudent to do so, until December, 1936, when common stock dividends were renewed. In the Fall of 1935, earnings were sufficient to pay dividends under the trust indenture but there were still arrearages on preferred stock so it would have been imprudent to pay common stock dividends.

Mr. John Francis Mannion, a senior vice president of the Continental Illinois Bank, said the Company could not prudently have paid dividends prior to December 1, 1936.

In March of 1932, the Company suspended the payment of both preferred and common dividends. In 1935, it began to pay off the arrearages on the preferred stock, and in 1936, the entire preferred arrearages were paid off.

The Company (according to Dr. Anderson, plaintiffs' economist) was in pretty

95. June 1, 1932: "We have enjoyed relations with the Company for a considerable length of time, being favored with substantial balances, and we extend a line of credit of $500,000 on plain note."

November 14, 1933: "James B. Clow is an old and well established enterprise. * * * We have had an account for a number of years, in which connection balances of substantial proportions are maintained with us and the company has borrowed in medium six figure amounts. While loans during the past year or so have been steady, our experience on the whole has been satisfactory.

"Due to generally depressed conditions during the past few years and the lack of interest in capital expenditures, the company, not unlike others in its industry, has experienced a substantial shrinkage in volume and while at first it was a little difficult to adjust expenses to pace the declining volume, it nevertheless effected substantial savings so that its operating record so far this year reflects a marked improvement over the same period last year. * * * *We have a high regard for the management and we believe the business received close and able supervision."*

October 7, 1937: "This is an old well-established organization engaged in the manufacture of plumbing supplies * * * and *the business is in excellent standing in all respects.* We have a substantial account from the company and have extended loans well into six figures on unsecured paper, in fact we assisted the company in taking up the remainder of its first mortgage bond indebtedness. * * * The company made a substantial profit last year and paid up accumulated dividends on the outstanding Preferred Stock." (Italics supplied.)

bad shape in 1931, 1932, and 1933, with losses.

The Company purchased the assets of National Cast Iron Pipe Company in 1929 for $3,500,000 borrowing $3,000,000 through the issuance and sale of 5½% first mortgage bonds, maturing at rate of $300,000 a year beginning February 1, 1931, through February 1, 1938, with balance of $600,000 to be retired February 1, 1939. The indenture provided the Company could not pay a cash dividend except out of net income accrued after July 1, 1928, nor which would reduce ratio of current assets to less than double its current liabilities. Plaintiffs challenge the Company's early or premature retirement of the installments of this bonded indebtedness, rather than declaring dividends on the common stock. In 1932, the Company reduced its bonded indebtedness to $1,900,000. It had purchased $119,600 bonds of varying maturities mostly at from $47 to $50 a hundred. It was indebted to the Continental Bank in the sum of $425,000 at the end of 1932. At the end of 1933, $1,684,500 in bonds were outstanding. The Company refused to default on the February 1, 1934, bond maturity as suggested by the Bank. At the end of January, 1934, the Company owed the Bank $450,000. No dividends were declared in 1933, and the arrearages on the preferred amounted to over $100,000 at the end of that year.

The combined earnings of the Company dropped from $629,071 in 1929 to $328,630 in 1930; sales in 1930 fell to $8.7 million from over $10.7 million in 1929; in 1931, net sales fell to $4.8 million, ending the year with a loss of $393,304. Salaries and wages were cut across the board from 10–15%. Sales fell to $2,193,305 in 1932 (one-fifth of 1929); they were $2,311,536 in 1933 (about 25% of the $11,000,000 of 1929); production was one-sixth of the peak 1927 year.

In 1930, the Company initiated the policy, which plaintiffs condemn, of prematurely retiring the first mortgage bonds, retiring the entire 1931 maturity in 1930, and called for retirement the 1932 maturity for payment on February 1, 1931. In addition, the Company in 1930 purchased $184,500 of bonds of varying maturities for subsequent years to 1932. The stockholders had been advised of this program in the annual report of 1930. In 1931, $70,500 of later maturities were purchased so outstanding bonds were reduced to $2,145,000 by the end of 1931. The Continental Illinois Company had purchased for the Company, during 1931, $126,000 of the Company's bonds at $98.25 or less. The Company was indebted to the Bank for $500,000. There was a total loss for 1932 of $672,996, ranging from $30,000 to $92,000 per month. By midsummer 1932, wages had been cut a total of 40%; they were cut an additional 10% in 1933. On March 20, 1932, the directors voted to omit common stock dividends until further notice.

In each of the first nine months of 1933, the Company lost money, losing in excess of $200,000 in that period; but in the last quarter its earnings improved markedly so the year showed a loss only of a little less than $3,000. The first five months' loss in 1934 was $20,000 and December showed a loss of $95,000, but June through November were good, so the year had a total combined profit of $216,660. The sales increased to $3,797,486, about one-third of 1929. Production was about one-third of its 1927 peak year. Its bank debt was wiped out by the end of 1934; bonded indebtedness remained at $1,412,500 with $228,000 due on February 1, 1935. No dividends were paid, and preferred arrearages were $171,465.

The year 1936 showed a substantial increase in sales, the best since 1930. The Company earned money in each month and closed out the year with earnings of $844,000—more than double the earnings in the year 1935. In 1936, it retired the balance of its bonded indebtedness with the aid of an $800,000 bank loan, of which it was able to pay off $300,000. By 1936, the Company had paid up all of its preferred dividend arrearages. In 1937, the Company's sales

declined by more than $400,000 because of cutbacks in federal spending. During the last half of 1937, the monthly profit rate was running substantially lower than the corresponding period in 1936, but the Company showed earnings of $518,000 before an extraordinary write-off for abandoned coal lands. The first quarter of 1938 was the most profitable for the Company since the depression. The earnings for the first half of 1938 had declined 32% from the year 1937.

Mr. Mason testified that from his experience in reorganizations, he believed that if the Clow Company had defaulted its bond issue and been reorganized there would have been nothing left for the common stock.

The tempo of the Company's business, as reflected by the general statements in its balance sheets for the years 1930 through 1938, is shown by excerpts quoted below.[96] Witness Sporrer had no criticism of the Company's annual

96. The Condensed Consolidated Balance Sheet for *1930* stated:
"During 1930 the depression in the building industry was the worst we have experienced in fifty-three years. Our organization is to be congratulated on their exceedingly good work that resulted in *earnings justifying payment of dividends* and a substantial increase in surplus. * * *" (Italics supplied.)

The 1931 Sheet stated:
"For the first time in fifty-four years, we were unable to earn money during the year 1931. *Loss for the year amounted to $393,304.* * * * The demand for all products sold by your company was lower than in any recent year. Prices on all products were reduced. * * * Our various manufacturing plants have not averaged 40% of normal production. * * *" (Italics supplied.)

The 1932 Sheet stated:
"Unfortunately, I must now add another year during which your Company lost money. * * * I believe the worst of the depression is over—that from this time forward there will be an improvement in the demand for our products. * * * Throughout your organization drastic economies have been put into effect to meet the existing situation. We are entering 1933 with the expense account so reduced that should there be even a moderate upturn from our very low sales in 1932 it will be possible for the Company to again operate in black figures. I trust and believe that the year 1933 will prove the turning point. * * *"

The 1933 Sheet stated:
"The year 1933, although it records a small loss for the year, shows results which we sincerely feel justify great optimism for the future. * * * The retirement of these bonds * * * has been an added financial burden. With the return of reasonable earnings, such as may be expected in 1934, it is felt your Company will not only be able to meet this obligation, but it is hoped that at least

a start may be made in paying dividends on the preferred stock, arrears on which, on February 1, 1934, amounted to $102,879. * * * Our organization has necessarily suffered heavy cuts in compensation —*the minimum reduction of salary in all but the lowest brackets having been 50 per cent.*" (Italics supplied.)

The 1934 Sheet stated:
"For the first year since 1930, we earned a net income of $216,660.63. * * * The volume of our business improved during 1934 and we sincerely trust that there will be a continued improvement in 1935. In this day it is impossible to predict the future—dependent as it is on so many unknown and unpredictable factors. * * * Wages and salary increases were made during the past year, but drastic economics are still in effect throughout the organization. * * * I express the hope that the year 1935 will bring with it a fair reward. * * *"

The Balance Sheet for 1935 stated:
"Improvement in our general business, which began in 1934, continued during 1935. * * * Prospects seem to indicate continued improvement in our entire business during this year. The building business * * * is showing great improvement."

The Balance Sheet for 1936 stated:
"Our statement submitted herewith very clearly shows the improvement resulting from more normal earnings which your company enjoyed in 1936. * * * Our pipe business during recent years has depended to a considerable extent on loans made by the Federal Government to municipalities. * * * Earnings made in 1936 were used to reduce bank indebtedness to pay all arrears in dividends on our cumulative preferred stock, and moderate dividends on the common stock were paid —the first since March 1st, 1932. Part of these common dividends were paid in notes maturing in 1941. * * * Salaries and wages have been readjusted during

reports; he said that these reports for ten years in this Company, a closely held and family managed company, had as much information as is given in audit reports of independent public accountants.

The Clow Company business was directly related to the expansion and development of new homes which create a demand for cast iron pipe, which in turn is dependent upon the financial situation of local governments. During the depression, conditions were chaotic; taxes were delinquent; municipal financing for new developments which had totaled almost a billion and a half dollars in 1927 had dropped down to $156,-000,000 in 1933, a decrease of about 90% from the 1927 total. By 1935 it had picked up slightly to 29% of the 1927 total. In 1925, the value of new building construction was about $4,000,000,000 in 257 cities; by 1929 new construction had declined to slightly over three billion dollars. It was a half billion in each of the years 1932, 1933, 1934. Chicago building permits [97] in 1934 were but two per cent of the 1929 figures; the construction industry did not come up to the late 1920 level until 1947.

Industrial production in 1932 was only about 53% of what it had been in 1929. Between the end of 1929 and the beginning of 1933 the increase in unemployment was about 4,000,000 a year and reached a peak in the first quarter of 1933. In the years 1932 to 1935 there were 10,000,000 unemployed.

Privately financed building construction in United States was about six and a half billion in 1928, declined to five and one-fourth billion in 1929, three-fourths billion in 1933, and less than one billion in 1934.

Dr. Langum testified that April, 1938, was a low point in the sharp recession of 1937–1938.

Dr. Robert Mason, testifying as an economic expert for the defendants, stated that the climate of the security market in January, 1935, was "very stormy." The conditions in Chicago were very bad about that time. With the exception of Detroit, Chicago had had more bank failures, more bond defaults, more financial trouble than any city in the country. The Sanitary District bonds had been in default as to interest and some as to principal. Twenty-one park districts had bonds outstanding. There were hundreds of special assessment issues in the Chicago area in default. The City issued tax anticipation warrants with which it paid its teachers and firemen. All of this was very much in the minds of people in January, 1935. The skepticism was due to the fact that such recovery as had

---

the year to more than offset the increased cost of living."

The Report to stockholders for the year 1937 stated that:

"The consolidated balance sheet submitted herewith continues to reflect the improvement in the financial position of your company. Current assets of $2,-523,042.51 and current liabilities of $440,-220.10 show a ratio of 5.7 to 1. Inventories continue high due to a desire to keep employment steady and to an unexpectedly severe drop in the volume of business experienced during the last quarter of 1937. * * * Total earnings were considerably less than in 1936 due to higher wages and increased taxes. * * * Present indications are that we are entering an apparently difficult year but look forward with confidence in the ability of our organization to meet whatever is in store for us."

The 1938 Annual Statement said:
"The statement of the financial position of your company * * * shows a considerable improvement resulting from more normal earnings and the reduction of fixed indebtedness. Our earnings during 1938 were largely due to very favorable purchases of raw materials. * * * It is difficult to prophesy what our prospects will be during 1939. It is perhaps interesting to note that our 1938 volume of business was approximately 40% of the volume of business in 1926. During the latter months of 1938 there was a material increase in building permits; so far in 1939 they are running at a considerable increase over the period in 1938. Should this condition continue, it is reasonable to expect an increase in our volume of business. * * *"

97. 17,501 in 1925; 6,146 in 1929; 461 in 1933, and 521 in 1934.

542

occurred was due to Government pump priming.

The management of the Clow Company by William, Sr. and his sons appears to the Court to have been able, conservative and sturdy, with prosperous results and failure averted. Plaintiffs complain of the premature retirement of bonds in preference to the declaration of common dividends, but the bonds were retired at less than face value, thereby effecting the double saving of not having to pay the full amount at maturity and erasing continued high interest liability. The saving in any respect was vital during the times of such great losses and uncertainty of sales. The Court reads into such action ultra conservatism rather than spite to deprive Mrs. Pryor of much-needed common dividends. Several of defendants were substantial common stockholders as well—they were thwarting their own income to a very considerable degree, when they too needed the income, a need evidenced by Company advances to them.

Great reliance is placed on the allegedly illegal loans and advances between 1930 and 1938 by the Company to the Clow family members, without interest being charged. Plaintiffs point to the fact that Mrs. Pryor, on the other hand, was routinely charged interest. They contend that the loans were frequent, sizeable,[98] unauthorized, without interest, and generally without collateral. They were illegal because to officers, and, being not divulged to Mrs. Pryor, "shows a lack of fair dealing on the part of William, Sr. and the Corporation on each of the four stock acquisitions from Mrs. Pryor."

Charts reveal in great detail the very substantial personal indebtednesses of the various members of the Clow family on the Company's books, from July, 1929, through December, 1942. The total ran as high as $211,431 in November, 1936. At other times the total sums owed were low, such as in January, 1931, when a total of $2,800 was owed. However, the total owed was generally well over a hundred thousand dollars. The principal debtor was William, Jr., who in the same month of November, 1936, owed his top indebtedness of $135,927. Kent's top figure occurred the same month, and amounted to $37,294, but his indebtednesses were generally quite a bit lower. William, Sr.'s peak indebtedness occurred in September, 1931, when he owed the Company $59,724. His indebtedness was generally below $10,000 and frequently there was no indebtedness. His wife's largest loan was for $53,175 in November, 1929, but from May, 1930, until June, 1937, she sustained no debt to the Company.

William, Jr.'s indebtedness to the Company was secured not later than 1936, by stock of the Company, amounting to 5,-554 shares of common stock pledged as security at the time of his death. He also assigned two $50,000 life insurance policies to the Company as security. Advances to William, Sr. were considered as advances against anticipated annual compensation, including customary bonuses. William, Jr. was permitted to charge larger amounts to his personal account, it was testified, because "of his peculiar personal circumstances and his personal importance to the most vital interests of the Company." An answer to an interrogatory said that no collateral was procured from William, Jr. from 1928 to 1936. In September, 1936, the two five-year policies were assigned to the Company as security, in addition to the common stock and held as security until his death in 1953.

Defendants maintain that the advances and loans to the officers and key employees did not constitute fraud, duress or unfair dealing. They adduced evidence to show that the Company had, since 1910, permitted officers and employees to draw against anticipated compensation, and the practice was frequent. The accounts were settled at the end of the year, except in the depression years. The advances to officers' wives (or mother) were usually charged to the

98. Ranging from "$99,000 to over $211,000."

officers' accounts, but if not, they were considered their obligation. *Mrs. Pryor's own husband, Charles, Sr. was indebted to the Company for $15,000 when he died and which she as executor had to pay back.* She must therefore have known of the practice of loans to officers. The annual reports she received showed these advances. It was usual corporate practice and was known to the Company's attorney. William, Jr.'s debt was the only really sizeable one; he was having illness in the family and financial distress, was heading the Company and was deemed invaluable to it. (His procuring of a loan from the Continental Bank when his father failed seems to prove that assertion.) Defendants stoutly maintain that the loans and advances were not directed to embarrass Mrs. Pryor; they had no effect on dividends.

They point out that Mrs. Pryor was not being discriminated against in not being permitted to make these loans. She was only a stockholder, not an employee or officer. The Court might also add that the Company might well have been censured for lending to so improvident a stockholder.

They also refute the assertion that the advances to officers and employees were illegal under the Illinois Business Corporation Act (Ill.Rev.Stat.1959, ch. 32, secs. 157.41b, 157.42(h)), because under the first section any director who votes for or acquiesces in a loan to a director or officer is personally liable for the repayment of it, and, under the second section referred to, it is a criminal offense for a director to vote for or assent to such a loan. The sections, passed in the midst of the depression, were designed to protect creditors from an improper withdrawal of capital by directors or officers, but were never considered or construed to affect the right of a company to advance moneys against anticipated compensation. But whether legal or illegal, the existence of the practice was fully known to Mrs. Pryor.

Mr. Kiddoo, a retired vice president of the First National Bank, testified that many corporations made advances to their employees to keep them from being thrown out of their homes or having their mortgages foreclosed or being able to meet pressing needs for medical care. It was his experience that that was common practice; it was done by the First National Bank, whether it was legal or not.

Mr. Harry H. Wolf, the Company's accountant, stated that the Clow Company practice of making advances went back many years, and the advances were always shown on the audits.

Harry Clow, in answer to the question as to why William, Jr.'s debt was permitted to run the way it did was that he was the person who was getting the Company out of the woods and they had a lot of confidence in him. William, Jr. had heavy expenses because his wife was very ill. Since the advances were secured they could be collected at any time. He felt it was good corporate practice and finally it worked out all right because every cent was paid.

Mr. Mannion, senior vice president of the Continental Bank, said he could not recall that the Bank ever questioned the propriety of the advances to the officers or employees in the years 1930 to 1938. He knew of the substantial advances to William, Jr. He said William, Jr. did a tremendous job for the Company. He went on to say that "Bill Clow and Kent Clow did a remarkable job."

The Court concludes that the existence of the advances was well known to Mrs. Pryor personally through her husband's own loan and through the statements of total amounts in the annual statement. She was under no delusion at the time of the four transactions as to the occurrence of such loans, and the loans themselves had no effect upon the value of the stock or the failure to declare common stock dividends. They assisted the controlling personnel who were much needed to weather the depression. The Company suffered in no way therefrom. Mrs. Pryor was not in the same category as were officers and their wives, and employees, to whom the Company would be paying salaries and bonuses from which

the advances could be and were deducted. She was an outsider in respect to her relationship to the Company and the privilege of receiving advances.

The plaintiffs also complain of "excessive" salaries and bonuses paid officers and employees, and the method of making the bonuses. The bonus system started in 1911, and in the beginning was handled by the Company giving William, Sr. a lump sum check which he deposited in his personal account, out of which he gave personal bonus checks.[99] The plaintiffs stress the oddness of this procedure. Plaintiffs even infer that William, Sr. presumably retained sums paid to him to be distributed. Thus in 1936, $13,117 is asserted to have been retained by William, Sr., whereas the diary reveals the names and amounts of payments totaling $9,800 additional was paid out of the $62,867.01 received, leaving a net deficiency of over $3,000. Defendants on the other hand contend the secretiveness was not for William, Sr.'s benefit but to prevent dissatisfaction of the personnel which would occur if all bonuses were known. Key personnel in the three departments made recommendations to William, Sr. as to the amount of bonus to be paid deserving personnel.

The by-laws pertaining to bonuses were amended in 1919 to provide that officers might pay such bonuses as the President determines.[100] The provision was revoked in 1935 and replaced in 1936 with a similar provision, with the additional requirement of the "approval of the Board of Directors" but no resolutions were passed and William, Sr. continued making the payments. Sometimes bonuses were paid although payments had not been made to surplus, or in excess of amount of dividends, and even though no dividends were paid and although there were losses shown in the audits. Plaintiffs argue all this information was not divulged to Mrs. Pryor, and it was important data for a stockholder contemplating sale of her stock, because materially affecting assets, net worth, earnings and dividend paying capacity. The practice could have been curtailed in the future, and recovery had for the past practice.

Defendants point out that the bonus plan was in existence long before the transactions with Mrs. Pryor and still continue. The Board's actions on the key personnel's recommendations were not generally made a matter of record, in line with the attempt at secrecy. The uncontradicted evidence showed that this was not an unusual procedure with companies. The bonuses were reported as compensation for income tax purposes and were never questioned by the Government.

Defendants also maintain that as to the salary and bonus matters, they could have had no bearing on the stock transactions, and there is no inference that if Mrs. Pryor had known all these details it would have made the slightest differ-

---

99. Later the bonuses were put in a special account and the records destroyed after the payments were made.

100. The minutes of the annual meeting held April 8, 1919, stated: "After payment of dividends of 6% on the Common Stock and 7% on the preferred stock and an equal amount added to surplus, the President may pay out from the earnings of the Company an amount equal to the dividends paid, this amount to be distributed in the form of bonuses among the employees and officers of the company in such amounts and to such persons as may be determined by the President."

The 1919 by-law amendment was voted by four directors, including William, Sr., William, Jr. and Kent, and opposed by Harry, Sr. Plaintiffs ascribe to this amendment an intention "to be used and was used by William, Sr. and his sons as a means of distributing to themselves as 'special bonuses' large amounts of corporate earnings in addition to their substantial but unauthorized salaries." They concede, however, that William, Sr. "distributed some additional portions of these funds to selected officers and employees of the Corporation." Plaintiffs argue that because William, Sr. and sons knew and intended they would be used primarily for their own personal benefit their votes "must be disregarded" and as "a result the resolution was never adopted for lack of a disinterested quorum" and was therefore "never validly enacted."

ence to her in her decision to sell the stock or the price at which to sell it.

Plaintiffs also challenge as "large and unauthorized" the salaries [101] and special bonuses [102] paid William, Sr. and his family from 1929 through 1938, the salaries for William, Sr. averaging $27,-314.85 and those of each of his sons, $20,-756.08. In the years of the transactions, 1935 and 1938, each son received a $10,-000 bonus in 1938 and $2,500 in the year 1935.

Plaintiffs do much calculating over the nineteen-year period, 1920 through 1938, to come up with an aggregate monumental figure of $2,621,923 for the father and two sons in bonuses and salaries.[103]

Mr. Harry H. Wolf, the accountant, stated that it was determined that the salaries paid were proper, and he had no

101.

| Year | William, Sr. | Salaries of William, Jr. | Kent | Total |
|------|------|------|------|------|
| Total Salaries 1920–1938 | $518,982.11 | $394,365.52 | $394,365.49 | $1,307,713.12 |
| Average Annual Salary, 1920–1938 | 27,314.85 | 20,756.08 | 20,756.07 | 68,827.01 |
| Salary in 1929 | 31,250.00 | 26,250.00 | 26,249.97 | 83,749.97 |
| Salary in 1930 | 35,000.04 | 30,000.00 | 30,000.00 | 95,000.04 |
| Salary in 1931 | 33,250.04 | 28,500.00 | 28,500.00 | 90,250.04 |
| Salary in 1932 | 19,773.61 | 16,948.89 | 16,948.89 | 53,671.39 |
| Salary in 1933 | 21,350.20 | 18,300.00 | 18,300.00 | 57,950.20 |
| Salary in 1934 | 19,191.66 | 16,450.00 | 16,450.00 | 52,091.66 |
| Salary in 1935 | 24,499.92 | 21,000.00 | 21,000.00 | 91,209.84 |
| Salary in 1936 | 29,166.64 | 25,000.00 | 25,000.00 | 79,166.64 |
| Salary in 1937 | 31,500.00 | 27,000.00 | 27,000.00 | 85,500.00 |
| Salary in 1938 | 31,500.00 | 27,000.00 | 27,000.00 | 85,500.00 |

102.

| Year | Special Bonuses Received by William Sr. During Years Shown — Total Received by Wm. Sr. During Yr. | Amount Redistributed by him to William, Jr. | Kent | Others | Difference Presumably Retained by William, Sr. |
|------|------|------|------|------|------|
| 1920–1938 | $ 98,263.50 | Unknown | Unknown | Unknown | Unknown |
| 1929 | 239,200.00 | Unknown | Unknown | Unknown | Unknown |
| 1930 | 280,950.00 | $55,000.00 | Unknown | Unknown | Unknown |
| 1931 | 99,780.00 | 30,000.00 | $30,000.00 | Unknown | Unknown |
| 1932 | 31,034.52 | Unknown | 15,600.60 | Unknown | Unknown |
| 1933 | 15,300.00 | Unknown | 5,000.00 | Unknown | Unknown |
| 1934 | 9,500.00 | 1,500.00 | 1,500.00 | $ 750.00 | $ 5,750.00 |
| 1935 | 18,000.00 | 2,500.00 | 2,500.00 | 3,046.00 | 9,953.50 |
| 1936 | 62,867.01 | 10,000.00 | 10,000.00 | 29,750.00 | 13,117.01 |
| 1937 | 70,300.00 | Unknown | 10,000.00 | 40,300.00 | Unknown |
| 1938 | 74,150.00 | 10,000.00 | 10,000.00 | 44,150.00 | 10,000.00 |

103. There does not seem to be a whit of evidence they did not earn either the salaries or bonuses. It is possible that if it had not been for these very "interested" personnel the Clow Company might not have weathered the storm that others failed to survive.

546

question in his own mind that those responsible for operating the business had properly executed their responsibility with respect to compensating themselves and those working for them.[104]

Mr. Mannion of the creditor bank also testified that he had reviewed the salaries paid and felt that in view of the circumstances, they were not disproportionate.

Plaintiffs bemoan the fact that Charles, Sr.'s family was never asked to nominate a director although holding sufficient stock interest to merit it, and that their proxy was solicited by and given to management. Again, however, there is no indication anywhere that plaintiffs' ancestors sought to nominate a director. It seemed evident they had no real interest, such as held by the other Clows, in the family company. Charles, Jr. had twice been employed with regrettably poor performance.

*Laches and Estoppel*

One very serious obstacle to plaintiffs' right to maintain this suit is the long delay in its institution. Plaintiffs negate the charge of laches, however, asserting that it is undisputed that they had no knowledge personally of the complicated facts on which this action is grounded, and Mrs. Pryor and Charles, Jr. lacked knowledge of many important facts. Attorney Wynn also lacked knowledge as evidenced by his correspondence with co-counsel in Chicago, who were unable to get needed information. They state there was concealment and nondisclosure of vital facts by William, Sr. and the Company, which facts were learned for the first time through discovery in this cause.

The defendants maintain that the period of laches begins to run not when the parties suing or their predecessors learned of the matters complained of,[105] but when, with reasonable diligence, they could have learned of such matters. And, as plaintiffs sue derivatively on behalf of an alleged trust and Mrs. Pryor as an alleged trustee, the laches of Mrs. Pryor constitutes a complete bar to their claims. Furthermore, since the alleged trust was unequivocally repudiated by Mrs. Pryor with the full knowledge of Charles, Jr. and Mr. Wynn not later than July 26, 1940, the five-year statute of limitations strictly bars each and every claim asserted by plaintiffs herein.

Defendants point out that there have been many deaths of important persons,

104. He testified that on the personal income tax returns of William, Sr., William, Jr. and Kent, and the Company's tax returns, the bonuses were treated as compensation.

105. Defendants contend it is not a matter of when *plaintiffs* acquired their knowledge but when their *predecessors* had knowledge, and the predecessors had actual knowledge that the stock which had been sold to the Company was later acquired by William, Sr. The consent clause of Charles, Sr.'s will was also known to Mrs. Pryor and Charles, Jr. and their attorney. Mrs. Pryor knew of the facts on which plaintiffs predicate fraud, breach of confidential relation and breach of duty to a corporate shareholder. Mrs. Pryor knew of the loans, and bonuses; she knew of the business and its prospects. She knew of the earnings. She communicated her knowledge to Charles, Jr.

Plaintiffs' attorney, Mr. Wynn, knew for at least fifteen years that the money received for the 2,000 shares of Clow stock had not been restored to the trust; he was executor of Charles, Jr.'s will, but took no action as such in respect to the transactions.

Since plaintiffs sue derivatively, they are barred because Mrs. Pryor had knowledge of all the facts for 15 years. This is the kind of situation, defendants say, in which the trustee being barred, so are the beneficiaries. (Waterman Hall v. Waterman, 220 Ill. 569, 77 N.E. 142, 4 L.R.A.,N.S., 776 (1906); Graff v. Rankin, 250 F. 150 (7th Cir., 1917); Scott, Trusts, Sec. 327.1, p. 2375.)

Scott states: "Where a third person wrongfully takes possession of trust property or damages it, and the trustee is barred by the statute of limitations, the beneficiaries are barred even though they have interests enjoyable only in the future, and even though they do not become entitled to the present enjoyment of the property until after the trustee's right of action is barred."

including William, Sr. in 1942, Kent S. Clow in 1952; William, Jr. and J. Beach Clow in 1953; Sidney Murray in 1954, and Charles, Jr. in 1943. They itemize the lack of evidentiary material on several known conferences between William, Sr. and Mrs. Pryor, Mr. Pryor, Attorney Hafter and Attorney Wynn. Nor is there evidence of the conversations over the years in the interval of 1930 to 1938 between the Pryors, Attorneys Wynn and Hafter, participated in with William, Jr., Kent S. Clow and Sidney Murray. Attorney Murray's testimony would have been extremely valuable on his interpretation of the consent clause of Charles, Sr.'s will, and the need for consents.

Defendants cite the fact that the instant suit was brought more than twenty years after the first transaction in 1935 and seventeen years after the last transaction. They also cite plaintiffs' failure to call as a witness Attorney Hafter, a direct participant in the transactions.

Plaintiffs, defendants assert, must have exercised reasonable diligence in the acquisition of knowledge and enforcement of their right because:

> "The defense of want of knowledge on the part of one charged with laches is one easily made, easy to prove by his own oath, and hard to disprove; and hence the tendency of courts in recent years has been to hold the plaintiffs to a rigid compliance which the law demands, not only that he should have been ignorant of the fraud, but that he should have used reasonable diligence to inform himself of all the facts." [106]

Defendants deny the validity of plaintiffs' assertion that they as remaindermen can not be deemed barred by laches because their interest did not vest until the death of the life tenant, Mrs. Pryor, on June 1, 1959. They say that such a rule, if it is still good law (under Beasley v. Beasley, 404 Ill. 225, 88 N.E.2d 435

(1949)) applies only to legal remainders and not to equitable estates. The holder of an equitable remainder interest need not wait (Oehmich v. Hedstrom, 251 Ill. 481, 487, 96 N.E. 256, 259 (1911)). In that case it was held that an

> "equitable interest under the will was such that he could have maintained a bill against the trustees and the purchasers at the sale, on the ground that the trust fund was being illegally diverted from the purposes contemplated by the will. * * That appellant [the beneficiary] was not required to wait until he became entitled to the complete enjoyment of the estate is well supported by authority."

They also cite 2 Scott, Trusts, Sec. 219.4 p. 1616, where it was said that since the beneficiary with a future interest can recover from the trustee for a breach, although the interest has not become possessory, "it would seem that he may be held guilty of laches if he delays suing even though the life beneficiary is still alive." Defendants also cite Tontz v. Heath, 20 Ill.2d 286, 170 N.E.2d 153 (1960), where a cause of action on behalf of a third party whose rights, under joint and mutual wills were defeated by a conveyance by the survivor contrary to the contract, was held to have accrued at the time of the making of the conveyance and not at the death of the survivor of the two testators.

Defendants distinguish Penn v. Folger, 182 Ill. 76, 55 N.E. 192 (1899), as having been repudiated in Ferroline v. General Aniline & Film Corp., 207 F.2d 912 (7th Cir., 1953), and as merely covering a case where the beneficiaries had insufficient knowledge to place them on inquiry.

Defendants insist that the plaintiffs are barred by laches, defined as:

> " * * * [S]uch neglect or omission to assert a right as, taken in

---

106. Neagle v. McMullen, 334 Ill. 168, 181, 165 N.E. 605 (1929); LeGout v. LeVieux, 338 Ill. 46, 51, 169 N.E. 809 (1930); Schreiner v. City of Chicago, 406 Ill. 75, 91, 92 N.E.2d 133 (1950); Ferroline Corp. v. General Aniline & Film Corp., 207 F.2d 912, 929 (7th Cir., 1953).

conjunction with the lapse of time, more or less great, and other circumstances causing prejudice to an adverse party, operates as a bar in a court of equity." (Morse v. Seibold, 147 Ill. 318, 325, 35 N.E. 369, 371 (1893) ; 2 Pomeroy, Equity Jurisprudence, Sec. 419 (5th ed. 1941))

And, significant in determining laches are:

" * * * [T]he length of time during which * * * [a party] has delayed in bringing a proceeding against the trustee; the reasons for such delay; the character of the breach of trust; the change of circumstances, if any, between the commission of the breach of trust and the bringing of the proceeding, such as the death of witnesses or parties, or a change of position by the trustee. Underlying the notion of the barring of suit because of laches is the general idea that it is in accordance with public policy that suits should be brought with reasonable promptness. There is also the idea that after the lapse of a long period of time it is difficult to ascertain the truth. * * * " (2 Scott, Trusts, Sec. 219 (2 ed. 1956))

In Carlson v. Carlson, 409 Ill. 167, 173, 98 N.E.2d 779, 782 (1951), it was said:

" * * * [T]he general principle of equity is that the one calling upon the court for relief must show reasonable diligence, and where this is absent, a court will not grant the relief, particularly where claims rest in parol and the lapse of time and frailty of human memory may cause the truth concerning the transactions to be lost or misrepresented."

(Similarly, Neagle v. McMullen, 334 Ill. 168, 181, 165 N.E. 605 (1929), and Chicago, Wilmington & Franklin Coal Co. v. Jilek, 42 F.Supp. 200, 203 (E.D.Ill. 1942))

Also cited is Klee v. Chicago Trust Co., 365 Ill. 354, 358, 6 N.E.2d 442, 444 (1937), where it was said:

"In passing upon the issue of laches when death of the person against whose estate the proceeding is brought has occurred before the commencement of the suit, it is proper to consider the fact that death has closed the lips of him against whose estate a demand is sought to be enforced. * * * The estate is thereby placed at a great disadvantage. Dempster v. Rosehill Cemetery Co., 206 Ill. 261, 68 N.E. 1070."

And in James v. Frantz, 21 Ill.2d 377 at page 382, 172 N.E.2d 795 at page 798 (1961), the Court said:

"In the present case the appellees' action was not commenced until the persons who had knowledge of the original transaction, and upon whose testimony the decrees reforming the deed was based, were dead. If the present attack were permitted, the defendants might be vulnerable to claims by way of accounting running over many years, but they are helpless to sustain the decrees which reformed the deed 55 and 39 years before this action was instituted. * * * 'Here the delay must be considered in conjunction with another circumstance,—the death of Brown,—which would seriously prejudice the appellee in defending against appellant's claim.' " [107]

The Company points out its prejudice though delay of the suit would be extreme due to the fact that it had sold the stock involved in the four transactions within months after it acquired it as treasury stock, and would now be required to replace it with a similar number of shares, which now have far greater value, and therefore the doctrine of laches would be available to it.[108]

---

107. See also Shapiro v. Grosby, 25 Ill.2d 245, 249, 184 N.E.2d 855 (1962).

108. Williams v. Rhodes, 81 Ill. 571, 589 (1876) ; Benson v. Dempster, 183 Ill. 297,

In the case of Alexander v. Phillips Petroleum Co., 130 F.2d 593, 605 (10th Cir., 1942), it was said:

"A substantial increase in the value of the property involved, where the right could have been asserted before such increase and the granting of relief would work inequity, is a circumstance which may be considered in applying the doctrine of laches."

Defendants maintain that the five-year statute of limitations also bars the suit because Mrs. Pryor with the full knowledge of Charles, Jr. and Mr. Wynn, not later than July 26, 1940, unequivocally repudiated the trust. This repudiation is shown by the November 18, 1935, document; by the four transactions selling the stock to the Company, and by the failure of Mrs. Pryor to reinvest the proceeds under the testamentary trust.

The defendants point out that where the trustee repudiates the trust the statute begins to run from the time of repudiation (Simpson v. Manson, 345 Ill. 543, 178 N.E. 250 (1931); Thomas v. Bourdes, 327 Ill.App. 197, 63 N.E.2d 621 (1945); Becker v. Billings, 304 Ill. 190, 136 N.E. 581 (1922)). Where the trustee has repudiated the trust to the knowledge of the beneficiary and he fails to bring suit, he may be barred by laches. (1 Restatement, Second Trusts, Sec. 219, comment g.) Defendants note, as heretofore stated, that the trust was repudiated by the trustee, with the knowledge of the beneficiary, his lawyer, and executor, and the predecessors of plaintiffs.

"A party seeking equitable relief against fraud should commence proceedings for relief as soon as reasonably pos-

sible. Acquiescence, consisting of unnecessary delay after such knowledge, will defeat the equitable relief." Halla v. Chicago Title & Trust Co., 412 Ill. 39, 49, 104 N.E.2d 790, 795.[109] It has been held that:

" * * * [E]ven if there were any fraud or inequity in the original transactions, the appellants, by their many years of remaining in default and because of inaction and failure to complain during such a long period of time, have lost the right to assert that defense in this suit." (Crawford Realty and Development Corporation v. Woodlawn Trust and Savings Bank, 382 Ill. 354, 362, 47 N.E.2d 81, 85.)

As to the matter of laches in the filing of a suit to set aside a stock transfer allegedly induced by fraud, it was very recently held in Brubaker v. Gould, 34 Ill. App.2d 421, 180 N.E.2d 873, that there was no laches where the transfer occurred on May 9, 1951, and the suit was filed on May 15, 1955. The Court pointed out that there had been no change of stock ownership since May, 1951. It held 34 Ill.App.2d at p. 431, 180 N.E.2d at p. 877:

"Mere delay will not bar relief, where the injured party was ignorant of the fraud and filed his complaint within a reasonable time after acquiring knowledge of it. (Bremer v. Bremer (1952), 411 Ill. 454, 468, 104 N.E.2d 299.) Neither Gould, Gould & Company nor Lahman have been prejudiced by the alleged delay of Brubaker in commencing the instant action, and no defendant has changed his position in reliance on plaintiffs' failure to take action at an

---

306, 55 N.E. 651 (1899); Simpson v. Manson, 345 Ill. 543, 556, 178 N.E. 250 (1931); Jackson v. Anderson, 355 Ill. 550, 557, 189 N.E. 924 (1934); Chicago, Wilmington & Franklin Coal Co. v. Jilek, 42 F.Supp. 200 (1942).

109. Contrariwise, in Wood v. MacLean Drug Co., 266 Ill.App. 5, 17 (1932), there was held to be no laches precluding recovery of stock by a stockholder, sold to of-

ficers who failed to reveal pendency of negotiations for the sale of the company, where there was a delay of seven months in bringing suit, and the delay was explained by absence from the jurisdiction due to illness in the family. The Court said at p. 17: " * * * [T]he length of time that elapses before a party asserts his rights, which would show the party was guilty of laches, varies with the particular circumstances of each case."

earlier date. McCartney v. McCartney (1956), 8 Ill.2d 494, 500, 134 N.E.2d 789."

The Court deems most significant the fact of Mrs. Pryor's failure to institute this action, or to participate therein after institution of the suit by others. The reasons assigned of age and ill health seem incredible in view of the amount at stake, which her grandchild would gain. More credible an explanation would be that she simply could not bring herself to the point of such base ingratitude for all the decades of constant, complete, and consistent solicitude which William, Sr. and the other members of the Clow family displayed toward their thrice remarried sister-in-law and aunt for whom they had genuine affection, and for whom she evidently in turn had the same affection. One cannot read the contemporaneously written letters and diary entries—not written for the purpose of this trial—without the profound reaction that here was a devotion to the memory of a brother and to the welfare of his family, throughout many difficult years and trying situations. William, Sr. took his position as patriarch seriously; he gave good advice freely and continuously, but it fell on deaf ears. He tried to guide Charles, Jr. in the Company. He sought to save Charles, Jr.'s fortune in his marital problems. William, Sr. took Charles, Jr. into his home when he was sick. It was all in vain. Now Charles, Jr.'s heirs very tardily seek retribution for all this benevolence. The Court feels it would be bitter exaction indeed to permit plaintiffs' recovery in this case and to force liability at this late date upon the heirs and transferees of William, Sr. and others.

The delay and intervening illnesses and age have dimmed the memories of those who did testify, such as Mr. Johnson, Mrs. Pryor and Harry Wolf. Documentary evidence has been lost, such as Mrs. Pryor's letters to which William, Sr.'s letters were responsive, and the letters from Charles, Jr. to Mrs. Pryor and to William, Sr. were not in evidence. They would have been enlightening on the relationship between William, Sr. and Mrs. Pryor.

To paraphrase the statement of the Illinois Appellate Court in Barker v. Barker, 36 Ill.App.2d 20 at p. 27, 183 N.E.2d 518 at p. 521:

"* * * [W]hat [William, Sr.] * * * did in this transaction was motivated by instincts of generosity for his younger brother and was not for the purpose of acquiring any interest for himself."

That Court pointed out a further important element in the doctrine of laches. 36 Ill.App.2d at p. 29, 183 N.E.2d at p. 522, it said:

"*Where the property involved is of a speculative or fluctuating character, a claimant must be more than ordinarily prompt* and may not await the outcome of an enterprise to assert his interest. 30 C.J.S. Equity § 118, p. 541; Pyle v. Ferrell, 12 Ill.2d 547, 147 N.E.2d 341; Benson v. Dempster, 183 Ill. 297, 55 N.E. 651; Cleaver v. Green, 107 Ill. 67. The finding by the master that plaintiff's claim was barred by laches is amply supported by the evidence." (Italics supplied.)

In another recent Illinois Appellate Court case, Roy M. Shoenbrod v. Rosenthal, 36 Ill.App.2d 112, 183 N.E.2d 188, it was held that the suit was barred by laches after a delay of five years. The Court said 36 Ill.App.2d at p. 121, 183 N.E.2d at p. 192:

"*Laches* is the neglect to assert a right or claim which, taken together with lapse of time and circumstance causing prejudice to the opposite party, will bar a complaint in equity. Freymark v. Handke, 415 Ill. 360, 114 N.E.2d 349; Curtis v. Curtis, 398 Ill. 442, 75 N.E.2d 881. In cases based on fraud far greater emphasis is placed on the delay in asserting the claim than on a change of circumstances, for *an unreasonable lapse of time between discovering the supposed fraud and bringing the suit is of itself prejudicial to the*

*party charged with fraud. The very nature of the charge calls for prompt action.* An unexplained delay raises an immediate doubt as to a plaintiff's right to ask the intervention of a court of equity which is an appeal to justice and good conscience. One who requests the help of a court of equity must be of good faith and must be diligent in prosecuting his claim. *The natural reaction of a person who has been defrauded is to cry out in protest and to move with alacrity in seeking redress. When he does neither, his claim and his motives are suspect.*

·"*It has been uniformly held in Illinois that anyone seeking to rescind a transaction on the ground of fraud must elect to do so promptly after learning of the fraud,* must announce his purpose and must adhere to it. An unexplained delay of less than 11 months was called *laches* in Kanter v. Ksander, 344 Ill. 408, 176 N.E. 289. Where no facts were shown to excuse the delay, a lapse of 18 months was held to be too long in Huiller v. Ryan, 306 Ill. 88, 137 N.E. 484. Twenty-five months between obtaining knowledge of the facts and filing suit was held unreasonable in Foston v. Swanson, 306 Ill. 518, 138 N.E. 119. A period of three years was called'an extraordinary delay in Prather v. Hill, 36 Ill. 402. A delay of three years and ten months was said to be inexcusable *laches* in McKay v. McKean, 384 Ill. 112, 51 N.E.2d 189. A lapse of over four years was held to be in contravention of equitable principles in Mock v. Higgins, 3 Ill.App.2d 281, 121 N.E.2d 865." (Italics supplied.)

▆ Plaintiffs call the issue of estoppel "spurious" and deny the existence of any of the requisite elements of estoppel, namely, misrepresentation or concealment of material facts made with knowledge of their untruth and with intent they be acted upon, which untruth is unknown to the party acting thereon to his prejudice. (Lowenberg v. Booth, 330

Ill. 548, 162 N.E. 191 (1928); 31 C.J.S. Estoppel, § 67.)

Defendants point out that Charles, Jr. consented to each of the four sales, although his consents were not necessary for Mrs. Pryor's sales, after Mrs. Pryor had talked over the sales with him. He knew the number of shares being sold and the reasons for the sales. The Company relied on these consents. Therefore Charles, Jr. and the plaintiffs who claim through him, are equitably estopped, under the doctrine stated in 3 Pomeroy, Equity Jurisprudence, Sec. 804 (5th ed. 1941):

"Equitable estoppel is the effect of the voluntary conduct of a party whereby he is absolutely precluded, both at law and in equity, from asserting rights which might perhaps have otherwise existed, either of property, of contract, or of remedy, as against another person, who has in good faith relied upon such conduct, and has been led thereby to change his position· for the worse, and who on his part acquires some corresponding right, either of property, of contract, or of remedy."

Similarly, Augustus v. New Amsterdam Casualty Co. of Baltimore, 100 F.2d 581 (7th Cir., 1938); First National Bank of Colorado Springs v. McGuire, 184 F.2d 620 (7th Cir., 1950); Troyak v. Enos, 204 F.2d 536 (7th Cir., 1953); White v. Sherman, 168 Ill. 589, 605, 48 N.E. 128 (1897); Rogers v. Tyler, 144 Ill. 652, 32 N.E. 393 (1892); Kinney v. Lindgren, 373 Ill. 415, 422, 26 N.E.2d 471 (1940).

▆ Defendants deny the accuracy of plaintiffs' assertion that plaintiffs are not barred by the consents of Charles, Jr. and Mrs. Pryor, because they did not consent "with the full knowledge of the facts, or of his rights in the premises," by asserting that the knowledge required for estoppel is as to matters relevant and material to the disputed transaction. And the test is not only what he knew but *what he might with reasonable and proper diligence have known.* They point out that Charles had worked for the Company, knew the number of shares being

sold, the price and reason for the sale, and he could have made further inquiry if he wished.

As is the case of the conclusion on laches, the Court is of the opinion that plaintiffs' long delay in the institution of this suit, and their predecessors' many formal and informal acts estop them from successfully asserting this cause of action. Mrs. Pryor and Charles, Jr. were intelligent, sane adults when they signed the consents to the sales. They discussed the sales with each other and Mr. Pryor. The transactions occurred in *1935* and *1938*. The Company issued new certificates; stock splits have occurred; the shares have passed into some new hands. Yet not until *1955* did plaintiffs institute this suit—then by attorneys who should have been and most probably were very well versed in Mrs. Pryor's, Charles, Jr.'s and Clow Company affairs.

### Mississippi Consent Decree

To support their right to sue, plaintiffs rely on the binding effect of the Mississippi decree and further maintain that under the law of Illinois the presumption against intestacy cannot obtain where the provisions of the will indicate the contrary. They quote from Foss v. State Bank & Trust Co., 343 Ill. 94, 98, 175 N.E. 12, 14 (1931):

> "Where a will fails to dispose of all of testator's property or income, leaving a part thereof intestate, the presumption against intestacy does not authorize the court to place a construction upon the will itself not justified by the language used, for the purpose of making it dispose of all such property or income."

Similarly, Hampton v. Dill, 354 Ill. 415, 420, 188 N.E. 419 (1933); Glaser v. Chicago Title & Trust Co., 393 Ill. 447, 462–467, 66 N.E.2d 410 (1946). Plaintiffs point out that the scrivener of Charles, Sr.'s will would be cognizant of the possibility—which actually occurred—of Mrs. Pryor's dying and leaving the substantial part of her estate to strangers of his descent. But by making the laws of descent of Illinois applicable

to the beneficial interest in the principal of his trust estate through omitting any other provision therefor, the testator thereby protected his son's descendants. They cite 36 I.L.P., Wills, Sec. 208, p. 304, where it is said:

> "Where the testator's intention as expressed in the will is ambiguous or obscure, such a construction should be adopted, if possible, as will dispose of his property in a just, natural, or reasonable manner."

Plaintiffs further maintain that the testator's will must be gained from the instrument itself and not from the surrounding circumstances. Thus it was said in Vollmer v. McGowan, 409 Ill. 306, at p. 312, 99 N.E.2d 337, at p. 340 (1951):

> "Again, the testator's intention must be ascertained from the words of the will itself, and effect must be given to the intention or meaning so expressed rather than to some other intention which, from surrounding circumstances, the testator may be presumed to have had but failed to express."

Similarly, Peoples Bank v. Hoffman, 403 Ill. 463, 86 N.E.2d 185 (1949).

Plaintiffs insist that a bequest by implication will be recognized only when it is necessarily required by the express provisions of the will. (Pontius v. Conrad, 317 Ill. 241, 148 N.E. 17 (1925)) Since Article Second excludes the Clow stock from the general bequest to the testator's widow, it expressly forbids the defendants' suggested bequest by implication of the principal to Mrs. Pryor. They note that gifts by implication cannot be inferred from silence on the subject. (Pontius v. Conrad, 317 Ill. 241 (1925), 148 N.E. 17; Bond v. Moore, 236 Ill. 576, 86 N.E. 386, 19 L.R.A.,N.S., 540 (1908)) Similarly, Peoples Bank v. Hoffman, 403 Ill. 463, 86 N.E.2d 185 (1949). Since the testator did not provide in his will for the distribution of the principal of the trust estate if his son predeceased his widow, the Court cannot supply the omission. (Hampton v. Dill, 354 Ill. 415, 420, 188 N.E. 419 (1933);

Foss v. State Bank and Trust Co., 343 Ill. 94, 98, 175 N.E. 12 (1931); Glaser v. Chicago Title & Trust Co., 393 Ill. 447, 462–467, 66 N.E.2d 410 (1946))

The plaintiffs say there is a strong presumption against any construction which will disinherit an heir or dispose of property contrary to the laws of descent, and the construction contended for by defendants would have given all to Mrs. Pryor and none to his principal heir, Charles, Jr., but the law favors the heirs of a decedent, and in construing wills a construction which avoids disinheriting an heir is preferred. (Desmarteau v. Fortin, 326 Ill. 608, 614, 158 N.E. 444 (1927); Boys v. Boys, 328 Ill. 47, 51, 159 N.E. 217 (1927)) The Court in Peoples Bank v. Hoffman, 403 Ill. 463, 86 N.E.2d 185 (1949), said the construction is favored which conforms most nearly to the general law of inheritance.

Plaintiffs also claim that the 1953 Mississippi decree collaterally estops the Company and the executor of Mrs. Pryor's will from now claiming that Mrs. Pryor was entitled as remainderman to the entire principal of the trust. They deem it immaterial that the decree *applied specifically* to the 16,000 shares she *then* held, the basic issue being the ownership of the entire beneficial interest. They further maintain that the consent of all the parties to the Mississippi decree adds a contractual element to the adjudication. They say this Court may freely follow the Mississippi law which gives the same force and effect to a consent judgment as to any other judgment. (Guthrie v. Guthrie, 233 Miss. 550, 102 So.2d 381, 383 (1958); Asher v. Hart, 212 Miss. 749, 55 So.2d 447 (1951)) If the defendants wish to challenge the correctness of the Mississippi decree they should do so directly but not collaterally here. (Montgomery v. Equitable Life Assurance Co., 83 F.2d 758, 762 (7th Cir., 1936)) In the Montgomery case, it was said:

"It is well settled in Illinois that a decree of a court of general jurisdiction cannot be impeached for fraud or for errors of law where the court had jurisdiction of the parties and the subject matter."

Similarly, Weberpals v. Jenny, 300 Ill. 145, 133 N.E. 62 (1921).

Plaintiffs disclaim any merger in Mrs. Pryor of the legal and equitable interest in her one-third share, terminating the trust thereto because, they assert, there can only be a merger when the sole beneficiary of the trust becomes the sole trustee.[110] They also point out that under Charles, Sr.'s will there were several co-trustees, or advisory trustees, so for that reason also there could be no merger of interests, there being no unity of beneficiaries and trustees.

The Mississippi decree did not indicate, as defendants contend, that the trust had been automatically terminated at Charles, Jr.'s death in 1943 as to Mrs. Pryor's one-third interest in the principal of the trust.

The 1953 decree of settlement of the Mississippi Court adjudicated that the 16,000 shares of Clow common stock became, upon Charles, Jr.'s death prior to his mother's, intestate property of Charles, Sr., subject to Hattie Pryor's life estate, and, under Illinois law, one-third of the reversion passed to Mrs. Pryor as widow, and two-thirds to Charles, Jr. and passed under his will. The settlement gave Mrs. Pryor absolute ownership of one-third, or 5,333.334 shares with a life estate in the remaining 10,666.666 shares. Upon Mrs. Pryor's death, 3,555.54 shares would go to each of the plaintiffs, Joanna Gwin Clow and her mother Joanna G. Clow Clayton; $12,000 in cash and 1,777.778 shares to Charles R. Clow III, and in the same number of shares, Lawrence B. Pryor was to have a life income, with remainder to Joanna G. Clow Clayton.

As a part of the settlement Charles R. Clow III dismissed his cross-bill insofar as it required an accounting of Mrs. Pry-

110. 3 Scott on Trusts (2d ed.), § 341.2, p. 2507; Restatement, Second Trusts, § 341, comment d and g.

or for the prior sale of 3,250 shares of stock. It also provided that

> "Joanna G. Clow Clayton, Lawrence B. Pryor, W. T. Wynn, as trustee and executor, and Joanna Gwin Clow, minor, covenant not to sue Hattie B. Pryor for an accounting for the proceeds of the prior sale of said 3,250 shares of stock. * * *"

The document was signed on behalf of Clow Company by its attorney. In its answer to this suit the Clow Company had averred that it refused to transfer the stock in the trust to Mrs. Pryor because it was unwilling to undergo the risk involved in taking upon itself the responsibility of deciding the legal ownership of the stock, and asked for an adjudication as to whom it should transfer the stock represented by the four enumerated certificates, C–064–066, and C–081.

The decree found that the minor, Joanna Gwin Clow, might have an interest in the claim against Mrs. Pryor for an accounting for the proceeds of the prior sale of the 3250 shares of stock but it also appearing that the suit for accounting against Mrs. Pryor is "of *doubtful nature*" and "in view of the *doubtful outcome*" of said cause" (Italics supplied), it would be for the best interests of the minor that the suit be settled and the guardian execute on behalf of the minor and in favor of Mrs. Pryor a covenant not to sue so that she be not sued by said minor, said minor's guardian or guardian ad litem, or her heirs or assigns, for an accounting for the proceeds of the sale of said 3250 shares of stock. The covenant not to sue provided that Hugh A. Clayton, guardian, Charles S. Tindall, Jr., guardian ad litem, and W. T. Wynn, Executor and Trustee under the will of Charles,

Jr. covenanted not to sue and to refrain from prosecuting, asserting, collecting or proceeding in any action, legal or equitable, against Hattie B. Pryor, for any and all claims, rights, demands, and causes of action which the covenantors or any of them have or might ever have for an accounting for the proceeds of the sale by Hattie B. Pryor, prior to January 1, 1939, of 3250 shares of Clow common stock, but excepting from the release their rights against any others for those sales.

The Court, because of its decision on other aspects of this cause, does not feel called upon to determine the precise breadth of the Mississippi consent decree. But it would appear that the parties were binding themselves on the distribution of the stock that *remained* in the trust, and not the stock which had already left the trust. They agreed to forego their rights to sue the trustee on those prior transactions, since they were of "doubtful" nature. As heretofore intimated this Court joins in that doubt. The Court is also sympathetic to defendants' interpretation of Charles, Sr.'s will, that in Illinois the presumption against intestacy having the standing it does, and the will containing a residuary clause in favor of the widow, it would seem the Mississippi consent decree does violence to the testator's obvious intention. It would appear to the Court that the scrivener's failure to provide for the contingency of Charles, Jr.'s predeceasing his mother was an oversight, to be covered by the residuary clause.

*Agreement of November 18, 1935, Transferring Charles, Jr.'s Interest in Trust to His Mother, Mrs. Pryor*

By agreement of November 18, 1935,[111] Charles, Jr. tranferred his interest in his father's testamentary trust to his

---

111. The agreement of November 18, 1935, provided in part:
> "Whereas, under the terms * * * of the will of Charles R. Clow, * * * my mother, Hattie B. Clow, was bequeathed a life interest in certain common stock of James B. Clow and Sons, a corporation, and I was bequeathed a remainder in said stock; it being further provided in the will that my mother was entitled to all dividends declared upon said capital stock during her lifetime; and,
> "Whereas, my mother has loaned me the aggregate sum of Sixty Thousand Dollars ($60,000.00); and

mother, Mrs. Pryor, the life tenant, for the purported $60,000 consideration she had theretofore advanced to him, and the payment of the further sum of $25,000 in installments.

Plaintiffs with real agility overcome this formidable barrier to their right to sue, maintaining that the instrument was executed at the suggestion of William, Sr., and in derogation of the testamentary trust of which he was a trustee, thereby estopping defendants from asserting it as a defense. It is their position that Charles, Sr. intended the trust to provide for Mrs. Pryor throughout her life, but she should receive none of the principal. This document, plaintiffs, claim, was invalid because it permitted a transfer of the trust stock prematurely into her own name contrary to Charles, Sr.'s testamentary intent, rendering the transfer invalid under Illinois law. Nor did Mrs. Pryor ever pay her son, Charles,

Jr. the monetary consideration contemplated by the document.

The ineffectiveness of the document to terminate the trust is asserted further on the grounds that no reliance was ever placed upon it or effect given it, and it remained executory, and therefore the trust was never terminated by distribution,[112] and the document would have prematurely terminated the trust contrary to the testator's intention. After the 1935 document, the Company refused without prior court approval to transfer the corpus into Mrs. Pryor's name individually. The claim is made that the evidence is "overwhelming" that William, Sr. induced Mrs. Pryor and Charles, Jr. to make the transfer contemplated by the 1935 document.

Plaintiffs further state the 1935 document was *totally*, not partially, rescinded *ab initio* July 26, 1940, "as though it had never been executed." They maintain

"Whereas, I have been unable to repay the said sum to her, and said amount is now due her; and

"Whereas, due to conditions over which I have no control, I have been unable to earn a sufficient livelihood, and have no income, and

"Whereas, I desire to so arrange my affairs that I will have a present, continuous income, and

"Whereas, I have offered to sell my interest in said stock to my mother; and

"Whereas, in order to accommodate me, she has consented to buy my said interest in said stock:

"Now, therefore, this contract is this day entered into and executed in duplicate by and between Charles R. Clow, Jr. and Hattie B. Pryor. * * * For and in consideration of the cancellation of an indebtedness of Sixty Thousand Dollars ($60,000.00) heretofore referred to which I now owe the said Hattie B. Pryor * * * I, Charles R. Clow, Jr., hereby sell, transfer, convey, warrant and deliver to Hattie B. Pryor, all my right, title and interest in and to all the capital stock in James B. Clow and Sons, the remainder interest in which I now own, said stock being all capital stock of James B. Clow and Sons in which I now own any interest * * * including common stock certificate No. 6 for two thousand six hundred and eighty-seven and one-half (2,687½) shares, and a stock certificate

for one thousand three hundred twelve and one-half (1,312½) shares, comprising a total of four thousand (4,000) shares. [He also assigned his interest in 1542 shares of U. S. Pipe and Foundry Company.]

" * * * As a further consideration for the conveyance of my interest in the above mentioned stock, the said Hattie B. Pryor does hereby agree to pay an additional sum of * * * $25,000.00 and * * * $75.00 * * * on the 1st day of each and every consecutive month thereafter, until the said * * * $25,000.00 has been fully paid. * * * " (Signed Charles R. Clow, Jr., and Hattie B. Pryor, November 18th, 1935; the document was notarized, and *filed of record* in Mississippi, February 19, 1936.)

112. Under well-settled principles, plaintiffs assert, "a trust continues until the trust property is actually distributed by the trustee to the beneficiaries." (3 Scott on Trusts (2d ed.) Sec. 344, at pp. 2517–8; Restatement, Second Trusts, Sec. 344; Breen v. Breen, 411 Ill. 206, 103 N.E.2d 625 (1952); Swoboda v. United States, 258 F.2d 848 (3rd Cir., 1958); Commissioner of Internal Revenue v. Davis, 132 F.2d 644 (1st Cir., 1943); Rothwell v. Rothwell, 283 Mass. 563, 186 N.E. 662 (1933); Farmers' Loan & Trust Co. v. Pendleton, 115 App.Div. 506, 101 N.Y.S. 340 (1906)).

the 1935 document failed for lack of consideration in that none of the $25,000 recited in the document was paid, and the $60,000 previously paid to Charles, Jr. were gifts, not debts to his mother, and that there was no change of position or reliance by William, Sr. or the Company upon the document.

Plaintiffs belittle the transfer of November 18, 1935, pointing out that when Charles, Jr. through his attorney, Mr. Hafter, sought a transfer of the trust stock in Mrs. Pryor's name alone, the Company on December 3, 1935, and its attorney, Sidney Murray, on December 10, 1935, declined, without court order, which was not sought. On December 19, 1935, however, the Company cancelled the existing certificate for 4,000 shares and issued eight certificates for 500 shares each, as held in the name of "Hattie B. Pryor, Trustee under the Terms and Provisions of the Last Will and Testament of Charles R. Clow, Deceased, Dated February 17, 1908, and subject to certain Document Between Charles R. Clow and Hattie B. Clow, Dated November 18, 1935." This registration, plaintiffs state, gives notice of the November 18, 1935, agreement "without recognizing its validity or giving it any effect." Later, on January 2, 1936, seven of these certificates were reissued with the words "trustee under" substituted for "subject to," which plaintiffs deem indicative still of the Company's recognition of the trust ownership of shares by Charles, Sr.'s trust.

After the July 26, 1940, rescission of the November 18, 1935, document, the stock certificates were reissued to Mrs. Pryor as they had originally read as under her first husband's testamentary trust.

The argument is made that there was no repudiation of the Charles, Sr. trust, rather, the parties frequently reaffirmed its existence, as by the document of rescission (hereinafter discussed). Furthermore, the doctrine of repudiation would have no application to a wrongful acquisition of trust property by a third person from a trustee who in making the transfer was not purporting to repudiate the trust. The existence of the trust was recognized in the subsequently issued stock certificates of Mrs. Pryor.

▆▆▆ Defendants on the other hand contend the November 18, 1935, document was not void because contrary to Charles, Sr.'s intent; it was not fraudulently induced by William, Sr. for his benefit. And the Company relied on it so that plaintiffs are estopped to assert any invalidity. Furthermore, the July 26, 1940, rescission agreement did not rescind the November 18, 1935, agreement *ab initio* and *in toto*. Nor was the November 18, 1935, document invalid for lack of consideration, the $60,000 not being presumed to be gifts by mother to son when the transfer itself recited that it was a loan which he was unable to repay. The failure of Mrs. Pryor to pay the $25,000 did not invalidate the contract for lack of consideration, the promise itself to pay the sum was sufficient consideration. (1 Restatement, Contracts, Sec. 75, Illus. 4 (1932) ; 1 Williston, Contracts, Sec. 314 (Rev. ed. 1936))

In refutation of the assertion that the Company did not rely on the November 18, 1935, document, it points out that it twice changed the language on the stock certificates based thereon;[113] it purchased the stock from Mrs. Pryor; the Company desisted from getting written consents for the sale in reliance on the document.

The defendants deny that William, Sr.'s actions brought about the November 18, 1935, document, but point out it was the product of Mrs. Pryor's attorneys, Mr. Wynn and Mr. Hafter, who had been concerned with Charles, Jr.'s marital problems. William, Sr. did not know of the document until it was presented. Mrs. Pryor had rejected the spendthrift trust idea suggested by William, Sr. and

113. New certificates dated January 2, 1936, were sent to Mrs. Pryor issued in her name subject to the terms of her late husband's will and also subject to the November 18, 1935, document.

his counsel as being subject to attack by Charles, Jr.'s wives.

Defendants maintain that Charles' contingent remainder interest [114] was validly assignable under Illinois law.[115] They point out that irrespective of plaintiffs' contention that the document thwarted the testator's (Charles, Sr.'s) intention not to give his widow, the trustee, the absolute title, there still remained the power in the beneficiaries to terminate the trust. In support of the assertion, "If there is a sole beneficiary of a trust and he transfers his interest to the trustee, or if there are several beneficiaries and all of them transfer their interests to the trustee, the trust terminated although the purposes of the trust have not been fully accomplished," they cite 2 Restatement, Second Trusts, Sec. 343 (1959).

They distinguish the cases cited by plaintiffs, which indicate there can be no transfer by the remainderman, as cases where there was a spendthrift provision in the trust,[116] or where there were unknown contingent interests and there was an attempted acceleration of trust distributions in derogation thereof,[117] and cases where a beneficiary objected to the termination.[118]

On November 1, 1935, just before the transfer by Charles, Jr. to his mother, Attorney Wynn wrote Mrs. Pryor his firm disagreed with William, Sr. and Mr. Murray's thoughts as to the possibility of the creation of a spendthrift trust, and suggested a transfer or mortgage of Charles, Jr.'s remainder interest to his mother, the consideration being the indebtedness of some $60,000 "evidenced by Charles' checks to his mother. * * *" Attorney Hafter and Mrs. Pryor came to the Company office November 22, 1935, and presented a copy of the November 18, 1935, agreement, which recited Mrs. Pryor had loaned Charles, Jr. $60,000, which he was unable to pay and her agreement to pay an additional $25,000, and sought transfer of the stock title in Mrs. Pryor's name alone.

*Rescission Agreement of July 26, 1940*

The November 18, 1935, assignment was "rescinded" by an agreement on July 26, 1940, between Mrs. Pryor and her son, Charles, Jr. It recited the facts of Charles, Sr.'s will, the 1935 agreement between the mother and son modifying the will provisions upon specified consideration which it recited she was never able to pay. Excerpts of the rescission are set forth below.[119]

114. Kohl v. Montgomery, 373 Ill. 200, 209, 25 N.E.2d 826 (1940); DuBois v. Judy, 291 Ill. 340, 348, 126 N.E. 104 (1920); Ortmayer v. Elcock, 225 Ill. 342, 346, 80 N.E. 339 (1907).

115. Gridley v. Gridley, 399 Ill. 215, 227, 77 N.E.2d 146 (1948); Carter v. Lewis, 364 Ill. 434, 4 N.E.2d 853, 108 A.L.R. 458 (1936); Fisher v. Easton, 299 Ill. 293, 296, 132 N.E. 442 (1921).

116. Altemeier v. Harris, 403 Ill. 345, 86 N.E.2d 229 (1949); Anderson v. Williams, 262 Ill. 308, 104 N.E. 659 (1914); Hartley v. The Heirs of Wyatt, 281 Ill. 321, 117 N.E. 995 (1917); Sauvage v. Gallaway, 335 Ill.App. 35, 80 N.E. 2d 553; Lancaster County Bank v. Marshel, 130 Neb. 141, 264 N.W. 470; Bixby v. St. Louis Union Trust Co., 323 Mo. 1014, 22 S.W.2d 813; Adair v. Sharp, 49 Ohio App. 507, 197 N.E. 399; Blackwell v. Virginia Trust Company, 177 Va. 299, 14 S.E.2d 301.

117. Rhoads v. Rhoads, 43 Ill. 239 (1867); Wood v. Gridley, 217 Ill.App. 579 (1920); Binns v. LaForge, 191 Ill. 598, 61 N.E. 382 (1901); Stephens v. Collison, 274 Ill. 389, 113 N.E. 691 (1916); Sauvage v. Gallaway, 335 Ill.App. 35, 80 N.E.2d 553 (1948); Scheuing v. May, 213 Ill. App. 143 (1919); Mohler v. Wesner, 382 Ill. 225, 47 N.E.2d 64 (1943); Cowie v. Strohmeyer, 150 Wis. 401, 136 N.W. 956.

118. Rhoads v. Rhoads, 43 Ill. 239 (1867); Stephens v. Collison, 274 Ill. 389, 113 N.E. 2d 691 (1916); In re Hamburger's Will, 185 Wis. 270, 201 N.W. 267, 37 A.L.R. 1413 (1924); Claflin v. Claflin, 149 Mass. 19, 20 N.E. 454, 3 L.R.A. 370 (1889).

119. The contract of 1935 was "rescinded and cancelled so that the shares of common stock of the said JAMES B. CLOW & SONS, originally bequeathed to the parties hereto, by their Father and Husband, CHARLES R. CLOW, may be reinstated on the books of the Corporation so as to

On July 2, 1940, Attorney Wynn wrote to Attorney Murray as to the November 18, 1935, contract that Mrs. Pryor had never paid her son, Charles, Jr., the $75 a month which was part of the consideration of the contract of transfer, and because it was felt that inheritance taxwise it would be advantageous to have the stock pass under the original testamentary trust. The letter stated:

"Our thought is that the contract executed in 1935 between Charles and his mother could be cancelled by mutual consent and the stock reissued so as to be governed by the original Will of Charles R. Clow."

The letter also pointed out that the Clow Company had entertained some doubt as to the validity of the original transfer. It goes on:

"Certificates Nos. 20, 21, 22 and 24, each for 500 shares, endorsed by Hattie B. Pryor, have been delivered to us with authority to have the transfer made in accordance with their wishes."

Defendants point out that the 1940 contract of rescission was not a rescission *ab initio* of the 1938 transfer by Charles, Jr. It covered specifically only the *2000* shares of Clow stock she then held, and not the shares she had theretofore transferred; there was no provision for restitution of the $60,000 theretofore advanced to Charles, Jr. and cancelled by the 1938 transfer. They also point out that judicial and contractual rescission differ, the former being *in toto*, but the latter need not necessarily be so, without restitution.[120]

It is noteworthy that Charles, Jr.'s will, executed October 10, 1940, stated that he would inherit *2000* shares of Clow stock at his mother's death. That is the precise amount of stock *left* after the sale of shares to the Clow Company, here assailed, and the 400 shares transferred at the time of his divorce from Linda, for her and their child, Charles III. *The will was executed but three months after the rescision document of July 26, 1940,* and therefore indicative of Charles' interpretation that the rescission did *not* operate *ab initio* to revoke the 1935 agreement transferring his interest as remainderman under his father's testamentary trust to his mother.

There can be no clearer indication that the contract of rescission was not meant to cover transactions effected prior to the date thereof, or effect an *ab initio* rescission, than the rescission document itself when it makes specific reference to but 2000 shares, giving the certificate numbers thereof, and failing to cover shares or certificates theretofore transferred.

■ The Court concludes that both the 1935 transfer of Charles, Jr.'s remainder, and 1940 partial rescission of that transfer are insurmountable obstacles to plaintiffs' right to sue. They are documents which must be faced, and not glibly disregarded. They were the acts of plaintiffs' ancestors, knowingly made upon the advice of competent counsel, filed for record, based upon substantial consideration. The document of rescission could not have been clearer in its designation of limited scope to the

---

be governed entirely by the terms of said original WILL of CHARLES R. CLOW, deceased. For that purpose the following shares of common stock of the JAMES B. CLOW & SONS, to-wit:

Certificate No. 20 for 500 shares
Certificate No. 21 for 500 shares
Certificate No. 22 for 500 shares
Certificate No. 24 for 500 shares

aggregating 2000 shares of stock, all written in the name as follows * * * shall be reissued by the said JAMES B. CLOW & SONS so that said stock shall be gov-

erned by the terms of the WILL of CHARLES R. CLOW, deceased, and said certificates of stock, aggregating 2000 shares, is hereby tendered to JAMES B. CLOW & SONS to reissue the stock accordingly. * * * "

120. 6 Williston, Contracts, Sec. 1827 (Rev. ed. 1938) ; Lees v. Akshun Mfg. Co., 205 F.2d 577 (7th Cir., 1953) ; Babcock v. Farwell, 245 Ill. 14, 39, 91 N.E. 683 (1910) ; 2 Black, Rescission and Cancellation, Sec. 535, p. 1313 (2 ed. 1926) ; Restatement, Contracts, Sec. 409 (1932).

stock *then* remaining in the hands of transferee-trustee.

### Valuation of Stock Involved in Trustee's Four Transactions, Generally

The critical issue of the honesty of the Company and William, Sr. in evaluating the stocks upon the respective transfers made by Mrs. Pryor to the Company and by it to William, Sr. revolves upon so many diverse factors, the respective weights of which are said to vary with the circumstances of each case, in some cases one factor being controlling and in other cases the same factor being completely eliminated from consideration, that arrival at any accurate figure with any degree of certainty is an infinitesimal possibility. It is little wonder that the several experts here testifying arrived at widely variant figures, irrespective of partisan leanings. It would seem to the Court that it is for these reasons that it is extremely difficult to ascribe to William, Sr. or Mr. Johnson

dishonest motives deducible from the actual figure at which the respective blocks of stock were purchased.

In order to gauge the appropriateness of price, the Court has studied the norms considered in the field of taxation. There in fixing fair market value of corporate stock for tax purposes, the fact that the stock does not have as high a degree of marketability was held a factor to be considered.[121] Also to be weighed are the Company's earning power,[122] dividend-paying capacity,[123] the soundness of the corporation,[124] economic outlook generally,[125] net worth,[126] book value,[127] value of similar listed stocks,[128] size of block sold,[129] the Dow Jones average,[130] future prospects,[131] management,[132] value of tangible assets,[133] absence of earnings and losses,[134] restrictions on sale of stock,[135] the Company's position in industry,[136] existence of liens on the Company's property,[137] and par value.[138]

121. Bank of California v. Commissioner of Internal Revenue, 133 F.2d 428 (9th Cir., 1943).

122. Newell v. Commissioner of Internal Revenue, 66 F.2d 102 (7th Cir., 1933); Forbes v. Hassett, 124 F.2d 925 (1st Cir., 1942). Mertens, Law of Federal Income Taxation, Sec. 59.23, states: "Arbitrary formulae for valuation on the basis of earnings are not regarded with favor by the courts." But cf. Houghton v. Commissioner of Internal Revenue, 71 F.2d 656 (2nd Cir., 1934).

123. Forbes v. Hassett, supra.

124. Worthen v. United States, 192 F.Supp. 727 (D.C.Mass.1961).

125. Worthen v. United States, supra.

126. Bank of California v. Commissioner of Internal Revenue, supra; Worthen v. United States, supra.

127. Hitke v. Commissioner of Internal Revenue, 296 F.2d 639 (7th Cir., 1961); Worthen v. United States, supra; Cartier v. Commissioner of Internal Revenue, 37 F.2d 894 (6th Cir., 1930); Mertens, Law of Federal Income Taxation, Sec. 59.22.

128. 26 U.S.C. § 2031; Worthen v. United States, supra.

129. Commissioner of Internal Revenue v. Stewart's Estate, 153 F.2d 17 (3rd Cir., 1946).

130. Commissioner of Internal Revenue v. Stewart's Estate, supra.

131. Worcester County Trust Co. v. Commissioner of Internal Revenue, 134 F.2d 578 (1st Cir., 1943).

132. Griffiths v. Commissioner of Internal Revenue, 70 F.2d 946 (7th Cir., 1934).

133. Mertens, Law of Federal Income Taxation, Sec. 59.22. He says, however, "It is not a measure into which the number of shares can arbitrarily be divided, resulting in a clear * * * market value for each. This is particularly true in the case of a family or close corporation, and with respect to minority interests."

134. Mertens, Law of Federal Income Taxation, Sec. 59.23; Morrill v. United States, 18 F.Supp. 697 (D.C.N.H.1937).

135. Propper v. Commissioner of Internal Revenue, 89 F.2d 617 (2nd Cir., 1937).

136. Mertens, Law of Federal Income Taxation, Sec. 59.25.

137. Mertens, Law of Federal Income Taxation, Sec. 59.25.

138. Hershey Mfg. Co. v. Commissioner of Internal Revenue, 43 F.2d 298 (10th Cir., 1930).

560

Fair market value is the price at which property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell.[139]

In one case corporations were held not comparable where one corporate structure had preferred stock and the other did not, although the companies were engaged in the same or a similar line of business.[140]

In Mertens, Law of Federal Income Taxation, the criteria for determining value of stock in the absence of sales or where the sales standing alone are not a satisfactory criterion; are thus stated (Sec. 59.21):

"* * * Relevant factors may be the book and present value of the corporate assets, its management, its earnings, its history, its prospects, or the condition of the industry, the demand for its products, the existence and nature of competition, its financial set-up, prior liens, its accounting methods including its provisions for depreciation and other reserves, the relationship of dividends to earnings, appraisals of either assets or stocks, or any other matters considered pertinent. Any one of these alone may be determinative although the probabilities are that all the factors weighed and balanced against each other will give the more accurate result. Earnings usually reflect most of the other factors indicated except in the case of a new enterprise. * * * Stock in a close corporation is generally inactive and difficult to sell. * * * It has been said that 'in the valuation of closely held stock the book value must serve as a basis, if the result, as stated by the Court, is to be anything more than a "dignified guess." ' Book values are, of course, not conclusive and in some cases are even misleading."

The Federal Statute provides (26 U.S.C. § 2031):

"In the case of stock and securities of a corporation the value of which, by reason of their not being listed on an exchange and by reason of the absence of sales thereof, cannot be determined with reference to bid and asked prices or with reference to sales prices, the value thereof shall be determined by taking into consideration, in addition to all other factors, *the value of stock or securities of corporations engaged in the same or a similar line of business which are listed on an exchange.*" (Italics added.)

The Federal Tax Regulations[141] provide (§ 20.2031–2(f)):

"If the provisions * * * [foregoing] are inapplicable because actual sale prices and bona fide bid and asked price are lacking, then the fair market value is to be determined by taking the following factors into consideration: * * *.

"(2) * * * [T]he company's net worth, prospective earning power and dividend-paying capacity, and other relevant factors. Some of the 'other relevant factors' * * * are: the good will of the business; the economic outlook in the particular industry; the company's position in the industry and its man-

---

139. Fitts' Estate v. Commissioner of Internal Revenue, 237 F.2d 729 (8th Cir., 1956).

140. Levenson's Estate v. Commissioner of Internal Revenue, 282 F.2d 581 (3rd Cir., 1960).

141. Witness Sporrer read from the tax regulations (C.B., 1959–1, at pp. 237, 241):

"Potential future income is a major factor in many valuations of closely held stocks, and all information concerning past income which will be helpful in predicting the future should be secured. Prior earnings records usually are the most reliable guide as to the future expectancy but resort to arbitrary five or ten year averages without regard to current trends or future prospects will not produce a realistic valuation."

agement; the degree of control of the business represented by the block of stock to be valued; and the values of securities of corporations engaged in the same or similar lines of business which are listed on a stock exchange. However, the weight to be accorded such comparisons or any other evidentiary factors considered in the determination of a value depends upon the facts of each case. * * *"

In a recent Seventh Circuit case, it was held that the Tax Court did not err in finding that the Commissioner's use of book value as value, for income tax purposes of stock, was *not* arbitrary or capricious. (Hitke v. Commissioner of Internal Revenue, 296 F.2d 639 (7th Cir., 1961)) Yet, under other circumstances, Judge Duffy stated for the Court in Ketler v. Commissioner of Internal Revenue, 196 F.2d 822, 827 (7 Cir., 1952):

> "It is quite evident that the book value of a stock is a very unreliable basis upon which to determine the fair market value. 'Book value frequently bears no relationship to actual cash value or fair market value.'"

Especially noteworthy is the statement in the Seventh Circuit opinion, Griffiths v. Commissioner of Internal Revenue, 70 F.2d 946 (7 Cir., 1934), that the uncertainty which necessarily attends attempting to place a market value on stock which has never been sold or offered for sale increases *when the attempt to place the value occurs after the lapse of twenty years.*

In Snyder's Estate v. United States, 285 F.2d 857 (4th Cir., 1961), the Court said at pp. 861–862:

> "Closely held corporate stock cannot be valued reasonably by the application of any inflexible formula. One tailored to the particular case

must be found, and that can be done only after a discriminating consideration of all information bearing upon an enlightened prediction of the future.

> "Financial data is important only to the extent it furnishes a basis for an informed judgment of the future performance of the particular company, for investors buy stock of this kind out of reasoned hope in the future, not out of pride in the past. Specific data may be determinative in one case, but quite immaterial in another. * * *

> "A prudent investor, searching for a basis for a reasonable estimate of the future, does not depend upon averages alone. He searches for significant trends, and his use of data that measures past performance must be governed by all of those considerations which enter into managerial projections of sales and earnings."

It has been held that a provision in the articles of incorporation that shareholders desirous of transferring shares should first offer them for use of corporation at their book value would have a depressing effect upon the value of the stock in the market and should be considered in fixing value of stock for estate tax purposes.[142] Where earnings and dividends are not reliable criterion they are not employed to determine value.[143]

Plaintiffs confidently stress the lack of need to prove the extent of unfairness of the prices paid by William, Sr. inasmuch as they seek not monetary damages but restitution of the stock itself, and "adequacy of the consideration *is only one of several factors* which must *all* be established to overcome the presumption of fraud arising from the confidential relation." (Plaintiffs' italics.)

142. Worcester County Trust Company v. Commissioner of Internal Revenue (C.A.1, 1943), 134 F.2d 578.

143. In re Nathan's Estate, 166 F.2d 422 (C.A.9, 1948).

Exact value, plaintiffs say, need not be determined since it was "substantially more" than the prices paid.

The Court agrees with plaintiffs that the weight of opinion evidence as to value is for the Court to determine in the light of all the evidence, as was said in 32 C.J.S. Evidence § 568(h), pp. 385–387:

"The weight of opinion evidence as to value is for the jury, court, or other triers of the facts to determine in the light of their own experience and knowledge of like subjects, and the knowledge, experience, and capability of the witness to draw a sound conclusion. An opinion is not conclusive even though uncontradicted, but should be weighed by the trier of the facts and judged in view of all the evidence * * *."

Or, as plaintiffs note, the Seventh Circuit opinion in Friend v. Commissioner of Internal Revenue, 102 F.2d 153 (7 Cir., 1939), stated at p. 156:

"The determination of value involves a question of discretion, calling for sound and reasonable judgment, having as its basis due and proper consideration of all relevant facts and circumstances."

It is plaintiffs' position that the inadequacy of the price paid Mrs. Pryor for the stock is evident when the earnings, cash flow, dividends, and book value are reviewed thus:

| Date | Price paid | Earnings | Cash flow | Dividends | Book value | Dr. Anderson's value | Dr. Langum's value |
|------|-----------|----------|-----------|-----------|------------|---------------------|--------------------|
| Jan. 1935 | $25 | $10.77 | $18.29 | | 1–15–35 $174.91 | $84 | $150–$170 |
| | | | | | 12–24–35 $186.49 | | |
| Jan. 1936 | $30 | $25.86 | $33.86 | $11.00 | $141.33 | $90 | $150–$170 |
| April and July, 1938 | $50 | $14.25 | $20.98 | $8.00 | $144.90 | $100 and $120 | $100–$140 and $130–$140 |

They contend that "on a conservative basis the value of the shares was not less than two or three times the prices paid." Plaintiffs point out the estimable qualifications of their expert witnesses on valuation, Drs. Anderson and Langum, and contend the values to which they testified represent "sound, conservative levels which fully reflect the market conditions then prevailing, the lack of trading in the Corporation's shares and the restrictions on the sale of such shares." They assail as "bizarre" defendants' theories of value, and "somewhat less than sincere" the defendants' presentation of evidence on value, their four experts testifying to "strangely divergent theories, apparently designed to demonstrate the wide extremes which they would like the Court to believe are within the realm of possibility." One of the defendants' experts, plaintiffs say, "seemed to thrive on valuations for federal estate tax purposes." They state that defendants' experts eschew the time-honored factors such as earnings, earning power on equity, cash flow, dividends and book value, and comparison with other companies in the same business, and suggest as controlling the lack of a known market for the Clow stock.

Plaintiffs rely on letters [144] of William, Jr. to the Continental Illinois Bank officials touting the favorable prospects of the Company, and of memoranda [145] of the Bank to inquiries in respect to its borrower's finances, all as indicative of the Clow Company's officials' superior

144. Letters of November 23, 1933; December 8, 1933; December 12, 1933; May 17, 1934; July 17, 1934.

145. Memoranda of December 15, 1933; January 26, 1934.

knowledge of the stock's greater value. The Court, however, discounts those statements as concomitants of a borrower-lender situation, representations honestly made but with the vital purpose of maintaining a source of invaluable credit, about to be withdrawn.[146]

There is no general formula which could be applied to stock of this character to determine its value on a specified date, according to defendants' expert, Mr. Kiddoo, and there is no mathematical percentage of value on any one of the complicated factors that must be taken into account in determining value of stock. The condition of the market was stressed by Mr. Kiddoo as an important element in valuing stock of this kind. The lack of buyers for a stock of this character, which was closely held, was the most important factor in determining the value of the stock, in Mr. Kiddoo's view. Price-earnings ratio, while it is always to be taken into consideration, was not deemed by Mr. Kiddoo to be a controlling factor in arriving at a figure, and he gave very little effect to it. He stated that in the middle '30s, profits of companies had fluctuated so greatly that you could arrive at almost any price-earnings ratio you wanted depending on the period of time you took to cover. The Clow stock, Mr. Kiddoo said, had certain disadvantages. The Company's bonds and preferred stocks were selling at a substantial discount.[147]

The general attitudes of the various experts who testified on the trial as the proper approach to be taken in determining value also varied. Thus, Mr. Sporrer said he would consider book value only if he were buying a large interest, a majority interest, and then only if he expected to take over management control. Mr. Mason said that many companies during the depression had high book value to their stock, which companies went through receiverships and the common stock value wiped out.[148] Mr. Kiddoo testified that there is no consistent relationship between book value and market value—book value is just one of many factors taken into account, but it varies greatly between companies and at different periods of time in the same company.

Mr. Sporrer said he would normally use only a three times earnings factor; Mr. Mason felt that a five times earnings multiplier is a generous one. He said that it is only in recent years that there has been the emphasis on price-earnings ratio.

Mr. Kiddoo thought the U. S. Pipe Company was an entirely different kind of company. Mr. Mason thought the U. S. Pipe Company and the Warren Foundry & Pipe Company were not comparable to Clow Company for many reasons.[149] Mr. Sporrer noted that the two most comparable companies, the U. S. Pipe, and Warren Foundry, were not

---

146. Plaintiffs find dishonesty and sculduggery in the discrepancy in the optimistic attitude of the Company's letters to the Bank and William, Sr.'s bleak forecasts and gloomy forebodings. In view of the times, the Company's need for money, and the size of the loans and the difficulty of their procurement, it would seem to the Court that veracity more probably could be attributed to William, Sr.'s utterances to Mrs. Pryor than the Company's statements to the Bank, made in self-preservation, and subsequently justified.

147. The Company's books show that $100 par value preferred stock with $14 accrued dividends was purchased by the Company for $51 a share in August, 1934,

and in October the Company bought eight shares at $49 a share with two years' dividends due. They bought some bonds at around $50.

148. Mr. Mason said he did not deem book value as a criteria in the '30s except in the case of a bank or investment company, but not of a manufacturing company.

149. The Warren Company had a much better record because its business in pipe was not the predominant thing. Warren had the unusual situation in pig iron with Bethlehem Steel Company which provided Warren, which was not true of Clow Company. Warren did better than Clow in the early '30s but did not do as well in the middle '30s.

comparable enough to have a bearing on his decision.

Mr. Stiegelmeier said price-earnings ratios were used in the '20s and after the depression, but not during it; book values were important only in liquidation, or where the company was in liquid condition.

### The First Transaction

■ The Court is well satisfied that the $25 per share which Mrs. Pryor received on the first transaction involving the sale to the Company of 1250 shares in January, 1935, was a just price in view of all the financial circumstances of the Company, the times, and the expert testimony appraising the situation. True, plaintiffs' experts, Dr. Anderson placed the value at $84; Dr. Langum at from $150 to $170. On the other hand, the testimony of defendants' experts reveals that Mr. Mason felt an accurate price would be between $18 and $22, with $25 a "good," or "high" price, and $15 in "reason"; Mr. Kiddoo felt too, that $25 was a "fair," a "good" price; Mr. Sporrer's highest value was $30.

Less than a year and a half previous, in August, 1933, the Federal Government had placed a valuation of $18.75 for estate tax valuation, and the State of Illinois had set a figure of *$31.00* for Illinois Inheritance Tax purposes, for the Harry Clow estate.[150] The Federal figure was 43% of the $174.37 book value for 1933. The briefs filed in those estate tax proceedings reveal the issue to have been carefully considered at that time. Previous to this first transaction the stockholders of the Company had indicated willingness to turn in a pro rata share of each of their holdings at *$15.00* a share in order to effect the purchase of the minority interest in National Cast Iron Pipe Company. That price had been set by the Board of Directors.

The book value as of January 11, 1935, was $174.91, making the $25 (multiplied by four, $100) 53% of book value, or 10% more than the Government accepted in 1933. The earnings were $10.-77; there were no dividends, and had been none since the $3 paid in 1932. There was over a million dollars in bonded indebtedness.

Mr. Kiddoo said that the $18.75 valuation a share put on the Harry Clow estate stock a year and a half previous to one of the transactions, should be given some weight, as tending to support the validity of the $25 price. He criticized plaintiffs' expert, Dr. Anderson, as taking the figures for the profitable part of 1934, the last five months, and starting on a monthly ratio as though the condition had existed all through the year, and came out with a figure of $84 a share, which was not computed on a reasonable basis. He testified that it was his opinion that the price of $25 a share for the 1250 shares sold on January 15, 1935, was a fair and reasonable price.[151]

Mr. Mason thought the $25 price on the first transaction was reasonable because the Company had been through

---

150. It is significant that even as late as September 19, 1936, the Federal Government was nowhere near as optimistic as to the true value of the stock as plaintiffs' experts, when in again valuing the stock, this time for the Linthicum estate, they concluded a price of $54.12 (38% of the 1936 book value of $141.33). The inventory dated December 14, 1942, for William, Sr.'s estate revealed ownership of 30,672 shares of common stock of par value of $12.50. In Charles, Sr.'s estate the 437½ shares were valued at $43,750, or $100 a share, and a similar valuation was placed on 1375 shares in the James C. Clow estate in December, 1916. (There

had been a 300% stock split in Feb. 1934).

151. In making this determination, he took into consideration the Company's finances, its earnings, its management, the nature of the Company's industry, prospects for the industry, the Company's position in the industry, the products of the Company, the extent and depth of the depression and its effect on business generally and the condition of the market for common stock, the attitude of the investors to common stock, the volume of trading, volume of new stock issues, preferred stock limitation, dividends, transferability and government policies.

four very bad years and had lost money in 3½ of those four years. In arriving at a value for a particular date one considered only what had transpired in the past: the Company had come close to defaulting on its bonds; the stock was completely unmarketable and all stockholders, including Mrs. Pryor, had agreed to sell for $15. Its backlog was 20% in January of 1935 to what it had been in January of 1934; the bonds were selling at a considerable discount from par and the preferred stock had sold at around $50 a share, including accumulated unpaid dividends of around $15 a share. Twenty-five dollars was a little better than five times the 1934 earnings and 7½ times the average earnings for the ten years 1925 to 1934. In the '30s, people were not buying on the price-earnings average, but on the Company's record.

Mr. Mason believed that in January, 1935, it would have been impossible to find any public buyer for this stock in the Company, with its financial position and with conditions that existed in January, 1935, and with the outlook, so that he concluded the $25 price was not only a fair price but a good one. He further said that the $15, which Mr. Johnson had said for the exchange on the pro rata basis was "within reason," and the $25 was "definitely on the high side." He said he felt that "somewhere in the range of $18–$22 would be nearer." [152] He pointed out the difficulty of looking back now and trying to put one's self into the position of a buyer in January, 1935.

Mr. Mason pointed out that the record on the preferred stock sales was meagre, there being one at $51 and one at $49 in late 1934, within a few months of the sale of the common stock. This price included the accumulated unpaid dividends, which at that time were around $15. He pointed out further that in Mr. Johnson's testimony he said that dealers on LaSalle Street had offered stock to him for sale at $50 and that

he had refused those offers and had bid $25. Mr. Mason went on to say that "with the preferred stock having actual sale at under $50, with the bonds having sold at a 13% discount for a short term bond all within a couple of months of this sale, I can conclude that the price of $25 for the common was a very fair price and a very good price." He said that there could not have been a public sale except in an "under the hammer" sale. He said neither firm he has worked for would consider underwriting a stock such as the Clow common at any price in January, 1935, with the Company in the financial condition it was in, with its record of three and a half year losses, and with $17.50 owing on back dividends on the preferred stock.

Mr. Sporrer, in arriving at a January, 1935, figure, put a low of $5 if one had tremendous confidence in the construction industry. On the high side, a capitalization factor of as much as 25% would be warranted by reason of the hazardous nature and one would come out with a figure of somewhere around $20 a share. He was mindful of the fact that the Internal Revenue Service had made a valuation of the Harry B. Clow stock. He had died in August, 1933. The executor had returned its value at $50 (before the four to one split, or $12.50 a share). Mr. Sporrer said he looked at the ten-year average for 1926 to 1935, which gave an average per share net earnings of $2.99, and he used a 20% capitalization factor. Taking this five times earnings, he came up with a figure of a value of about $15 on the low side, and if one takes the average of earnings of $15.56 for the two years 1934 and 1935, which was $7.78, and allowed a four times earnings factor then he came up with a value of roughly about $30 a share. He said he would have advised the trustee that any price she could get over $20 a share would have been a fair price for her to sell it at. He said he might have asked for $50 to start with, knowing the value and that he

152. At other times he testified that the $25 paid was a "fair price to pay for the stock at that time." He then added, "not fair, a good price for the stock."

would never get it, but hoping to get $30 or $20. He said he would not have settled for as low as $5 but would have probably held out for $15, feeling that he could have "justified that in good conscience" to anyone who might have been interested. He said that the $54.12 final figure in the Linthicum estate seemed to tie in somewhere at about a little less than seven times the average of the net income for the years 1934 and 1935.

Mr. Sporrer discarded the preceding five-year interval as a basis because of the three years of substantial losses therein, and took the ten-year period of earnings to level out the peaks and valleys in the earnings record, or else only using the one year preceding. Taking the 1934 earnings of $4.93 a share and applying a 25% capitalization factor he got $20 a share. He considered the earning capacity, the dividend paying capacity; the bonded indebtedness; dividend record; the preferred stock issue.

Mr. Stiegelmeier thought the $25 was well within the range of reasonableness. He was impressed by the determination, a year and a half preceding of the equivalent of $18.75 per share for federal estate tax valuation in Harry B. Clow, Sr.'s estate. He thought those valuations very reliable and similar to those arrived at in an arm's length transaction. He also took the market prices of seven well-known companies in the construction field on August 4, 1933 (the date of valuation of the Harry B. Clow, Sr.'s stock for estate taxes), and on January 15, 1935, and found that the prices of those stocks between those dates had increased on an average of 13.3%, or a median of 9.3%. Applying that same percentage of increase to the value of Clow stock on August 4, 1933, of $18.75 per share, he arrived at a value of the Clow stock of $21.24, using the average increase, and $20.49 using the median increase, both less than the $25 paid Mrs. Pryor.

Defendants deny there was a persistent campaign on the part of William, Sr. to acquire Mrs. Pryor's stock. Rather, they point out, she was in most straightened circumstances and offered to sell the stock so she could get dividend paying stock. At this time her Kansas City property was about to be foreclosed; her daughter-in-law was destitute and had been deserted and left with an infant child; Mrs. Pryor even had to borrow money to pay her own fare to California to consult with her son. The motivation for sale was her, and her family's need for money. William, Sr. got none of the stock; it went to the minority shareholders of the Company with which Clow Company was merging. They point out that plaintiffs even attack four previous purchases of stock by William, Sr. in 1908, 1911, 1917 and 1924—long before the first transaction with Mrs. Pryor in 1935—as indicative of his greed, raising his family's control from 30 to 51%. These purchases were all legal ones, long removed in point of time, and prove that his family, having 51%, did not need any more stock to have control.

Defendants point out that in 1934 before the first transaction, the volume of construction in the United States was 35% of 1928 and employment 21.6% of total labor force. In 1934, there was a loss for the first four months but then business increased and with inventory reductions and reductions in salary up to 40%, the Company showed a $216,-000 profit and liquidated its debt to the Bank. While sales improved they were not half of those of 1930 nor one-third of those of 1929. The increase in business that had occurred was due to Government financing of which there was no assurance of continuance.

Harry Clow testified that he had placed a value of $50 a share on the stock in his father's estate and the Internal Revenue had proposed a $150 valuation, and on conference in Washington, there was a compromise figure of $75, which would make the stock value, taking the split into consideration, of $18.75, in the Spring of 1935, a few months after the date of the first transaction.

Mr. Johnson [153] thought $25 was a perfectly satisfactory and fair price. He had placed the price at $15 for the pro rata valuation in the proposed surrender of Clow stock to effect the contemplated merger, which pro rata exchange was rendered unnecessary by virtue of this first transaction of Mrs. Pryor. The Board of Directors had discussed the pro rata price, the price range in discussion being from $15 to $25. The deposition of Mrs. Pryor shows that she did not suggest the prices for the stock and when the price was named, she accepted it, and did not suggest a different price but was satisfied with it.

In the Linthicum Federal Estate Tax return the 250 shares of Clow Company common stock, par value of $100 was returned at $54.121 or $13,530.25 in September, 1936. Kent, in writing to the First National Bank of Birmingham, Alabama, May 21, 1937, stated to its vice president that "I sincerely hope that Mrs. Linthicum is able to sell her Clow stock at $165 a share, and if she is able to do so I would strongly comply with your recommendation, but our company is not interested in the purchase of this stock at any such price, and I doubt whether you will find anyone else, in the face of the earnings record that we have made, who will be willing to pay such a price."

Another chart reveals names in which shares of common stock were registered from 1935 through 1938. The chart shows these percentages of holdings, and number of shares of stock:

| Date | William, Sr. | Mrs. William, Sr. | Total of both | Percentage of both | All William, Shares | Sr. Family Percentage |
|---|---|---|---|---|---|---|
| Jan. 1, 1935 | 2,234 | 2,000 | 4,234 | 14.11 | 15,582 | 51.94 |
| Jan. 1, 1936 | 2,234 | 2,000 | 4,234 | 14.11 | 15,582 | 51.94 |
| Jan. 2, 1936 | 2,234 | 2,000 | 4,234 | 14.35 | 15,582 | 52.81 |
| July 10, 1936 | 2,734 | 2,000 | 4,734 | 15.78 | 16,082 | 53.61 |
| April 28, 1938 | 2,734 | 2,000 | 4,734 | 15.98 | 16,082 | 54.29 |
| Dec. 21, 1938 | 3,834 | 2,000 | 5,834 | 19.69 | 17,182 | 58.00 |

It is thus evident that before the purchase of Mrs. Pryor's stock, William, Sr. and his entire family owned 51.94% and after the purchases were completed it owned 58%. His and his wife's personal holdings during the same period rose from 14.11 to 19.69%. It would therefore seem that power-wise all the assailed transactions did not materially affect the degree of control exercisable by the man they assert was so avid for control.[154]

The diary reveals that when William, Sr. offered $25 a share at a discussion on January 2, 1935, his son told him he should have offered only $20 a share. Also that Mrs. Pryor signed papers agreeing to sell 219 shares at $15 a share for her pro rata share if each stockholder were to turn in a like pro rata share, but she decided to sell the larger block of 1250 shares.

The perspicacious acuity of plaintiffs' attack on the various transactions is re-

153. He testified that he had procured all the consents which Mr. Murray informed him were necessary—William, Sr., Pearl Libby Clow and her son, James Beach Clow, and Harry B. Clow.

154. The 500 shares of common stock which the Company got from Mrs. Johnson on May 1, 1918, remained in the Company treasury for eight years and were sold in September, 1926, to Mrs. Kent Clow in exchange for 375 shares of preferred stock, and 350 shares to William Clow, Jr. The Company's books seem to indicate that on August 7, 1936, 250 shares of Paul Ivy, and on December 28, 1937, 125 shares of A. P. Finch, were reacquired by the Company as treasury stock and the 375 shares remained as treasury stock through 1938.

vealed by the "benefit" to William, Sr. and his brothers in the acquisition of 1250 shares in the first assignment by Mrs. Pryor to the Company, which shares were used to acquire the minority interest in the Company's subsidiary, National Cast Iron Pipe Company. They state the "book value of the Corporation's common stock was immediately increased by $4.63 per share, and the annual savings in taxes and other expenses were estimated to be an amount equal to 83¢ to $1.65 per common share annually. In the first acquisition of trust stock, William, Sr. also benefited directly by avoiding a reduction of his majority common stock position from 51.94% to 49.-78%." Of course, she was not giving this stock to the Company—she received $25 a share therefor, the Company paying $31,250. In practical voting operation the possibility of a reduction of voting power from 51.94% to 49.78% (the latter lodged in diverse holdings) could hardly be deemed a potent threat to control, nor a driving force to action to forestall its occurrence at all costs.[155]

Plaintiffs deny defendants' statement that the Clow brothers were the only market for the stock, there being no evidence to show what the potential market for the Clow stock was when Charles, Sr. made his will and when he died. The evidence only shows that the stock was held by James B. Clow and his sons. They further maintain the "restriction" could have had little effect on the marketability because there was only a ten-day waiting period before the stock could be sold to an outsider; the restriction did not apply to sales to others or gifts to anyone, and therefore a gift could always have been made of a share to an outsider and then a sale to him.

They point out how marketable the preferred stock was, and therefore the more valuable common stock would have been even more marketable. Its steady earning power would indicate marketability. Furthermore, until the time William, Sr. got a majority control, Mrs. Pryor, with any two brothers could have sold a stock control to an outsider, which possibility increased the practical marketability of the stock.

These statements of plaintiffs have a glimmer of plausibility, but under circumstances differing from those at the time Mrs. Pryor made the sales. True, "control" stock of a company has especial value, but the times must be ripe, the industry important, and live competition for that control. The testimony of Mr. Johnson was that the stock was offered to other of the Clow family but none wanted it. There is no evidence that any person other than a Clow family member wanted this stock in the depth of the depression. Even the bank which lent Mrs. Pryor money was dubious of the stock's use as collateral without a definite expression or commitment of its value.

Plaintiffs' witnesses, including Dr. Corliss D. Anderson, concededly possess extraordinary qualifications as economists. Dr. Anderson valued the common stock to be worth $84 a share, with no significant change in value between January, 1935, and February 18, 1935. He

155. The chart disclosing the per cent of shares present voted by William, Sr. invariably discloses well over the majority cast by him, long before his acquisition of Mrs. Pryor's stock, probably due in part to her forwarding to him her proxy. If he had this control theretofore there would be no inducement to acquire more just to ensure control. The chart reveals the per cent of shares voted by him as:

| | | | | | | | |
|------|--------|------|--------|------|--------------------|------|--------|
| 1928 | 78.47% | 1932 | 68.52% | 1936 | 71.48% | 1940 | 81.27% |
| 1929 | 77.78% | 1933 | 61.25% | 1937 | (William, Sr. abroad) | | |
| 1930 | 99.40% | 1934 | 64.94% | 1938 | 76.92% | 1941 | 81.06% |
| 1931 | 84.70% | 1935 | 69.06% | 1939 | 96.98% | 1942 | 82.03% |

This would not indicate much need for William, Sr.'s acquisition of more stock in order effectively to control the Company.

outlined his criteria in establishing value.[156]

Plaintiffs' next expert witness, Dr. John K. Langum, also possesses high qualifications. He deemed the value of the common shares to be not less than $150 to $170 a share during January, 1935.[157]

Defendants point out that Dr. Anderson's opinion of an $84 value per share was predicated only on the months of good earnings in 1934, projecting them for the year, and using a multiple of six for the price-earnings ratio, coming up with $84. He did not consider significant the fact that sales of the Clow stock were restricted, nor the unstable source of business due to Government spending.

As to Dr. Langum's figure of $150 to $170, this was arrived at by averaging price-earnings ratio of U. S. Pipe & Foundry and Warren Foundry & Pipe companies, which were from 21.5 to 24.1

times the $10.77, 1935 earnings, or $231.55 to $259.56, which he reduced one-third. He refused to take the 1934 earnings to calculate the January, 1935, value, because he deemed them inappropriate.

The book value from 1924 to 1928 based (a) on undivided profits and surplus of the Company and its subsidiaries, and (b) on only the surplus of the Company as shown by its audits are respectively:

| | (a) | (b) |
|------|----------|----------|
| 1924 | $332.31 | $463.36 |
| 1925 | 364.33 | 507.39 |
| 1926 | 416.77 | 557.74 |
| 1927 | 431.68 | 595.96 |
| 1928 | 532.94 | 601.87 |

Another chart reveals computations of book value computed according to the Company's balance sheets and taking into account accrued dividends in arrears on preferred stock, adjusted to equivalent 1935 shares:

| 1929 | $232.84 | 1934 | $174.91 | 1939 | $157.14 |
|------|---------|------|---------|------|---------|
| 1930 | 236.04 | 1935 | 186.49 | 1940 | 166.12 |
| 1931 | 219.80 | 1936 | 141.33 | 1941 | 187.52 |
| 1932 | 180.70 | 1937 | 140.49 | 1942 | 194.87 |
| 1933 | 174.37 | 1938 | 144.90 | | |

---

It is extremely significant to the Court that in the year 1933 when the book value stated above was $174.37, the Federal Government determined a value for estate tax purposes of $75 (or $18.75, taking into account the 4–1 stock split), or some 43% of book value, and in 1936, when the book value stated above was $141.33, the Government determined the estate tax value of $54.12.

In 1924, 458 shares of James B. Clow common stock were bought from Pearl Clow for $91,600 or $200 a share.

Mr. David H. Nelson testified that the entry in the Company's books reflects the turning in of 250 shares of common stock at $35,000, the 1929 contract cost on the Paul Ivy stock subscription account, which was cancelled in August,

156. Company in business for 55 years. Other facts to be considered were whether Company was well managed, whether aggressive; the financial statement; type of products, whether necessities, and whether apt to be in demand in future; the competitive situation; whether prices are regulated; whether raw materials are plentiful; the efficiency of the plant; past record of earnings and dividends. The most important consideration is the current earning power. He considered marketability of the stock important. He felt that a price-earnings ratio of six times earnings would have been justified, and six times $14 would be $84.

157. In his computations of value he considered the quality of earnings, book value and the general financial market trend (which was upward).

1936. That would be a price of $140 a share of persons buying the stock in 1929.

There can be no question about the first transaction whereby the Company acquired 1250 shares, which were utilized to effect the merger with the Company's subsidiary, National Cast Iron Pipe Company. The merger was brought about to achieve tax savings to the parent Company. Two and a half shares of Clow Company were exchanged for one share of National. A plan was first devised for all Clow Company stockholders to turn stock in on a pro rata basis at *$15* a share, which plaintiffs point out would have reduced William, Sr.'s family position from 51.94% control to 49.78% or a minority position, but acquiring all 1250 shares from Mrs. Pryor at *$25* a share avoided this reduction. While the avoidance of having his family interest fall below 50% resulted from this transfer yet the Court is not impressed that this was the motivating factor behind this transaction bound up as it was with other more plausible motivations.

If the truth be that Mrs. Pryor were divested of these shares being purloined by William, Sr. and the Company, why, on this first transaction did she not insist on turning in only the pro rata amount (and not the 1250 shares she did sell) at the lesser figure, which all the rest of the stockholders, as well as she, had agreed to do? Even as a trust beneficiary and trustee she had no right to be treated differently or better than other stockholders.

If the price of $15, as agreed to under the pro rata plan, was too low, why did the other and greater holders of stock agree to that price? At least some of those other stockholders possessed all that knowledge of the corporate affairs which plaintiffs claim Mrs. Pryor was deprived of and which prevented her holding out for a greater and more adequate price based on the Company's actual financial condition.

### The Second Transaction

The second transaction involved the sale of 500 shares at $30 in December, 1935, by Mrs. Pryor to the Company. Plaintiffs interpret the situation as one where Attorney Hafter had come to Chicago with a cashier's check for $13,-200 to pay Mrs. Pryor's debt to the Company and procure the stock which had been used as collateral. He was to take the stock back south to collateralize the loan made by the lender of the funds he had brought up, but William, Sr. maneuvered the sale of 500 shares instead for $15,000, giving a check for $1,434.11 for the balance over the debt, and letting her think the Company was acquiring the stock and concealing the fact that William, Sr. was really going to buy it.

Plaintiffs point to the sharp increase in earnings for the first six months of *1936*, which was known to William, Sr. when the Company transferred this stock to him, with corporate earnings of $25.86 a share for *1936*, and paid dividends of $11 a share, $5 in cash and $6 in *note*, maturing five years later. These notes were used by William, Jr. and family to reduce personal indebtedness to the Company. William, Sr. in July, 1937, purchased Mrs. Pryor's dividend note of $18,600 for $15,309, financed by the Company, which loan he repaid in January, 1938.

Mrs. Pryor and Attorney Hafter had planned that Mrs. Pryor's advances under the 1932 pledge agreement be paid by the sale of 500 shares of Clow stock for $15,000 to William, Sr., to which all agreed but then they changed their minds on returning to Greenville and planned to borrow the $15,000 from a Greenville bank. William, Sr. wrote in reply to this change on December 3, 1935: "Right now *I want to assure you that that will please me an almighty sight better than buying 500 shares of stock from you.*" Then Mr. Hafter came to Chicago, armed with proper credentials to take all *4,000* shares of Mrs. Pryor's trust stock back, which, with her U. S. Pipe and Foundry preferred stock, they were to put up as collateral for the $15,000 loan. Mr. Johnson told William, Sr. he thought that was a very dangerous procedure since he did not see how she could repay

the loan and she would lose her stock. William, Sr. dictated a letter to Mrs. Pryor, which Mr. Johnson then 'phoned and read to Mr. Pryor in William, Sr.'s presence. The diary reveals that Mr. Pryor said, "If Company bought for $15,000 the 500 shares they would not borrow any money—I told Earle say Co. would loan the money but Earle told him that we would take it up with Will and Kent."

Mrs. Pryor, pursuant to William, Sr.'s suggestion, had consulted with her Memphis lawyer, Attorney Walker, who wrote William, Sr. on May 23, 1935, of the "terrible jam" she was in unless she could get some relief on the Clow stock and *asking for a letter from the Company's lawyer giving his grounds for objecting to the purchase of the stock* so he could review it. William, Sr. had written to her on May 20, 1935, and, after saying he would not have the slightest objection to buying the stock if it could be done legally, said "Lawyer and auditor are set against my buying the stock. You have good lawyers in Memphis and *you can tell them the situation better than I can.*" (Italics supplied.)

The letter of William, Sr. of May 28, 1935, reflected that he was trying to help her out of her financial troubles and was aware that if she could hold out a little longer the Clow stock income would ameliorate her distress. He wrote:

> "The cold hard facts are that *I feel I would not sleep well if I made this purchase and profited by it.* I know your situation is desperate." (Italics supplied.)

He told her he believed the hard times were not going to continue much longer and suggested she make a list of all her debts and he would see what he could do. He continued:

> "I know the boys will agree with me in doing anything I possibly can to make you comfortable until such time as there may be a dividend paid on our common stock."

William, Jr. wrote her the same time saying he was glad his father felt he could not buy the common stock, and he felt that some time in the future her stock was going to have real value, although the year had been unprofitable so far, and of the possibility of a dividend next year. She replied on June 3, 1935, saying that most of her debts were three years old and were in the hands of collection lawyers. She sent a list of her debts and was lent $6,000 at six per cent (which was debited to the Company), making her total indebtedness to the Company approximately $12,500.

William, Sr. wrote Mrs. Pryor on June 7, 1935, after consultation with Mr. Murray, that in his opinion to save the estate a permanent trust should be established. He wrote: "*I suggest discussing the matter very fully with your husband.*" (Italics supplied.)

William, Jr. wrote her optimistically on June 13, 1935, that if they got business due to the new PWA bill, he would have good news for her. He also wrote her on that day that " * * * it is entirely up to your good self to make any decision in regard to the trust."

In the summer of 1935, Charles, Jr. came to live with Mrs. Pryor and they conferred with the firm of Wynn, Hafter & Lake as to Charles, Jr.'s personal problems, and as to what could be done under his father's will.

On October 7, 1935, William, Sr. wrote Mrs. Pryor the Company owed $1,163,500 on the old bond issue, $250,000 of which would be due before the end of the year; $250,000 on February 1, 1937; $256,000 on February 1, 1938, and $457,-500 on February 1, 1939. They also owed three years' dividends on the preferred stock. He wrote her she was "just as good a judge as I am of what that common stock is worth today." He wrote further:

> "I want you to settle it one way or the other—now. I made up my mind when we did not come to an understanding last time that I was through with it and I ought to stick to that right now, because when all is said and done I am in my 76th

year and *I have no right to dispose of dividend paying stocks to take up one that is not paying a dividend, no matter how attractive it might be in years to come."* (Italics supplied.)

On October 29, he wrote her:

"I did not like the idea of exchanging the stock and increasing my holdings in this company for all my arrangements have been made and were made some years ago. * * *I am assuming from one of your former letters that you have consulted an attorney and you are at perfect liberty to show him this letter that he may understand clearly my position."* (Italics supplied.)

Mr. Johnson on December 20, 1935, following a conference with Attorney Murray in the presence of William, Sr., advised Mr. Pryor that the Company *could legally transfer,* and would do so, the stock previously subject to the trust, to Mrs. Pryor, with form of consent to be signed by Charles, Jr., which he did sign and return.

No consents were obtained from the Clows to the second transaction because Attorney Murray for the Company deemed the consents no longer necessary in view of the November 18, 1935, assignment by Charles, Jr. of his interest to his mother.

As to valuation of the shares involved in the second transaction, defendants' experts concluded as to the $30 price thus: Mr. Kiddoo stated it was a "fair, reasonable price";[158] Mr. Sporrer felt the proper price was between $15 and $30, possibly between $15 and $20 a share; Mr. Stiegelmeier arrived at the price of $35 but thought $30 was fair. Mr. Harry B. Clow and Mr. Donald Douglas,[159] both directors in 1935, thought $30 was a fair price. The $30 figure was within the "realm of reason," Mr. Mason testified, and the range of fair value of the stock would have been $25 to $30, with $30 the "top side," as $25 was the "top side" of the earlier transaction. On this valuation he considered the same factors as previously, and additionally that the Company had made financial progress in 1935, having paid a considerable amount of its funded debt; it had paid regular dividends on the preferred stock, and had strengthened its working capital position.

Plaintiffs' witness, Dr. Anderson, testified that the value of the common stock per share on December 24, 1935, was $90, which was roughly eight and a half times the 1935 annual earnings. He pointed out the Dow Jones average had risen 40% in 1935. Dr. Langum found the January 2, 1936, value to be from $150 to $170.

As to the lack of confidential relationship at the time of the second transaction, the defendants point out that Mrs. Pryor visited with William, Sr. but once in 1935, after the January transaction, and was accompanied by Attorney Hafter, in November, 1935. She had discussed all the stock transactions with her husband and son. She had conferred with William, Jr. and Kent S. Clow. They point out that when she did not sell the 2500 shares she was interested in selling in January, 1935, William, Sr. wrote her on January 28, 1935, as to the other 1250 shares:

"So far as selling an additional number of shares to me for reinvestment,

---

158. He further testified the price was reasonable because the $30 figure was a 20% increase over the price paid at the beginning of that year. He did not consider the U. S. Pipe Company and Warren Foundry as comparable companies because of the inability to find a buyer for the stock of this character in this market.

159. Mr. Douglas testified that the statement was made at the directors' meeting that the price being paid was a lot higher than a previous sale. He said $30 was more than he would pay for the stock. He was interested in the value of the stock because his wife had a large block of it. Before the stock was sold to William, Sr., it was offered to others at a directors' meeting, but William, Sr., was the only one who agreed to take it. Mr. Douglas said he did not want it because he did not want to buy it at that price.

that is simply a question for your good self to decide, when you want an income in excess of $150.00 a month."

They further point out that when it was determined the Company would buy 500 shares of stock from Mrs. Pryor in December, 1935, the discussions were conducted not with Mrs. Pryor but Mr. Pryor.[160]

Defendant Company and Mr. Johnson point out in substantiation of lack of self-dealing on the second transaction, Mrs. Pryor's letter of December 21, 1935, (quoted infra) addressed to the Company and specifically confirming the sale to them. The books of the Company show that the purchase was not charged to his account, as were the loans. They concede that if a trustee deviously manages a purchase from the beneficiary by an intermediate sale to a third party for later transfer to him, the device is ineffective (Bogert, Trusts and Trustees, Sec. 543 (2d ed. 1960)). Here there was no agreement by William, Sr. to repurchase; Mr. Johnson raised the possibility of selling the treasury stock to get cash for the Company; the stock was offered to the other members of the family, but none wanted to purchase it. Mr. Johnson testified that the directors decided there was no point in holding the stock in the treasury, and after it had been offered to the other family groups who were not interested in buying any of it, it was sold to William, Sr. in July, 1936, at the same price of $30 a share. There was no testimony, defendants point out, of an agreement by William, Sr. to buy the stock from the Company, at the time Mrs. Pryor sold it to the Company.

Mrs. Pryor wrote on December 21, 1935, a confirmation of the sale of 500 shares at $30. She also wrote:

"Larry (Mr. Pryor) told me of his nice talk to Earl yesterday. I am sorry things have been so mixed up. I understood when I left Chicago that you or the Company would buy 500 shares of the Clow stock. * * * The borrowing the money at the bank was to get the stock down here where it could not be attached in Chicago. I thought then we could complete the sale of the stock.

"I am glad that Mr. Murray agreed that this transfer of the stock to me is perfectly legal. I can then rest in peace. * * * "

In 1935, the Company's combined net sales increased to $3,600,000; production was still about one-fourth of the 1927 peak year. There were losses for the first five months and the last month, but the entire year, 1935, showed net earnings of $391,585; there was sufficient to permit a dividend under the trust indenture, and a dividend of $3.50 was paid on the preferred, the first since February, 1932, but leaving an arrearage in preferred dividends of over $170,000 at the end of 1935. The Company borrowed $400,000, which with $69,000 of the Company's funds, they used to retire the February 1, 1936, and February 1, 1937, bond maturities, and in December, 1935, arranged with Continental Bank to borrow $800,000 to pay off the rest of the bonds.

It is the Court's conclusion that $30 a share paid by the Company to Mrs. Pryor, and by William, Sr. to the Company, for the stock involved in the second transaction, was a fair price. It was a 20% increase over the January price. The year 1935 was not too auspicious, with losses in the first five months and in the last month (but with an overall profit). A small dividend was paid on preferred stock, but there was still much owed on the preferred stock back divi-

160. The diary entry of November 22, 1935, stated that Hattie and her attorney came to the office: "Mr. Jerome Hafter of Greenville, Mississippi—lunch with them and Sid Murray ULC. Mr. Hafter stayed over to talk with Sid Murray." November 23, 1935: "Hattie phoned from ULC—offered her $15,000 for 500 shares Clow common stock—when I left for 3:03 she said she accepted and to send papers Monday."

dends, and with large bank loans made to retire bond obligations prematurely.

Mrs. Pryor had attorneys in attendance, with whom she could have conferred on the matter of valuation, but neither they, she, nor Charles, Jr. questioned the price stated by the Company, or asked that it be increased. There are statements of William, Sr. that he preferred not to buy the stock. It is quite probable that if Mrs. Pryor's original plan of withdrawing all 4,000 shares to lodge as security with the bank in the south, that, as Mr. Johnson feared, she would have lost the complete trust corpus and these present plaintiffs would be without their present inheritance. Mrs. Pryor and her attorneys wanted to sell the stock and wrote to ask what the Company's objections were to such a sale. She had been repeatedly advised by William, Sr. to consult with her lawyers and her husband. There can be no doubt she was in a "terrible jam" with her debts three years old and in the hands of collection lawyers. William, Sr. wrote her in summary the financial position of the Company, telling her she was as good a judge of its value as he.

Since the Clow Company did not get the consents contemplated under Charles, Sr.'s will, for the sale by the trustee of the stock, because of the trustee and beneficiary's document assigning his interest to her, plaintiffs cannot complain of such failure.

### The Third Transaction

This transaction involved the sale of 600 shares to the Company by Mrs. Pryor at $50 a share in April, 1938. The genesis for the need for this sale was in the Pryors' very large debt to the Southern Credit Corporation, secured by 1,000 shares of Clow common. They were unable to pay the debt because of the collapse of the cotton market. The Union Planters Bank, which had discounted the Southern Credit Corporation's loan to the Pryors, became concerned and made inquiry as to the Clow Company of Mr. Wynn and the Continental Bank.[161] Mr. Wynn made inquiry of Mr. Pryor who queried the Clow Company. Then the Southern Credit Corporation wanted the loan, secured by the Clow stock, cleaned up before February 1. They were advised by Attorney Wynn in early 1938 that their $11,000 loan from the Greenville Bank and Trust Company and the $23,000 loan from Southern Credit Corporation, both secured by Clow stock, needed a long time loan on the Clow stock because the debts could not soon be paid out of farming. Charles, Jr. was also seeking money from Mr. Wynn, who reported Charles, Jr. was "frantic." Attorney Wynn suggested Mr. Pryor get the money from "Chicago" but Mr. Wynn indicated that Mrs. Pryor did not want to go to the Clows again.

A letter of February, 1938, of inquiry for the benefit of the Southern Credit Corporation, addressed to Clow & Company sought a commitment from the latter as to whether they would bid the stock at $50 a share to establish a value, the stock not being liquid, and used to secure a proposed crop loan to the Pryors. William, Sr. replied he disliked seeing Mrs. Pryor jeopardize her 3100 shares in such a big farming proposition that in the case of failure might prove completely disastrous.

---

161. The Union Planters Bank was pressing Mr. Wynn for the clearing up of the Pryors' debt secured by the Clow stock, writing several letters in early 1938. Mr. Wynn received this strong letter dated March 31, 1938:

"Ike Wilson (Union Planters Bank) brought me over list of unpaid accounts at Blytheville this morning. Said he was disappointed that the Pryor loan had not been taken out of the Southern Credit Corporation.

*It was our promise to take this out when we arranged the loan and we want to do it if it takes hair, hide and all, so please get onto Mr. Pryor and tell him his loan must be paid in full and it must be done promptly before April 15th.*

"If the stock is as good as he says it is he should have no trouble borrowing money on it or sell enough of it to pay the account, so let's have it done. * * * "

Mrs. Pryor wrote William, Jr. asking about the prospects of dividends late in March, 1938, and he replied it was a hard question to answer, but asking her how $1 a share in June and the same in September would "fit your present requirements." He asked her what she felt she absolutely had to have and she could count on him to help her in any way possible consistent with the rights of other stockholders. He went on: "In fact, I think they will all join with me in wanting to stretch a point if it will be of any assistance to you."

These two diary entries of William, Sr. are of interest on the third transaction:

January 28, 1938: "L. Pryor called 10:00 a. m.—said loan company demanded payment $23,000 they borrowed and is due February 1. *EFJ said $50 share* and I offered that for 500 shares." (Italics supplied.)

April 8, 1938: "Hattie phoned asking to dine * * * *with her attorney.* * * * Hattie wanted to borrow $20,000 against future dividends. I said no—could not show any preferences. That I would buy 500 shares at $50 giving her $25,000 and will write her tomorrow offering to buy 500, 600 or 700 at $50, giving her $25,000, $30,000 or *maximum,* $35,000. She accepted $50 for 600 and Company bought the stock and I sent her check for $30,000 on April 29, 1938. EFJ said Sid Murray told him I could not buy the stock for six months. Will wanted me to let EFJ, JAB, Frank Egan and CJ Day each buy 50 shares and I take only 400." (Italics supplied.)

Mr. Johnson also testified that he had suggested the price of $50. Defendants' evidence showed the Company purchased the stock and held it in its treasury, with no understanding at the time of purchase that it would be bought by William, Sr.[162] Defendants also maintain that the

assignment by Charles, Jr. to his mother on November 18, 1935, being valid, she could deal with the stock as her own and it was not invalid for lack of any written consents because the 1935 document destroyed the trust and any reason for consent. The consent provision was for the benefit of a designated class of persons and their failure to object to a sale was the equivalent of consent. But, in fact, all the necessary consents were obtained, inasmuch as Mrs. Harry C. Clow, Sr. and her two daughters were not "heirs, devisees, executors and administrators" of Harry B. Clow, Sr.'s stock.

Defendants further maintain that at the time of the third transaction there was no confidential relationship between William, Sr. and Mrs. Pryor—he had seen her only once after December, 1935, and that was in April, 1938, when she came to Chicago with Attorney Wynn to borrow money or sell stock to pay Mr. Wynn's Southern Credit Corporation. She was being advised by her husband who came to Chicago in January, 1938, to try to borrow money to pay the loan.

Defendants point out that the need for the money was in no way related to the failure to pay dividends but to the collapse of the cotton market. She had in fact received from the Company in 1936 and 1937 $58,709 in dividends, less an amount charged her for discounting her dividend note.[163]

As to the evidence of value of the shares involved in the third transaction, plaintiffs' witness, Dr. Anderson, placed the value at $100, using the 1937 earnings of $15.01 and multiplying by a factor of 6⅔. Dr. Langum arrived at a figure of $100 to $140 a share by applying the average of the price-earnings ratio of the U. S. Pipe and Foundry Company, and Warren Foundry Company for 1938 and applying it to the 1938 Clow earnings of $14.28, with a resultant $158 and $215 a share, which, reduced by one-third, he

---

162. The defendants' evidence shows that the treasury stock was offered to all of the family interests and nobody was interested in purchasing it other than William, Sr. and the shares were sold to him.

163. She had also received $32,382 in 1937 when the preferred stock of U. S. Pipe & Foundry Company was called, making a combined total of $91,091.

arrived at a Clow value of $100 to $140. *He was using 1938 earnings when they could not yet be known.* Defendants assail this finding as the result of blindly adhering to a mechanical formula without the use of judgment.

Mr. Kiddoo testified that $50 was within the range of a fair value of the stock. He said the market for securities in the first half of 1938 was not good. The Federal Reserve Index of Production which had been 117 in August of 1937 had dropped in January, 1938, to 80 and a little lower in March. He took into account the fact that the Clow stock in the Linthicum estate was valued as of September, 1936, at about $54 a share and there was no reason to value it any higher in April, 1938, in that Clow earnings were substantially better in 1936. The April, 1938, earnings were substantially below what they had been in 1936 and 1937 as were the annual earnings. He laid more importance in the limited market for the stock and restrictions on sale of it than to book value and price-earnings ratio. The Dow Jones averages for April, 1938, were the lowest since June, 1935. Mr. Kiddoo also stated that while the Clow business was pretty well maintained due to heavy governmental expenditures, the general business in the first half of 1938 was not good. The $50 price fully reflected the improvement that had taken place in the Company's affairs since 1935.

Defendants' witness, Mr. Mason, also felt that the $50 a share price for the 600 shares, which the Company bought April 14, 1938, was a "fair and reasonable price." He pointed out that 1938 presented quite a different picture—the Company was out of debt, it had cleared up its dividends on the preferred stock, it had paid dividends on the common stock, totaling $5 in cash and $6 in notes in 1936, and $8 in cash in 1937. It had strengthened its working capital so that the stock was worth more in April, 1938. But business was not as good in 1938 as in two preceding years, dropping from $6,000,000 in 1936 to $5,700,000 in 1937,

and to $5,200,000 in 1938. The backlog had slipped from 4,220 in January, 1938, to 1,822 by April.

Defendants' witness, Mr. Sporrer, deemed the value of Clow stock in April, 1938, to be between $25 and $50, taking average earnings for ten years as $4.91 and five years as $12.59. At that time, there had been four good years after a loss year. Five times earnings of $4.91 a share gave the witness the figure of $24.55 or around $25 a share on the low side and if he took four times earnings of $12.59 he came out with a figure of $50.36. He said the Internal Revenue Service in arriving at a valuation of $54.12 in the Linthicum estate, the date of death involved being August or September, 1936, undoubtedly used the $10.72 a share for 1935, times five. Witness said he might have arrived at the $50 determination independently of the Linthicum appraisal.

Mr. Stiegelmeier, a witness for the defendants, thought the price paid was a fair and reasonable one, placing great reliance on the estate tax valuation in the Linthicum estate of $54.12 in September, 1936. He had taken the average price of the stock of seven test companies in April, 1938, and found they were 66.6% of the value on September 29, 1936, or the median instead of the average, 68.6%, which, applied to the Linthicum estate valuation, would give the Clow stock a value of $37 on April 24, 1938.

Mr. Douglas testified that he was satisfied that $50 was a fair price to pay for the 600 shares purchased in April, 1938. He stated he had been told in the directors' meeting that she wanted to sell the stock in spite of the excellent dividends which she had received in the previous year because she wanted to make an investment. The other directors, Earl Johnson and Harry Clow, also testified they felt the price of $50 was fair.

Defendants point out that evidently most of the proceeds of this sale were used to pay off the Southern Credit Corporation's loan and were not invested under the terms of Charles, Sr.'s will.

On the other hand, Dr. Langum testified as expert for the plaintiffs and found the April, 1938, value to be from $100 to $140. Dr. Anderson found the value at that time to be $100 a share, which figure is seven times the $14.25 earnings. Dr. Anderson did not know that there had been an $18.75 valuation placed on the stock in August, 1933, in the valuation of Harry Clow's estate. Furthermore, in figuring value he looked forward rather than backward and disregarded the losses in previous years. He conceded there would be a very limited market for stock like Clow Company where it was family-owned.

As to the economic situation at the time of the 1938 transactions, there had been a 1937 recession, when the index of low-priced common stocks fell from a high of 200 earlier in the year to a low of 75, and the high grade common stocks fell from 115 to 85. During the first half of 1938 the low-priced common stocks continued to decline to a low of about 60 and in April of 1938 the Dow Jones average reached its lowest since June of 1935. Employment in construction was the lowest at the end of 1937 since the fall of 1935 and by the end of the last quarter of 1938 it had not recovered to the lowest level of 1936.

In 1937, the Company's pipe production fell from over 66,000 tons to 53,000; sales declined by more than $400,000 to $5,424,236. Earnings of $518,000 were reported before the extraordinary deduction for the coal lands writeoff. The Company stayed current on its preferred dividends, paid $8 per common share and prematurely retired $300,000 of notes with the Bank, ending with a debt of $200,000 to it.

The first quarter of 1938 was the most profitable for the Company since before the depression, and the Company prematurely paid in January its $100,000 note to the Bank due July 15, 1938. In February, the Company paid its regular semi-annual dividend on its preferred stock, and in March paid $1 on common and paid off the last $100,000 note due to the Bank on September 15, 1938, so that the Company was out of debt to the banks at the end of March.

Defendants feel "It is preposterous to claim that detailed knowledge of the salaries and bonuses and advances and loans to officers and key employees were of any relevance or materiality to this sale, or that if all the details had been given to her it would have made any difference in Mrs. Pryor's decision to sell the stock, or to sell it at a particular price."

Defendants also point out that when Mrs. Pryor needed money it was Mr. Pryor who came to Chicago in January, 1938,[164] to procure it and then she came with Mr. Wynn in April, 1938.[165] As defendants point out, Mr. Pryor was prominent in acting for her and was consulting Messrs. Wynn and Hafter. They contend that if there was any pressure on Mrs. Pryor to sell the stock it was by Mr. Wynn, president of her creditor (and also her own attorney). They feel it was the

164. Mr. Pryor reported to William, Sr. at this time that the Loan Company demanded payment of the $23,000 the Pryors had borrowed.

165. She came to Chicago with Attorney Wynn, April 8, 1938, asking for a loan of $20,000 against future dividends, which was refused. William, Sr. offered to buy 500 shares at $50 giving her $25,000, enough to pay off Southern Credit Corporation. He wrote her he would take up to 800 shares at $50 saying: "It is immaterial to me which you accept." She replied by wire, April 15, 1938: "*Charles, Larry and I had Conference.* Decided Would Appreciate If You Buy 600 Shares My Stock. Would Put Us Out of Debt. * * *" Then William, Sr. conferred with Mr. Murray who thought it proper that the Company buy the stock and not William, Sr. William, Sr. wrote her shortly that he was advised he could not buy the stock, that the Company would have to do so, and that they were to "*decide among yourselves* just what you want to do and then let us close the transaction in a way that is entirely satisfactory to your good self." Mrs. Pryor executed a written confirmation of the sale on April 28, 1938, which Charles, Jr. approved, and the consents of the Clow family were also obtained. (Italics supplied.)

pressure by Southern Credit Corporation to pay the $23,000 loan that was the motivating force behind the sale. The Company states it had sound, good business reasons for not lending $20,000 to Mrs. Pryor, against future dividends, in January or April of 1938.

There was evidence that there was no agreement that William, Sr. would repurchase the stock from the Company, at the time of its sale to the Company; it was offered to all the stockholders of the Company but only William, Sr. was interested in purchasing it at $50. There is evidence that the stock was offered to Harry and Beach Clow.

The Court is convinced on this third transaction, as it was on the prior ones, that the evidence soundly points to the integrity and honesty of William, Sr. and the Company and other defendants in the fixing of the price of $50 for the stock which Mrs. Pryor sold at that time because of her dire necessities. It is evident that William, Sr. did not fix the $50 price, that Mr. Johnson did. William, Sr. was not pressing for as large a purchase from Mrs. Pryor as possible; he gave her the option of selling the size block which would meet her financial needs. They were willing to manage a small common stock dividend if it would solve her problems.

The Government had valued the stock two years before at $54 at a time more favorable for business generally than the time of the third transaction, although the Company position was more sound. The weight of the evidence therefore clearly points to the adequacy of the price the Company paid Mrs. Pryor for the block of stock purchased on the third transaction.

### The Fourth Transaction

In the last transaction, Mrs. Pryor sold 500 shares to the Company at $50 a share in July, 1938.[166] The directors of the Company decided that in order to relieve the Company of debt it should prepay one-half of the 1936 dividend notes due in 1941, on May 31 and the remaining half on June 28, and it would not pay a common stock dividend in June. William, Sr. wrote Mrs. Pryor on June 15 that he felt a dividend of $5 on the common stock would be paid before the end of the year. He stated:

"No use telling you again that I was sorry you decided to sell your stock. However, that was a decision that you had to make and I couldn't be too insistent upon it for the reason that I might be wrong, namely—you might make more out of selling your stock and going into the cotton business than you would have made out of keeping the stock."

*Mr. Pryor* came to Chicago on June 23, 1938, with a common stock certificate for 500 shares which he offered to the Company at $50 a share. *Mrs. Pryor was in California.* William, Sr.'s diary reveals the purchase[167] and said William, Jr. objected to the purchase. The proceeds were split, $1,000 being sent to the Greenville Bank, $9,000 to Mr. Pryor, and $15,000 deposited in Mrs. Pryor's name at the Northern Trust Company. No proceeds were invested by her under the will of Charles, Sr.

The expert testimony as to the valuation of this block of stock reveals that

166. On February 9, 1940, Mr. Pryor wrote Mr. Johnson of Clow Company stating that Mrs. Pryor's income tax for 1938 was being questioned as to the $25,000 reported loss on the 500 shares she sold to the Company in 1938, on the basis of $100 value when the stock was acquired, and asking him for support of the valuation. He sent a reply showing there had been a four to one split of the original stock. A certified public accountant wrote a letter back that the Internal Revenue Service wished information on the book value or market value on March 1, 1913, and he was forwarded the balance sheet as of February 1, 1913.

167. Diary entry of June 23, 1938: "Larry Pryor came. Had 500 shares Hattie's stock which I bought at $50 a share for Company. Larry sent paper for Hattie's signature. We kept stock. Will objected to my buying." Diary entry of September 9, 1938: "EFJ and Murray agreed to my buying 300 shares Clow common. * * *"

Mr. Sporrer determined that the valuation he made would be the same as on the third transaction because the few months' interval therebetween would make no difference. He disregarded Dr. Anderson's approach saying he never used a period of only six months out of a year as a basis where there had been losses in several of the other months. He did not approve of extracting the six best months and then proceed to project that, to annualize it. He said it did not make "sense." Mr. Kiddoo also felt that the fourth transaction's value was similar to the third, and $50 was a fair price.

Mr. Mason determined the price of $50 was fair and reasonable; he noted the earnings for the first half of the year 1938 were a bit less than that of the first half of the preceding year. He also noted that while there had been some improvement in business generally, that was not true of the Clow Company. Their earnings for the first half of 1938 were less than those for the first half of 1937; there being a decline of *32.6%*. The earnings were off almost one third in the same comparable period. However, the stock market and the Dow Jones average had moved up slightly.

Mr. Stiegelmeier testified the price of $50 was a fair price, using the Linthicum valuation of $54.12 of September, 1936, and applying the percentage of the change in the market price of the stock of his seven test companies, he reached a figure of $45, the test companies' market price on July 1, 1938, being 80% of their market value on September 29, 1936.

Plaintiffs' witness, Dr. Anderson, thought the value of the stock in the fourth transaction was $120 a share, which he determined by multiplying the 1937 earnings of $15 by eight. He did not mention the 1937–1938 recession.

Dr. Langum testified that the value of the Clow stock on July 1, 1938, was $130 to $140, using average price-earnings ratios in June, 1938, of U. S. Pipe, and Warren Foundry, and applying them to the full 1938 earnings of Clow of $14.-25, producing $202.35–$216,60, which he reduced by one-third, resulting in a valuation of $130 to $140. Dr. Langum testified that he considered the quality of earnings, book value, and the general financial market trend, which was upward.

Plaintiffs stress the fact that as to this last transaction, the transfer of the treasury stock to William, Sr., which ran his immediate family's control to 51.94%, no opportunity was given to the other stockholders, especially Mrs. Pryor as trustee, to acquire any of the stock, and no resolutions of the Board of Directors or the stockholders authorized the action, and the price paid was nominal—as " 'control stock' it had an exceptionally high value."

The defendants maintain that the fourth transaction was without prearrangement for William, Sr.'s later purchase of the stock. It became treasury stock and was offered to other stockholders in September, 1938, but none wished to purchase it. Defendants claim that all persons within the testamentarily designated class actually consented in writing to the sale, in that Mrs. Harry C. Clow, Sr. and her two daughters were not "heirs, devisees, executors and administrators" of Harry B. Clow, Sr. Consents of William, Sr., Pearl Libby Clow, J. Beach Clow and Harry B. Clow were noted on Mrs. Pryor's confirmation of the sale.

Defendants deny the existence of a confidential relationship on this fourth sale, negotiated by Mr. Pryor while Mrs. Pryor was in California.

As in the other transactions, the Court concludes that the price paid Mrs. Pryor by the Company was a fair one in view of the various factors, considering the Linthicum valuation for Federal estate tax purposes, and the substantially lesser earnings of Clow Company for a comparable preceding period.

*Liability as Trustee by Virtue of Corporate Officer and Director Capacity*

Finally, plaintiffs assert the liability of some of the defendants as trustees by

virtue of their being officers and/or directors of the Clow Company during some or all of these transactions.

One of the most recent expositions of the law of Illinois appears in the decision of the Illinois Appellate Court in Precision Extrusions, Inc. v. Stewart, 36 Ill. App.2d 30 at p. 42, 183 N.E.2d 547 at p. 552, where the Court said:

"It is generally held that a director of a corporation, though not responsible for errors of judgment, is a fiduciary charged with the duty of caring for the property of the corporation and of managing its affairs honestly and in good faith. If this duty has been so violated as to result in an impairment of its assets or loss of its property he can, without the aid of statute, be compelled to make restitution. 3 Fletcher, Cyclopedia Corporations, sec. 1011, p. 514, (Perm Ed.). Directors are liable for misappropriation of funds where they act *ultra vires* in authorizing the corporation to purchase its own stock. 3 Fletcher, Cyclopedia Corporations, sec. 1022, p. 529 * * *."

In Anchor Realty and Investment Company v. William E. Rafferty, et al., 308 Ill. App. 484 at p. 498, 32 N.E.2d 394 at p. 400, (1941), the Court quoting from Corpus Juris Secundum, stated:

" ' * * * [a] director is not a trustee in a technical or unlimited or universal sense. Moreover, *he is not a trustee as to individual shareholders, so as to preclude him, according to the weight of authority from dealing with individual shareholders in respect to the sale or purchase of their shares.*' " (Italics supplied.)

And 308 Ill.App. at p. 499, 32 N.E.2d at p. 401, the Court said:

"It must be admitted, of course, that for certain purposes a corporation, its officers and directors are trustees for the stockholders, but not for all purposes. * * * '*Officers of a corporation may purchase the stock of stockholders on the same terms and as freely as they might purchase of a stranger.*' * * * "*There is no confidential relation between him and a stockholder, so far as a sale of the stock between them is concerned; and so long as he remains silent, and does not actively mislead the person with whom he deals, the transaction cannot be set aside for fraud.*" ' " (Italics supplied.)

In Shlensky, et al. v. South Parkway Building Corporation, et al., 19 Ill.2d 268, at p. 278, 166 N.E.2d 793 at p. 799 (1960), the Illinois Supreme Court said:

"This court, in conformity with the practically universal judicial opinion, has recognized that directors, or other officers of a corporation, occupy a fiduciary relation toward it."

19 Ill.2d at pp. 282–283, 166 N.E.2d at p. 801, it said:

" * * * The contrary rule, urged by defendants, whereby those attacking the transactions of fiduciaries would have the burden of establishing its unfairness or fraudulency is not only without substantial support in the case law, but would put a premium on sharp practices by directors by putting the onus of proof on their victims, and would also tend to further separate corporate management from ownership.

"In contrast, the rule of the Geddes and Winger cases, insofar as it provides that the directors shall have the burden of establishing the fairness and propriety of the transactions, not only protects shareholders from exploitation, but permits flexibility in corporate dealings."

Fletcher, Cyclopedia Corporations, Perm.Ed., Sec. 1168.1, states:

" * * * The older or so-called majority rule laid down by one class of decisions is that 'while directors occupy a trust relation to the corporation which they direct, their duty does not apply to the stockholder in the sale and purchase of

stock. \* \* \* *In buying or selling stock, directors may trade like an outsider, provided they do not affirmatively act or speak wrongfully, or intentionally conceal facts with reference to it.* There is also the qualification that no other relation of trust exists between the parties.' The numerical majority of the decided decisions have adopted the rule that *courts do not impose upon officers and directors of a corporation any fiduciary duty to its stockholders which precludes them, merely because they are officers and directors, from buying and selling the corporation's stock. In short, there is no absolute prohibition against a director's acquiring stock by purchase from a stockholder.* And when the evidence shows that the stockholder not only placed no reliance on any act or statement of the director but, on the contrary, conducted his own investigation for the purpose of establishing an acceptable price, the director is entitled to purchase the stock without being called upon to account for any subsequent rise in the market price thereof. \* \* \* The reason for the majority rule is: '*The books of the corporation are open to all stockholders, and each may inform himself of the condition of the company.*'" (Italics supplied.)

In the recent Illinois Appellate Court case, Henry's Drive-In, Inc. v. Anderson, 37 Ill.App.2d 112, at 122, 185 N.E.2d 103, at 107 it was stated:

"The law is uncontroverted that corporate officers and directors owe a duty to the corporation to take no advantage of their position for their financial gain in derogation of the corporation's rights. \* \* \*"

It was stated in Wood v. MacLean Drug Co., 266 Ill.App. 5, 13, that the president and director of the company was a trustee for the stockholder and therefore in a fiduciary and confidential relation requiring him to disclose all facts within his knowledge, and he could not retain a benefit acquired by a breach of that duty or use knowledge to obtain a bargain from the complainant-stockholder. The Court said at p. 14:

"\* \* \* 'The management of the business and property of a corporation is entrusted to its officers, and they are empowered to act for the whole body of stockholders. They therefore occupy the position of trustees for the stockholders as a body in respect to such business and property, and cannot have or acquire any personal or pecuniary interest in conflict with their duty as such trustees. *A director, however, does not sustain that relation to an individual stockholder with respect to his stock,* over which he has no control whatever, but he may deal with an individual stockholder and purchase his stock practically on the same terms as a stranger. \* \* \* Beatty did not sustain such a trust relation to the complainant, as an individual stockholder, as would prevent him, in the absence of actual fraud, from purchasing the stock.'" (Italics supplied.)

It was held that the purchase of the stock was for the company and not for the directors themselves and therefore there was a trust relation which required the divulgence of all the facts, which, not having been done, required a voiding of the sale and retransfer of the stock. There was a failure in this case to disclose the pendency of the negotiations for the sale of the company. Plaintiffs rely on this Wood case as authority to support their claim.

In Chatz v. Midco Oil Corp., 152 F.2d 153, 155, Judge Kerner stated:

"\* \* \* To be sure, officers and directors of a corporation are trustees for the stockholders with respect to the business and the property of the corporation and in the management of its affairs. They cannot have or acquire any personal or pecuniary interest in conflict with

their duties, but *the trustee relationship does not extend to a stockholder in respect to his individual stock certificates,* over which the officers have no control. *Courts do not impose upon officers and directors of a corporation any fiduciary duty to its stockholders which precludes them, merely because they are officers and directors, from buying and selling the corporation's stock,* Securities and Exchange Commission v. Chenery Corporation, 318 U.S. 80, 63 S.Ct. 454, 87 L.Ed. 626. *A director may deal with an individual stockholder and purchase his stock practically on the same terms as a stranger.* Hooker v. Midland Steel Co., 215 Ill. 444, 74 N.E. 445, and Bawden v. Taylor, 254 Ill. 464, 98 N.E. 941." (Italics supplied.)

The Court of Appeals recently held in Duane v. Altenburg, 297 F.2d 515 at p. 519 (7 Cir., 1962):

"Illinois law requires 'a strong showing' to impute dishonesty and mismanagement to directors of a corporation. Goldberg v. Ball, 305 Ill.App. 273, 282, 27 N.E.2d 575, 579. * * * The strong showing required can not be avoided by invoking federal diversity jurisdiction."

In Jamieson v. Chicago Title and Trust Co., 33 Ill.App.2d 477, 179 N.E.2d 844, Abstract Opinion No. 48469, the Illinois Appellate Court said:

"Directors and other officers, while not trustees in the technical sense in which that term is used, occupy a fiduciary relation to the corporation and to stockholders. At common law, and by modern current of authority in this country and in England, the directors of a private corporation, while not regarded as trustees in the strict sense, are considered in equity as bearing a fiduciary relation to the corporation and its stockholders. * * * In other words, it is universally recognized that courts of equity treat the rela-

tionship of director and stockholder as a trusteeship, in order to determine the rights, duties and liabilities of the directors."

(Similarly, Dwyer v. Tracey, 10 F.R.D. 115 (D.C.Ill.))

Plaintiffs maintain that William, Sr. as a controlling stockholder and a principal officer and director of the corporation had a fiduciary duty to Mrs. Pryor as trustee in her capacity as a stockholder to give her adequate information about the corporation's affairs and the value of the stock purchased from her. They insist on the existence of an Illinois rule making the officers and majority stockholders trustees for the minority interests. (Lebold v. Inland Steel Co., 125 F.2d 369, 372 (7th Cir., 1941)) In commenting on the cited case in James Blackstone Memorial Library Association v. Gulf, Mobile and Ohio Railroad Company, 264 F.2d 445 at p. 450 (7th Cir., 1959), Judge Major said: "These cases furnish support only for the proposition that majority stockholders of a corporation occupy a fiduciary relationship toward minority stockholders and, when purchasing their shares, are under an obligation to divulge all material facts." The Court went on to say that there was no duty to inform the minority of possibility of sale of corporate property to government which was not a necessarily reasonable probability at time of negotiation. In Duane v. Altenburg, et al., 297 F.2d 515, 519 (7th Cir., 1962), Judge Castle, speaking for the Court said:

"Illinois law requires 'a strong showing' to impute dishonesty and mismanagement to directors of a corporation."

The defendants deny that William, Sr. as an officer and director violated a fiduciary relationship to Mrs. Pryor as a stockholder. They cite Fletcher, Cyclopedia Corporations, Secs. 1168.1 and 1168.2 to support their contention that a director's or officer's purchase of a stockholder's stock is not that of a fiduciary since purchasing stock is not a corporate function. There are, concededly,

exceptional circumstances where the official with knowledge of special facts or circumstances is rendered a fiduciary (Strong v. Repide, 213 U.S. 419, 29 S.Ct. 521, 53 L.Ed. 853 (1909); Wood v. MacLean Drug Co., 266 Ill.App. 5 (1932); Agatucci v. Corradi, 327 Ill.App. 153, 63 N.E.2d 630 (1945); Northern Trust Co. v. Essaness Theatres Corp., 348 Ill.App. 134, 108 N.E.2d 493 (1952)). They point out there were no special circumstances known to William, Sr. or the Company's officials which were unknown to Mrs. Pryor.

It cannot be gainsaid that "A director is a fiduciary. * · * * So is a dominant or controlling stockholder or group of stockholders. * * * Their powers are powers in trust. * * * Their dealings with the corporation are subjected to rigorous scrutiny and where any of their contracts or engagements with the corporation is challenged the burden is on the director or stockholder not only to prove the good faith of the transaction but also to show its inherent fairness from the viewpoint of the corporation and those interested therein." (Pepper v. Litton, 308 U.S. 295, 306, 60 S.Ct. 238, 245, 84 L.Ed. 281 (1939)) And, as plaintiffs point out, Judge Lindley said in Lebold v. Inland Steel Co., 125 F.2d 369, 372 (7th Cir., 1941): "* * * [M]ajority stockholders of a corporation represent it and its minority stockholders. * * * If when he votes he does so against the interest of his company, against the interest of his minority and in favor of his own interest, by such selfish action, by omission of fidelity to his own duty as a trustee, he forfeits approval in a court of equity. * * * [N]o legislative enactment could endow them with the right as trustees for the minority stockholders to take over for their own, through any legal device, plan or method all assets and all business of the company for which

they were fiduciaries, if to do so was clearly and obviously against the best interests of the company and the minority stockholders."

It is the Court's conclusion that while an officer or director is generally not a fiduciary to a stockholder whose stock he purchases, absent fraud and concealment, in this case no director or officer has been shown to have been guilty of any fraud or concealment to either Mrs. Pryor, Charles, Jr. or Mr. Pryor or any of their attorneys, all of whom were given such information as they rarely sought. It was perfectly apparent that all parties contemplated that Clow family members had the right to purchase any shares offered for sale, by virtue of the by-law and will provision. A devastating depression had been experienced; no one could foretell if it were completely over, nor when prosperity would return with any degree of permanency. There was no market for the stock in this closed corporation. The Government on two occasions evaluated this stock. Defendants' prices approximated those evaluations. The fact that plaintiffs' experts some twenty years later, in times of market boom, with experience of the intervening years to sustain their evaluations, arrive at far greater figures, is not convincing to the Court of the soundness of their calculations. The Company's and William, Sr.'s conclusions seem well founded under all the contemporaneous economic facts of the Nation and the Company.

The Court, finding all the issues of fact and law in favor of the defendants and against the plaintiffs, concludes that the cause of action should be dismissed at plaintiffs' costs. The defendants are directed to submit a consolidated findings of fact and conclusions of law and order consistent with this opinion within twenty days.